UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-30014-MAP

| | |
|---|---|
| THE MERCY HOSPITAL, INC., ) <br> Plaintiff ) <br> ) <br> vs. ) <br> ) <br> MASSACHUSETTS NURSES ) <br> ASSOCIATION, ) <br> Defendant ) | **BRIEF IN SUPPORT OF** <br> **PLAINTIFF'S MOTION TO** <br> **VACATE ARBITRATION AWARD** |

## STATEMENT OF THE CASE

This is an action under 29 U.S.C. §301 (The National Labor Relations Act) and 9 U.S.C. §10 (The Federal Arbitration Act) to vacate an arbitration award. The plaintiff and the defendant are parties to a collective bargaining agreement. Pursuant to that agreement an arbitration was held on February 21, June 10, 11, 12 and July 2, 2003, before Arbitrator S.R. Butler, under the auspices of the American Arbitration Association. The arbitrator entered an opinion and award dated December 22, 2003. The award ordered the reinstatement of the grievant, Nancy Dufault, together with back pay and interest. The plaintiff filed this complaint on January 23, 2004. Plaintiff now files this Motion to Vacate the Arbitration Award.

## STATEMENT OF FACTS

The plaintiff and the defendant are parties to a collective bargaining agreement (Complaint, para. 3). The defendant, Massachusetts Nurses Association, is the representative of all registered nurses at Mercy Hospital (Complaint, para. 2).

1

On August 29, 2002, registered nurse Nancy Dufault, a member of the bargaining unit, was terminated for "failure to adhere to the standards of narcotic/controlled substance administration - suspected drug diversion." (Exh. 1, p. 2). The arbitrator referred to this as "specifically failure to administer certain drugs that doctors had ordered for five (5) different patients under her care (Exh. 1, p. 2). By itself, this was a considerable understatement of the allegation since the Hospital's accusation was that Ms. Dufault had, according to the Hospital's computerized record of controlled substances, consistently removed controlled substances without being able to account for their proper use and in amounts exceeding the proper dosage (Exh. 2, pp. 4-5).

The Hospital did not specifically contend or attempt to prove that Ms. Dufault was a drug user or that she was impaired at work. The Hospital's position was that it had a legal and ethical obligation to monitor the use of controlled substances at the Hospital and that it could not ignore the failure to follow proper procedures in the dispensing of those controlled substances in circumstances where withdrawal of excess drugs in Ms. Dufault's care, left those substances unaccounted for, and suggested diversion. The Hospital did not know what Ms. Dufault was doing with those excess drugs, but there were at least three possibilities:  (1) taking them for her own use; (2) taking them for the use of someone else (without prescription); or (3) giving an overdose to the patient. There was no way the Hospital could determine which of those possibilities were the reason - but it didn't matter, since all of those possibilities were unacceptable.

The grievant had been a registered nurse at Mercy Hospital since 1977 and had worked the night shift in the Intensive Care Unit (Exh. 1, p. 2). In 2001 the Hospital introduced a computer system called "Omnicell" for the purpose of monitoring the use of controlled

substances and other medications. It was required to do so, as the use of controlled substances is strictly regulated under federal and state law. *See eg, 21 U.S.C. §301 et seq; 21 U.S.C. §801 et seq, M.G.L. c. 94C §1-48, M.G.L. c. 112 §80B, 244 CMR §9.03.* Omnicell was a locked cabinet containing the controlled substances and medicines used in the Hospital and its access was controlled by an attached computer. Nurses who were responsible for administering prescribed medications to patients would obtain the medications by entering their code and the patient's code into the computer and requesting the prescribed drug (Exh. 1, p. 3). The computer would then open access to the cabinet for the amount of the substance requested (Exh. 1, p. 5). It contemporaneously recorded and kept a record of the nurse opening it, the substance taken, the amount of substance withdrawn, the patient and the time (Exh. 1, p. 3)[1]. The nurse would then administer the drug and record its administration in a separate computerized medical record referred to either as "MAR" or "SMS" (Exh. 1, p. 3). This computerized medical record was the official medical record and was used by doctors and nurses on the floor to verify what medications had been given to the patients (Exh. 3, Tr. Vol. I, p. 59, Vol. III, pp. 162-165, Vol. IV, pp. 19-21, 68-72). Administration of medication was also sometimes recorded by nurses in nursing notes which included other information.

In June, 2002, a supervisor, who was charged with monitoring the Omnicell records, noticed an unusually large amount of Ativan (also known as Lorezpam), a controlled substance, had been withdrawn all at once by Nancy Dufault. The supervisor, Jean D'Espinosa, discussed this with Ms. Dufault and decided not to take any action because she found Ms. Dufault's explanation acceptable given her years of experience (Exh. 1, p. 4). For some reason, the

---

[1]The nurse could not manipulate the time or amount recorded in the Omnicell - it was kept automatically. There was no dispute as to the accuracy of these items at the hearing.

3

arbitrator recounts this incident as a "discrepancy between what the records showed the grievant

had withdrawn from the Omnicell and what had been administered" (Exh. 1, p. 4). There was no

testimony of a discrepancy *on this occasion* between the amount withdrawn and the amount

administered (Exh. 3, Tr. Vol. I, p. 23). Ms. D'Espinosa had not at that point examined any

medical records regarding administration, she had only been informed of the withdrawal of an

usually large amount of Ativan as recorded by the Omnicell (Exh. 3, Tr. Vol. I, p. 22-26). The

arbitrator goes on to find that again in July of 2002, "apparent disparities" were found (Exh. 1, p.

4). However, this again was not a matter of disparities between the medical record and the

Omnicell, but another discovery from Omnicell of an unusually large amount of a controlled

substance being withdrawn all at once (Exh. 3, Tr. Vol. I, p. 22-26).[2]

At that point the supervisor (D'Espinosa) had nurse Cindy Gallant review the medical

records of Ms. Dufault's patients to see if the withdrawals corresponded to the amounts

prescribed and administered to the patients. What she then found were a large amount of drugs

being withdrawn that were not administered to patients according to the medical record (Tr. I, p.

26). The supervisor presented this information to her supervisor, Mary Brown, Director of

Medical Surgical Nursing (Exh. 3, Tr. Vol. I, p. 27).

Ms. Brown placed Ms. Dufault on administrative leave pending further investigation

---

[2]In the context of this appeal, the arbitrator's incorrect statement about the testimony may seem trivial or irrelevant, but it is not. The implication of the arbitrator's version of the initial discovery is that the Hospital found discrepancies between withdrawals from Omnicell and administration to the patient - but did nothing more than make a casual inquiry and make a quick acceptance of the grievant's explanation, as if a discrepancy between a withdrawal and administration was not necessarily regarded as significant. In truth, the mere fact that so much Ativan had been withdrawn all at once, on two occasions, in and of itself caused enough alarm for the Hospital to make a full investigation of the medical records. It was then that the discrepancies were discovered.

(Exh. 1, p. 4). The grievant was told, and obviously understood, that there was a discrepancy

between her withdrawals from Omnicell and the medical record (Exh. 1, p. 4-5). The Hospital

investigated Ms. Dufault's Omnicell records for the period of time from April 1 to August 21.

Comparison of these records with the medical records of the patients revealed numerous

disparities which could be summarized as follows:

- Ativan and Morphine withdrawn by Ms. Dufault without any record of administration to the patient;

- multiple withdrawals of Ativan with a record of it being administered, but no record of the dose administered;

- withdrawals of Ativan or morphine from the Omnicell made several hours after the medical record showed an administration to the patient had already occurred.

- two situations where the grievant, when working with a nurse in training, withdrew the prescribed dosage of a drug, when the trainee had already withdrawn the drug and the trainee had administered it, with no record of Ms. Dufault administering what she took out (which would have made for a double dose if she had);

- a withdrawal of Ativan for a patient that the grievant was not responsible for, with a corresponding withdrawal and administration by the responsible nurse;

- withdrawal of a double dose with a record of administering a single dose and no record of a waste of the additional drug; and

- withdrawal of large amounts of morphine in excess of the prescription, with no record of the dose given the patient.

A meeting was then held with Ms. Dufault where Mary Brown presented to her, together

with the supporting documentation, the Hospital's findings as to the discrepancies (Exh. 4).

Present with Ms. Dufault was her union (MNA) representative. Ms. Brown showed Ms. Dufault

the records in question and asked for her explanation (Exh. 4). Ms. Dufault gave a variety of

responses either admitting she must have failed to record an administration of the drug, that she

failed to record a waste (where an excessive amount had been withdrawn) or that she "had no answer for that" (regarding her withdrawal of a dose of Ativan for a patient who was not her patient and whose nurse had already withdrawn and administered the proper dosage) (Exh. 4).

The arbitrator quotes Ms. Dufault's testimony that suggested she couldn't remember the events because they were two months prior and she was not shown the names of the patients (Exh. 1, p. 5). The arbitrator seems to adopt this explanation as acceptable even though in the very same statement Ms. Dufault says she was shown the Omnicell and SMS (the official medical record) records which indisputedly do show the patient's names. Those documents were in evidence and obviously the arbitrator knew they showed the patient's names.

The findings of fact make reference to Ms. Dufault's asking questions about the flow sheets and nurses notes. (The actual testimony was that she questioned this regarding two of the incidents, not all of them (Exh. 3, Tr. Vol. II, 72-76)). Much is made of this by the arbitrator who goes on to state in the "opinion" that the Hospital "refused" to give the grievant these notes (Exh. 1, p. 10). What the findings of fact do not state (nor could they since the evidence was undisputed on this point) is that neither Ms. Dufault or her representative ever *asked* or said they needed to see any other document other than the Omnicell and medical records that were being shown to her.[3]

Likewise, the union representative present with Ms. Dufault did not request to see any

---

[3]Although in reading the opinion, one would think that Ms. Dufault must have asked for and been denied these nursing notes at the time, it is clear that the arbitrator understood and agreed she never asked for them, or suggested she could answer the questions with them. Footnote 1 on page 10 carefully refers to this as "refusing to provide her with copies of these notes even after she asked *what they said.*" The arbitrator clearly understands that Ms. Dufault never asked to see these notes and never said to the Hospital that she needed to see them to give an explanation. She was told what the notes said or didn't say (Exh. 4).

other records (Exh. 3, Tr. Vol. I, pp. 72-80, 92, 131-132). The same is true of the second meeting on August 29th (Exh. 4). She again was represented by an MNA representative, asked one question about her notes, was told they did not contain an explanation, and did not ask to see anything (Exh. 3, Tr. Vol. I, pp. 92-95, 72-80, 131-132). Neither did the MNA representative ask (Exh. 3, Tr. Vol. I, pp. 72-80, 92-95, 99, 131-132). In the time between the two meetings, neither Ms. Dufault nor the MNA asked to see her nursing notes, or suggested they were necessary for her to respond.

A second meeting was then convened on August 29, 2002. Again, the grievant was represented by the MNA at the meeting (Exh. 4). Ms. Brown confronted the grievant with the fact that the IV bag or bottle drip that she claimed she had used had been discontinued. (Exh. 3, Tr. Vol. I, p. 128). Ms. Dufault said she "had no answer"; "I cannot recall that", and "I really think that is what I did". (Exh. 4). At the same time, even the MNA representative, Mr. David Powers, expressed incredulity at the grievant's explanation for how she used the existing drip to deliver the medication ("You did what?"). (Exh. 3, Tr. Vol. I, p. 99).

The conduct of these two meetings as described above, was not materially disputed at the arbitration hearing. Ms. Dufault asserted that at least at the first meeting, she was upset and could not recall some of the incidents. (Exh. 3, Tr. Vol. I, pp. 72-80). However, no one disputes that at the time she was informed of the charges, the grievant did not request to see or review any records to jog her memory, or to attempt to explain them further. Neither she nor her union representative suggested that she needed either time or information to furnish an explanation. There was no dispute that the grievant offered no more of an explanation than is indicated in Exhibit 4.

Ms. Brown then asked the grievant if she would like to speak privately with anyone at the

7

meeting, including the Human Resources representative. (Exh. 3, Tr. Vol. I, p. 152). Ms. Brown

did this so that if Ms. Dufault wanted to discuss any issue of substance abuse in private, she

could. (Exh. 3, Tr. Vol. I, p. 152). The Hospital did not accuse Ms. Dufault of abusing drugs

herself, it had no way of knowing what she was doing with the missing drugs. (Exh. 3, Tr. Vol.

I, p. 151-153).

Ms. Brown then decided to terminate the grievant and she explained her decision as

follows:

> ... Since there was no plausible explanation that I could see for any of this; there
> was so many cases where medication was taken out, documented it had been
> given previously; the comments about bolusing through the IV could not be
> accurate because the IV had been discontinued; there were too many discrepancies
> that point without any explanation. So the decision was made to terminate,
> mainly for failing to adhere to our administration policy and suspected drug
> diversion. (Exh. 3, Tr. Vol. I, p. 131).

Following her termination, Ms. Dufault filed a grievance under the collective bargaining

agreement. The process provided Ms. Dufault with additional opportunities to explain the

discrepancies. Still, neither she nor the MNA requested to see any other records or attempted to

provide any other explanation (Exh. 3, Tr. Vol. III, pp. 151-156). Only after the matter was

submitted to arbitration did the Union make a request for records that would include the nursing

notes. The arbitrator's statement in the opinion that the grievant did not have "time to pour over

the records" is completely unfounded: the grievant had weeks to do so - if she'd ever asked for

them, but neither she nor the Union did ask.


## THE ARBITRATION AWARD

The arbitrator's opinion never addresses the core matter at issue: the fact that there were

multiple instances where Ms. Dufault removed more medication from the Omnicell than was

8

called for by the doctor's orders, and that she withdrew medication that didn't correspond to any order at all. This is not something which can be explained by a tired nurse writing down the wrong time of administration at the end of the day.

In this vein, the award states that the Hospital had lead Ms. Dufault to believe "that she was being accused only of poor documentation, or questionable nursing practices." (Exh. 3, p. 11). A footnote states it is "undisputed that the grievant was not informed of the drug diversion charge until she was handed the termination notice." (Exh. 3, Tr. Vol. II, p. 3). This is a serious distortion of evidence. As the Hospital pointed out in its brief, *Ms. Dufault* asked, when placed on leave, whether she was being accused of taking drugs (Exh. 3, Tr. Vol. I, p. 69). Secondly, while a *few* of the scenarios questioned at the meetings of August 27th and 29th could be construed as documentation issues, most of them clearly involved excessive withdrawal of controlled substances. For instance, incidents 2 and 3 in Exh. 4 present *three* occasions where one nurse had withdrawn the proper dosage and gave it to the patient (according to the record) and yet Ms. Dufault made a duplicate withdrawal for the same patient with no record of administration. (And if she had, it would have been an overdose.) *Obviously* the question was, "Why are you taking duplicate doses and where did the extra drug go?" That is not a documentation issue. It is a "What did you do with the drugs?" issue.

Nor does the Opinion address any of the allegations in detail. The Hospital presented multiple (8) scenarios involving ativan and morphine for which there was no apparent logical reason provided by the grievant for her actions. Instead, the opinion mocks the whole concept of proper documentation of controlled substances and ignores the fact that Ms. Dufault could not provide explanations for what became of the excess withdrawals of drugs she made. Nurses, the opinion states, cannot be expected to accurately record their administration of controlled

9

substances:

> "This also corroborates the Grievant's testimony that she may have mis-stated the
> times and/or amount(s) of dosages when she did her paperwork at the end of her
> shift; if she was operating mostly from memory by that time it would be surprising
> if she *could* remember *exactly* what she did when over the course of a twelve hour
> shift."[4]
> (Exh. 1, p. 13)

The further assertion that, because a doctor sometimes talks to nurses about medication

given the patient, there is therefore no need to document it again makes a mockery of the legal

requirements for handling controlled substances as noted below.

The arbitrator then makes fun of Hospital witness Patricia Duclos-Miller, a registered

nurse who was the Director of Quality Improvement and president of the Connecticut Nurses

Association, who testified as to fundamental proper nursing practices (Exh. 3, Tr. Vol. I, pp. 31-

41). The arbitrator placed her use of the term proper in quotation marks with respect to the

handling of controlled substances:

> "The second witness called on rebuttal, Patricia Duclos-Miller, testified that it was
> not "proper" for nurses to record the administration of controlled substances in
> nurses' notes, and it was not "proper" to take out additional medications ahead of
> time or to use a discontinued i.v. drip where the physician's order was for an i.v.
> push, and that extra narcotics (i.e. those not administered) should be wasted in the
> presence of (and counter-signed by) another RN. This testimony, while credible,
> is non-dispositive. It in no way disproves the Grievant's testimony that she (and
> other RN's) occasionally deviate from proper procedures by using short-cuts or by
> helping each other out during breaks, and so forth." (Exh. 3, pp. 13-14)

Of course, the "proper" procedures described by Ms. Duclos-Miller are part and parcel of

the statutory and regulatory requirements for the handling of controlled substances (see below).

---

[4]Common sense dictates that this is not true. The very same medical record being filled
out by the nurse contains the physician's order stating when and how much medication should be
given. *If* one had administered that, they need only refer to those orders to determine what time it
was given.

The arbitrator also dismisses Nurse Kathy Hutchins' testimony as to the implausibility of the grievant's explanation of why she withdrew a large dose of ativan at 2 a.m. (when the patient had received the prescribed dose hours before) on grounds that what Ms. Dufault said she did was not "impossible or medically lethal" (Exh. 3, p. 14).[5]

The theme is the same throughout: it does not matter what the "proper" procedures are for handling and administration of controlled substances, if its not "lethal" and it's "not impossible" then a nurse should not be disciplined for doing it.

## ARGUMENT

I.    THE STANDARD

While arbitration awards are entitled to deference despite errors of fact or law, they are not free from challenge if they violate public policy.  A court may not enforce a collective bargaining agreement that is contrary to public policy.  *W.R. Grace and Co.* v. *Rubber Workers*, 461 U.S. 757, 766 (1983).  In *United Papermakers Int'l Union AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 43 (1987) the Supreme Court held:

> A court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."
> *Id., at 43*

An employer challenging an arbitration decision reinstating an employee based upon the

---

[5]This incident, not addressed in any detail by the arbitrator, requires somewhat lengthy treatment because the nurse's explanation is so convoluted.  Plaintiff attaches its arbitration brief which addresses this issue based on the *grievant's* testimony, at pp. 12-17.

public policy exception must establish two things: (1) a well defined and dominant public policy; and (2) that the arbitrator's decision is contrary to that public policy. Several federal courts have vacated arbitration decisions on public policy grounds. *See, e.g., Russell Mem'l Hosp. Assoc. v. U.S. Steelworkers of Am.*, 720 F.Supp. 583 (E.D. Mich. 1998) (vacating an arbitration award reinstating a nurse who failed to properly administer medication to a patient on grounds that the award violated the state's public policy of ensuring safe and competent nursing) ; *EXXON Corp. v. Esso Workers Union, Inc.*, 118 F.3d 841 (1st Cir. 1997) (vacating arbitration award reinstating truck driver who tested positive for cocaine on grounds that it violated public policy against employees performing safety-sensitive jobs while under the influence); *Delta Air Lines, Inc. v. Air Line Pilots Assoc.*, 861 F.2d 665 (11th Cir. 1989) (vacating an arbitration award reinstating an airline pilot who flew a plane while intoxicated on public policy grounds); *Iowa Elec. Light & Power Co. v. Local Union 204 of IBEW*, 834 F.2d 1424 (8th Cir. 1987) (vacating on public policy grounds an arbitration award that reinstated nuclear power plant employee who deliberately breached safety protocol); *U.S. Postal Service v. Am. Postal Workers Union*, 736 F.2d 822 (1st Cir. 1984) (upholding vacation of arbitration award reinstating postal employee convicted of embezzling postal funds); *Almagated Meat Cutters v. Great W. Food Co.*, 712 F.2d 122 (5th Cir. 1983) (vacating on public policy grounds an arbitrator's award reinstating a truck driver charged with operating a truck while intoxicated). Additionally, at least one state court has vacated an arbitrator's reinstatement of a nurse on the grounds that it violated a "well-defined and dominant public policy in favor of safe nursing care." *Ill. Nurses Assoc. v. Bd. of Trs. of the Univ. of Ill.*, 741 N.E. 2d 1014, 1023 (Ill. App. Ct. 2001).

II    THE ARBITRATOR'S AWARD VIOLATES WELL ESTABLISHED AND EXPLICIT
PUBLIC POLICIES AND SHOULD BE VACATED.

Here the arbitrator's award violates standards much more explicit than just safe nursing

care. The use of controlled substances is highly regulated under state and federal law. *See*

*generally 21 U.S.C. §301 et seq., 21 U.S.C. §801 et seq., M.G.L. c. 94C §1-48.* The

Commonwealth also provides for particular standards for the conduct of nurses:

> Each nurse licensed by the Board and engaged in the practice of nursing shall
> have knowledge and understanding of the Standards of Conduct for Nurses set
> forth in 244 CMR 9.00, all state laws and Board regulations governing the
> practice of nursing, and all other state and federal laws and regulations related to
> the practice of nursing.  . . .
>
>
> Adherence to Standards of Nursing Practice. A nurse licensed by the Board shall
> engage in the practice of nursing in accordance with accepted standards of
> practice.  . . .
>
> > (a) A nurse who holds a valid license shall comply with M.G.L. c.
> > 11: §§74 through 81C, as well as with any other laws and
> > regulations related to licensure and practice. Examples of such
> > laws include, but are not limited to, the following:  . . .
> >
> > 8.    M.G.L. c. 94C (Controlled Substances Act - requirements for
> >        possession, dispensing, administering, and prescribing controlled
> >        substances);  . . .
>
> (10)  Acts within Scope of Procedures. A nurse who holds a valid
>        license and is engaged in the practice of nursing in Massachusetts
>        shall perform acts within the scope of nursing practice as defined
>        in M.G.L. c. 112, §80B and 244 CMR 3.00. . . .
>
> (35)  Security of Controlled Substances. A nurse licenses by the Board
>        and engaged in the practice of nursing shall maintain the security
>        of controlled substances that are under his or her responsibility and
>        control.  . . .
>
> (37)  Unlawful Acquisition and Possession of Controlled Substances. A
>        nurse licenses by the Board shall not lawfully obtain or possess
>        controlled substances.

(38)    Administration of Drugs. A nurse licensed by the Board shall not administer any prescription drug or non-prescription drug to any person in the course of nursing practice except as directed by an authorized prescriber.   . . .

(39)    Documentation of Controlled Substances. A nurse licensed by the Board shall document the handling, admission, and destruction of controlled substances in accordance with all federal and state laws and regulations and in a manner consistent with accepted standards of nursing practice.

*244 C.M.R. §9.03*

These explicit standards are repudiated by the arbitrator's opinion whereby the Hospital is prohibited from disciplining a nurse for violation of these very standards. Nancy Dufault was terminated for "failure to adhere to the standards of narcotic/controlled substance administration - suspected drug diversion" (Exh. 3, p.6). The arbitrator finds that Ms. Dufault did indeed fail to adhere to the proper standards and at a minimum does not dispute that such failure gives grounds to suspect diversion, but excuses those failures. The arbitrator finds that the nurse in this case:

- misstated the time and amount of dosages of controlled substances she administered (Exh. 3, p. 13). *See 244 C.M.R. §9.03 (39)*

- failed, completely on some occasions, to record her administration of controlled substances in the medical record (SMS/MAR) where it was to be properly recorded (Exh. 3, pp. 12-15). *See 244 C.M.R. §9.03 (35) (39)*

- withdrew "additional" medications prior to the time they were needed (Exh. 3, pp. 12-15). *See 244 C.M.R. §9.03 (35) (39)*

14

- used a "drip" discontinued by the physician to deliver a controlled substance to a patient, i.e., in the opposite of the manner prescribed by the physician.[6] (Exh. 3, pp. 14-15). *See 244 C.M.R. §9.03 (38)*

- further ignores the fact the Ms. Dufault failed to document and have witnessed (by signature) the waste of narcotics or controlled substances where more was withdrawn than was necessary.[7] (Exh. 3).

Each of these actions is specifically prohibited by the regulations. Maintenance of the security of controlled substances required proper documentation and adherence to procedures for waste (*244 C.M.R. §9.03 (35) (39)*). Drugs are to be administered only *as* directed by an authorized prescriber (*244 C.M.R. §9.03 (38)*), not by shortcuts.

Nowhere in the statutes or regulations is such conduct excusable on grounds that no one was killed. The Hospital has an obligation to follow the law and to maintain proper procedure for the use of controlled substances. The arbitrator says is cannot enforce that standard.

These are not generalized concerns about the public interest or even just patient safety,

---

[6]This is no mere technicality. Even the arbitrator notes it was not "good practice" because of the difficulty of controlling the speed of injection into the body. The arbitrator makes it seem as if this was just a disagreement about methodology or an accepted shortcut. What she leaves out of the opinion is that Ms. Dufault *agreed* it was an improper practice and that Ms. Hutchins testified that the method used would have delivered the medication at *nine* times the proper speed. (Exh. 3, Tr. Vol. IV, pp. 57-58). Failure to give the medication in the manner prescribed by the physician is specifically prohibited by *244 C.M.R. §9.03 (38)*.

[7]This too is no technicality. It is specifically prohibited by *244 C.M.R. §9.03 (39)*. Often times medication comes in sizes larger than the prescribed dose. Consequently, nurses are required to give the required dose only and with a witness present and signing off, waste the remainder *and* record the waste in the Omnicell. The arbitrator neglects to include in her opinion the undisputed fact that in the entire time period examined in her Omnicell record, the grievant never *once* recorded a waste. Without adherence to these required procedures any nurses could continually take additional narcotics, and "claim" it was waste, and there would be no way to dispute it.

15

although those issues certainly are implicated. This case involves an arbitrator mockingly dismissing specific regulatory standards for the use of controlled substances by registered nurses.

It may be claimed that the arbitrator's "due process" analysis provides an independent basis for the award that does not violate public policy. This is not so. What the arbitrator creates as due process requirements would completely frustrate a hospital in monitoring the use of controlled substances. The arbitrator holds that even though the grievant didn't ask to see any further records, they should have been immediately given to her anyway. This would mean that in order to investigate a discrepancy, a hospital would have to provide copies of all the complete medical records for a nurse to review before it is allowed to take action, merely on the off chance that the nurse might have reason to look at them. Such a standard would frustrate reasonable attempts to monitor the use of drugs. Ms. Dufault was provided *two* meetings where she was represented where she was confronted with the evidence against her and given the chance to explain. No one suggested then that she needed time or more documents. She had further opportunity to explain in the grievance process. The further suggestion by the arbitrator that the hospital should not be able to reference events just two months old further stifles proper investigation. Not every discrepancy can be uncovered immediately. Looking at an event that is two months old is not regarded as unfair in any other context. It should not be here.

## CONCLUSION

For the reasons stated above, the Court should vacate the arbitrator's award and enter judgment for the plaintiff.

16

MERCY HOSPITAL, INC.
BY ITS ATTORNEY

Date:   June 30, 2004

Maurice M. Cahillane, Esq.
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121
BBO# 069660


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served this _3 0_ day of June, 2004, on all parties, by First Class Mail, postage prepaid, to:

Mark A. Hickernell, Esq.
McDonald & Associates
153 Cordaville Road, Suite 210
Southborough, MA 01772

Maurice M. Cahillane

0423-020804\72121.wpd

17