grievant made a duplicate withdrawal at 11:51 p.m., without any record of administration of that dose, which in any event would not have been due at that time and would have constituted an overdose if it were given.

In this case, the grievant claims that there was "miscommunication" between her and Ms. Iwasinski as to who would document the administration of the medication and that Ms. Iwasinski should have, but failed to document an additional administration of Ativan by Ms. Dufault.[8] The additional 2 mg. of Ativan, Ms. Dufault says, was inadvertently not recorded. (Vol. II, p. 148). The order was for 2-4 mg. to be given PRN every 2 hours. Ms. Iwasinski gave 2 mg. at 10:00 p.m. (Vol. II, pp. 147-150). Ms. Dufault says that the patient then became agitated and that she and Mrs. Iwasinski decided that the patient could receive an additional 2 mg. and still be medicated again at 1:00 p.m. as scheduled. (Vol. II, pp. 147-150). "The orientee and I calculated the math." (Vol. III, p. 105) In fact, 4 mg. was given at 1:00 a.m., withdrawn and documented by Ms. Iwasinski (Hosp. Exhs. 6, 7). The problem with this explanation is that the alleged undocumented administration at 11:51 p.m. would mean that the patient received 6 mg. in two hours from 11:51 p.m. to 1:00 p.m. That represents an overdose. Even if 2 mg. could have been given at midnight without exceeding the maximum dose, the next administration could not have exceeded 2 mg. To this, the grievant responded "....so, we did the math wrong" (Vol. III, p. 106).

The "math" that Ms. Dufault claims both she and Ms. Iwasinski "did wrong", consisted of $2+2+4 = 8$. Ms. Dufault asks us to believe that *two* registered nurses, deliberately calculating doses they were giving, incorrectly came to the conclusion, that $2+2+4$ equaled 6. It is a highly improbable explanation at best, for a situation where Ms. Iwasinski's withdrawal and recorded

---

[8]Hospital policy was in fact that the nurse administering the drug was to document it.

18

administrations match the Omnicell and the physician's orders, and Ms. Dufault's withdrawal corresponds to nothing. Ms. Dufault is further asking us to believe that Ms. Iwasinski, who documented all the other administrations properly, just coincidentally missed the one Omnicell withdrawal that does not, in fact, correspond to the physician's orders.

Again, the grievant's improbable explanation compels the obvious conclusion that she took the opportunity to take the drugs when there were two nurses working with one patient and, without careful tracking, the additional withdrawal might never be missed.

Incident 2B.

This incident occurred on July 17, 2002 and is summarized in Hospital Exhibit #7 and documented in Hospital Exhibit #6. It concerns the same patient as Incident 2A and the same physician's order. However, at the time at issue, the patient, B.B., was not Ms. Dufault's patient, but Michelle Lunds'. Here again, there are duplicate withdrawals of Ativan by Ms. Lund and Ms. Dufault, and Ms. Dufault's withdrawal at 7:42 p.m. of 2 mg. of Ativan does not correspond to any documented administration. More significantly, it is not her patient. For this incident, Ms. Dufault has, in fact, no real explanation. She states that she cannot specifically remember the incident (Vol. II, p. 153). She then speculates as to what might have happened, arguing that it was a change of shift and that Michelle Lund might have been receiving a report when Ms. Dufault withdrew the 2 mg. from Omnicell at 7:42 p.m. However, in the same statement, Ms. Dufault says report would be from 7:00 to 7:30 p.m. (Vol. II, pp. 152-154), contradicting the assertion that she could have been helping with Ms. Lund's patient at 7:42 p.m. while Ms. Lund was taking report. In addition, if this is why Ms. Dufault removed the Ativan from Omnicell at 7:42 p.m., it fails to explain why Ms. Lund would then remove 4 mg. of Ativan at 8:12 p.m. and

19

administer it. It was, after all, Ms. Lund's patient and Ms. Lund documented the administration in SMS/MAR. Ms. Dufault's "explanation", based solely on her own speculation, is that Ms. Lund must have, between 7:42 p.m. and 8:12 p.m. secured a new physician's order (never recorded) to increase the dosage and therefore took out additional Ativan (Vol. II, p. 155) There is *nothing* in the record to support this, but it is apparently the only explanation Ms. Dufault could conceive of in the face of the record.

Here again, the obvious explanation is diversion; where the grievant removed drugs for a patient who was not hers, concerning which there is no record of administration, and where she offers only a fanciful and speculative explanation (and originally no explanation at all), it is fair for the hospital to conclude that an improper diversion occurred.

Incident 2C.

This incident also involves the patient B.B. and occurred on July 17, 2002. This is also summarized in Hospital Exhibit #7. The situation is quite similar to Incident 2A which occurred the night before. For the second night in a row, the record shows that Ms. Iwasinski withdrew an appropriate dose and properly recorded its administration (Hosp. Exh. 7). Shortly thereafter, Ms. Dufault withdrew the same dosage from Omnicell with no record of its administration, and if it had been administered, it would have constituted an overdose. Here, Ms. Dufault's explanation for a second consecutive discrepancy is that she withdrew the medication without knowing Tawnia Iwasinski already had. (Vol. II, p. 158) She says Ms. Iwasinski saw her and stopped her. (Vol. II, p. 158) Ms. Dufault claims that they consciously decided not to return the surplus medicine to the Omnicell on the *chance* that the patient might become agitated by an x-ray to be

given early in the morning and that the patient might therefore, need extra medication.[9] Ms. Dufault then says that she administered the additional Ativan and morphine at 5:15. (Vol. II, pp. 161-163) The 5:15 time is indicated on nursing notes, though never recorded in the SMS/MAR, as it should have been. Here again, the grievant asks us to believe that Ms. Iwasinski forgot to make a record in SMS/MAR for a drug supposedly administered by Ms. Dufault when Ms. Iwasinski had properly documented her administration in SMS/MAR in every other case. Apparently, Ms. Iwasinski was only failing to record in SMS/MAR the drug administrations that coincidently appear as surplus drugs withdrawn by Ms. Dufault.

Beyond this, the "explanation" fails because administration of another 4 mg. of both Ativan and morphine at 5:15 would have been an overdose. Would both nurses consciously decide to overdose the patient with two drugs, one a narcotic, on the *chance* that the patient would be agitated by an x-ray, where there was no physician's order for additional medication?

The timing of the withdrawal by Ms. Dufault makes no sense either. The medication was due at 4:00 a.m. when Ms. Iwasinski withdrew it and administered it. Ms. Dufault did not withdraw hers until 4:26 a.m. If she were withdrawing the medication that late, why would she not have checked either the SMS/MAR or the nursing notes, both of which clearly showed administration at 4:00 a.m.

Confronted in cross-examination with the fact that a 5:15 a.m. administration would have been a serious overdose, Ms. Dufault then claimed that the time reference in the nursing notes might not be accurate at all (Vol. III, pp. 110-115). In defense of this, Ms. Dufault claims that she just put it in the flow sheets, perhaps without an accurate time, to remind her to document in

---

[9] For which it should be added, there was no physician's order.

21

SMS/MAR (Vol. III, p. 115). This, of course, contradicts her testimony that she believed SMS/MAR was only for charging patients and that, therefore, the time and dosage did not matter. But here she is saying that the *nursing notes* are not accurate as to time of administration, meaning that there is no place where Ms. Dufault believed she had to accurately record her administration of medication as to time and amount.

Again, Ms. Dufault's explanation lacks credibility and compels the obvious conclusion: she was withdrawing additional and unnecessary drugs from the Omnicell for no apparent patient purpose, but for her own purposes.

Incident 3.

This incident occurred from May 21, 2002 to May 30, 2002, and concerned the patient M.G. It is summarized in Hospital Exhibit #9 and documented in Hospital Exhibit #8. On five separate days over this period of time, Ms. Dufault withdrew *double* the dosage ordered by the physician, recorded no waste, and only twice recorded any administration of the medication. All of this left, at a minimum, 8 mg. of Ativan unaccounted for.

Ms. Dufault explains that in some of these instances she recorded an administration of 1 mg. in the nursing notes, but not in the SMS/MAR where it was required to be (Vol II, pp. 168-172). Some of these entries did not show the amount given (Vol. II, p. 170) and in two instances she admits to an overdose by giving 2 mg (Vol. II, pp. 171-172). This means that on three consecutive days, Ms. Dufault "forgot" to have her waste witnessed and recorded and that on two subsequent days she over medicated a patient whom she knew was being given what she described as an "unusual" order for only 1 mg. (Vol. II, 166). Furthermore, the 5/29 entry on the SMS/MAR shows a 1 mg. administration. The grievant's explanation, therefore, is that on

22

multiple occasions within a nine-day period, she "forgot" to witness and record her waste three or four times, "forgot" to record her administration in the SMS/MAR three times and "forgot" the proper dosage two times. The unlikelihood that so much would be forgotten for one patient over so short a period of time seems highly unlikely and again compels the conclusion that Ms. Dufault was in fact taking additional drugs.

Incident 4.

This incident occurred from May 4, 2002 to May 7, 2002 and is summarized in Hospital Exhibit #11 and documented in Hospital Exhibit #10. Here, patient, R.V., was prescribed 2-4 mg. of morphine per hour. On four separate occasions, during this time, the SMS/MAR record shows administration of the morphine *before* it has been withdrawn from the Omnicell. Withdrawals were consistently made after administration already occurred, without a corresponding subsequent administration.

Ms. Dufault claims that these discrepancies resulted from her failure to regard the SMS/MAR system as anything other than a charging or billing system, resulting in her only "guesstimating" the proper time, resulting in discrepancies from Omnicell. It is certainly remarkable that if Ms. Dufault's problem was her lack of concern about recording time and dosage in SMS/MAR, that almost all of the discrepancies resulting from this "guesstimating" should occur in one week for one patient on morphine.[10] Mistakes as to time seem feasible when they are within an hour, but even Ms. Dufault recognized that the discrepancy of four hours and twenty minutes (2:00 a.m. vs. 6:20 a.m.) required more of an explanation. She offers that she

---

[10]In fact, the SMS/MAR system asks the nurse to record the dosage. (Vol IV, p. 98)

23

mistakenly punched 6200 into the SMS/MAR as the time and it rejected the 6 and left 0200 (Vol. II, pp. 176-177), which she apparently chose not to correct.

However, when Kathleen Hutchins, on hearing Ms. Dufault's testimony, tried this on the SMS/MAR system, it did not convert 6200 to 0200 (Vol. IV, p. 97). In addition, leaving 0200 in the record, knowing it was wrong by more than four hours could have had serious consequences for a patient on morphine. Here again, the grievant's explanation defies logic. Suspicion of diversion was justified.

Incident 5.

This incident concerned the patient, C.I., and is summarized in Hospital Exhibit #13 and documented in Hospital Exhibit #12. Here, the physician's order was for 2-10 mg. of morphine every three hours. Omnicell reveals withdrawals of morphine by Ms. Dufault as follows:

| 11:41 p.m. | 2 mg. |
| 1:39 a.m. | 4 mg. |
| 1:46 a.m. | 10 mg. |

The SMS/MAR record shows an administration at 12:10 a.m. without noting a dose. (Hosp. Exh. 12). Presumably, this was the 11:41 p.m. withdrawal from Omnicell. But, the 1:39 and 1:46 a.m. withdrawals are unsupported in the SMS/MAR. The flow sheet showed a 1:00 a.m. administration of 2 mg. of morphine and a 5:00 a.m. administration of 2 mg. of morphine (Union Exh. 13, Hosp. Exh. 12, Vol. III, pp. 10-20). Consequently, the amount withdrawn from Omnicell, the SMS/MAR record and the flow sheet are all inconsistent with each other. Ms. Dufault could control the SMS/MAR and flow sheet, she could not control the Omnicell record.

24

For her part, the grievant presented no real explanation. She testified that she did not remember the patient. ("It was not that significant. Patient was a DNR, "comfort measures"." (Vol. III, p. 23)). At one point, she suggests the possibility that the Omnicell did not have the necessary size of morphine vials. (Vol. III, pp. 16, 19). This, it turns out, was not the case (Vol. IV, p. 87, Hosp. Exh. 18). She also suggests that she may have taken out additional morphine in anticipation of the patient needing a larger dose. (Vol. III, p. 19, Vol. IV, pp. 139, 146 and 149) Even this, she presents not as something that actually happened, but as a "plausible explanation". (Vol. IV, p. 140). But, it is not a plausible explanation. The grievant gives wildly contradictory testimony as to her speculative reason for withdrawing 14 mg. of morphine between 1:39 and 1:46 a.m. That testimony is contained in Vol. III, pp. 10-23. First, she notes that the flow sheet (Union Exh. 13, p. 5) shows an administration of morphine (2 mg.) at 1:00 a.m. (Vol. III, pp. 10-12)[11]. At 1:30 a.m., the flow sheet showed an increase in the patient's heart rate. (Vol. III, pp. 14-15). She says she then went to retrieve the morphine from Omnicell. She maintains that she doesn't know why she took out 14 mg. (Vol. III, pp. 15-16). She asserts when she returned to the patient she could not administer the morphine because the patient's blood pressure had dropped (Vol. III, p.19). She then speculates that she must have later given the medication between 2:00 a.m. and 4:00 a.m. (Vol. III, p. 21). She says *both* that she gave only 2 mg. and failed to record her waste (Vol. III, p. 21) and that she administered "the morphine that I took out" (Vol. III, p. 22). This, of course, is completely contradictory--but one must assume that the grievant means that she administered 2 mg. between 2:00 a.m. and 4:00 a.m. and "failed to waste" the remainder.

---

[11]As before, grievant argues that the times on her flow sheet are "rough", i.e. since she never cared to put an accurate time anywhere, she can expand or contract the time in the record to fit her "explanation".

25

By her own admission, the grievant's own flow sheet and notes (Union Exh. 13, pp. 5-6) do not support her story of a 2 mg. administration between 2:00 and 4:00 a.m., after the patient's heart rate declined. First, the patient's blood pressure decline to 64/31 does not, as grievant's testimony suggested, occur after her 1:30 a.m. and 1:46 a.m. withdrawals of morphine. Rather the flow sheet shows it occurred at 1:30 a.m., the same time as the elevated heart rate, not after. (Union Exh. 13, p. 5). Secondly, the flow sheet, which she wrote, shows administration of morphine of 2 mg. only at 10:00 p.m., 1:00 a.m. and 5:00 a.m. One could not conclude from this that there had been an administration at 2:00, 3:00 or 4:00 a.m. Contradicting the grievant even further are her own nursing notes which refer to an administration of morphine only at 11:00 p.m. and 12:00 a.m. (Union Exh. 13, p. 6). (highlighted parts).

To sum up: according to the grievant's testimony, she gave 2 mg. of morphine between 2:00 a.m. and 4:00 a.m. According to the grievant's contemporaneous flow sheet, she gave 2 mg. of morphine only at 1:00 a.m. and 5:00 a.m. According to her contemporaneous nursing notes, she gave 2 mg. only at 11:00 p.m. and 12:00 a.m. Even with the luxury of these contradictory records to choose from, the grievant cannot and does not explain why she took out 14 mg. between 1:39 a.m. and 1:46 a.m. when by her own records and admission, she used no more than 2 mg.

The grievant's "explanation" creates only confusion–it does nothing to explain the surplus narcotic or why she would have withdrawn such a large amount when it was not indicated. It should also be noted that the morphine prescription was for discomfort, not heart rate. Ms. Dufault had no business using morphine to control the patient's heart rate when again

26

by her own admission, another drug, Esmarol, was prescribed for that purpose. (Vol. III, pp. 13-18).

There is no record of the 14 mg. being administered. There is no record of waste. There is no reason to have withdrawn that amount and there is no logical explanation from the grievant. There is simply no reasonable explanation for why an excessive dose of morphine was ever removed from Omnicell and never administered.

The grievant has also raised the subject of other nurses having made mistakes with respect to documentation of controlled substances. By examining the complete medical record for all of the patients involved, the grievant finds several situations where the records seem to show some documentation problems. This whole analysis is irrelevant and mistaken for two reasons: First, if there were transgressions or errors by other nurses, those mistakes do not demonstrate an absence of just cause for the grievant's termination. That others made documentation errors cannot neither justify the grievant making errors nor explain missing drugs. If the point is to show that the grievant's actions (or at least her documentation) was consistent with regular practice, then the analysis fails completely. With the complete records of five different patients, the grievant can point to a few apparent mistakes by different nurses. The remainder of the records: the overwhelming majority of the content of the records, shows other registered nurses following hospital policy. A few documentation errors by other nurses pales in comparison to the grievant's "explanation" that she did not really believe there was *any place* where she had to correctly document what drug she gave, how much and when. It should be noted, as well, that this process does not allow for any explanation by these other nurses regarding what might be excusable errors.

27

Just as importantly, the whole analysis misses the forest for the trees. None of the other nurses demonstrate a pattern of conduct remotely similar to that of the grievant. At worst, several nurses made isolated mistakes. Many of the supposed errors cited are not, in fact, similar to the discrepancies in the grievant's records. For instance, the grievant cites cases where one nurse has withdrawn the drug and another recorded administration (whether it involved an orientee or not). That may represent a policy and documentation problem, but the problems presented regarding the grievant in Incidents 2A, 2B and 2C are not just one nurse withdrawing and another documenting–it is that *plus* the additional withdrawal by the grievant of a surplus of medication. Likewise, with time discrepancies of other nurses, while some may have put the wrong time in for administration of a medication, no one else presents the crazy scenario of Incident 1B, where she explains the time discrepancy by saying she decided, for some inexplicable reason, to take medication out of Omnicell and place it in a discontinued bottle drip. No one else continuously removed the same dose day after day without recording the necessary waste. (Incident 3). No one else presented *four* significant time discrepancies for a single patient–three of them in one day (Incident 4). And no one else removed extra narcotic (five times the dose given) hours before it could be needed (Incident 5). No one else presents a pattern of conduct as does the grievant: multiple scenarios involving multiple discrepancies, all within a two month time period and all involving the same issue over and over: an excess of Ativan or morphine withdrawn by the grievant and in some fashion unaccounted for and unexplained.

It should also be noted that there is no evidence of any bad faith or discriminatory motive on the part of the Hospital and the individuals who investigated this matter. None of them were shown to have any personal animosity toward the grievant. There is no evidence that any

28

management official acted on any basis other than the medical records before them. The person assigned to investigate those records (Kathy Hutchins) is a bargaining unit member. The Hospital acted in good faith on the basis of objective evidence and in accordance with its obligations to its patients and the law.

Finally, there should be no doubt that termination was the proper penalty and the only alternative the hospital could consider. Ms. Dufault was provided multiple opportunities to explain the discrepancies, but did not. If she had a personal problem with drug use, she had the opportunity to explain that. There are no grounds to challenge the penalty here–an arbitrator should not substitute his or her judgment for that of the employer unless the penalty is excessive, unreasonable or an abuse of discretion. *Franz Food Products* 28LA 543, 548 (1957); *Elkouri and Elkouri* at p. 911. The hospital was confronted with serious unexplained discrepancies that clearly pointed to diversion of controlled substances. There was just cause for the termination.

FOR THE MERCY HOSPITAL
Maurice M. Cahillane
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street
Post Office Box 9035
Springfield, MA 01102
Telephone: (413) 737-0260
Telefax: (413) 737-0121
BBO# 069660

0423-020804\55826.wpd