MNA & MERCY HOSPITAL
June 10, 2003

Vol. II

**Page 22**

1  of 320 milligrams?
2      A.   It's hard to explain.  320 and 320
3  would be the same as 40 and 40, 80 and 80, 160
4  and 160, 320 and 320.
5          So, it's the same At. mixture.  What
6  she was running it at would have been what the
7  patient received, not what she mixed it in.
8      Q.   But did she mix it in a higher
9  quantity than what the patient was receiving?
10     A.   Oh, she mixed it in a higher quantity
11 than is policy.  That's the way I would say it.
12 She mixed it in a higher quantity than we
13 normally do.
14     Q.   All right.  And what was your
15 understanding as to what the policy was?
16     A.   To be honest with you, at that point,
17 I was not sure how we did it.
18          And I asked Kathy Hutchins, who is our
19 clinical specialist, who you've already heard
20 from.
21          And she said that normally, 80/80
22 sometimes.  160/160, if it's a very -- if it's a
23 person that's going to go through a lot of Ativan
24 in a shift.

**Page 23**

1      Q.   Okay.  Now, what did Nancy Dufault
2  tell you?
3      A.   She told me she had mixed it 320 and
4  320.
5      Q.   Okay.  And what did you tell her?
6      A.   I told her -- at that time, I had not
7  talked to Kathy.
8          I told her, at that time, that it
9  sounded high to me.  The mixture sounded high.
10 And that she should just refer to the policy, and
11 run it at that, even if it meant she would have
12 to change it quite frequently during the night.
13     Q.   Now, did anything else come of this
14 incident?
15     A.   No.
16     Q.   And why didn't you do anything else?
17     A.   I felt really comfortable with her
18 answer.  She had been a nurse a very long time in
19 the ICU.  There was no reason to believe anything
20 else.
21          And the patient was receiving a lot of
22 narcotic.  And we do, often times, quadruple a
23 drip, even though 320/320 is even higher than a
24 quadruple.

**Page 24**

1      Q.   Now, later in the summer, did a
2  problem regarding Nancy Dufault come to your
3  attention again?
4      A.   Yes.  Again, at the end of July, Cindy
5  came to me again, and said, again, she was
6  reviewing the record, the Omnicell reports.  And
7  she had found a couple of Omnicell reports that
8  stuck out in her mind for the doses and the
9  times.
10          It was a large amount of doses in very
11 short periods of time.  Like, minutes.  One
12 minute apart.  There were large doses taken out,
13 mostly Ativan.
14          And she was concerned about the
15 amounts that were taken out.
16     Q.   Okay.  And what did you do then?
17     A.   Well, then, I thought, "Well, this is
18 the second time she's come to me.  We should
19 probably look into it a little bit deeper."
20          So, I asked Cindy to do a -- I
21 wouldn't call it an investigation.  I asked her
22 to look into some medical records for us, and
23 see, for the patients that she was identifying,
24 exactly what kind of documentation there was on

**Page 25**

1  that.
2      Q.   Okay.  And did you have any role in
3  procuring any records with respect to this at
4  that time?
5      A.   Do you mean by procure, did I call and
6  ask for them?
7      Q.   Call and what?
8      A.   Ask for them.
9      Q.   Yes.
10     A.   Yes.  I'm the one that called medical
11 records and asked that they be pulled.
12     Q.   Okay.  And what about the pharmacy?
13     A.   And I called pharmacy, and asked them
14 to -- well, I did that first.  I called pharmacy,
15 and asked them to run a report, so that I would
16 know which ones to pick from, and then gave that
17 list to medical records, so that I could get the
18 records.
19     Q.   Okay.  And did someone then go through
20 all those records?
21     A.   Cindy did.
22     Q.   Mm-hmm.  And during what period of
23 time was Cindy doing this?
24     A.   Cindy did that in the beginning of

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

MNA & MERCY HOSPITAL
June 10, 2003

---

**Page 26**

1  August. By the time we got the charts, got the
2  Omnicell reports, it was the beginning of August.
3      So, I would say middle of August,
4  maybe, by the time she started really getting
5  into it.
6      Q.  And at some point, did Cindy come back
7  to you with any results or finding?
8      A.  Yes. She had written her findings
9  down on a piece of paper for me that were kind of
10  awe-striking.
11      A lot of drugs being taken out of the
12  Omnicell, and not being charted on the MAR, which
13  is our med sheet.
14      THE ARBITRATOR:  Remind me what MAR
15  stands for.
16      THE WITNESS:  It's our med sheet. It
17  stands for medical administration report.
18      Q.  (By Mr. Cahillane) And is that the
19  computerized hospital record?
20      A.  Yes, it is. It's SAS. Yes.
21      Q.  Now, when Cindy presented you with
22  this, what did you do then?
23      A.  Well, when she came to me with these
24  issues, it was nearing the end of August. And

---

**Page 27**

1  like I said, it was pretty -- it was a lot of
2  drug.
3      So, I went to Mary Brown. And I
4  showed Mary Brown what we had.
5      And it was just a lot of drug with no
6  MAR. And as a nurse, I know that if you're going
7  to give a drug, you have to chart it in the MAR.
8  And that's our policy here, at Mercy. And it's
9  also a policy in nursing.
10      So, it wasn't charted. So, Cindy went
11  and looked at the MAR. They weren't charted.
12  There was a lot of drug not charted on the MAR.
13      And I went to Mary. And I said,
14  "Mary, these drugs aren't charted, and yet
15  they've been taken out of Omnicell, and I can't
16  account for them."
17      Q.  Now, was any decision made then as to
18  what to do?
19      A.  Mary asked me, at that point, to call
20  Nancy, and ask her -- not to ask her -- to tell
21  her that she was on administrative leave until we
22  were able to further investigate the situation.
23      Q.  Was a decision made as to how to go
24  about a further investigation?

---

**Page 28**

1      A.  Yes. We decided that Kathy Hutchins
2  would be the best person, because of her status
3  here, and because of her experience.
4      Q.  And what do you mean her status and
5  her experience?
6      A.  She's a clinical specialist. So, she
7  has had training in, obviously, advanced critical
8  care, medicine, and nursing.
9      And her job here is to, like mine, is
10  to check compliance. Hers is to check practice,
11  and make sure that people are adhering to
12  practice issues.
13      If we have a practice issue, we go to
14  Kathy Hutchins. And she looks into it for us.
15      Q.  Now, who was Ms. Hutchins going to
16  report back to?
17      A.  She reports to Mary Brown. And she
18  would have reported back to Mary Brown.
19      Q.  Okay. And at some point, did you
20  learn that she had completed her investigation?
21      A.  Yes. Kathy and Mary and I met. I
22  can't give you the exact date. It would probably
23  have been, if I had to guess -- I don't even like
24  to guess dates, especially when I'm sworn under

---

**Page 29**

1  oath. So, I'm not going to guess.
2      It was near the end of August. And we
3  all sat -- the three of us sat down. And Kathy
4  presented findings in a very, very specific, very
5  detail-oriented method.
6      She had everybody written out, that we
7  were able to follow very carefully.
8      It had taken her -- I bet it had taken
9  her five or six days to get through it. But as
10  she relayed to us, the handwriting was very, very
11  hard to read.
12      She had to go through medical MARs,
13  and she had to go through flow sheets, and she
14  had to go through a lot of different
15  documentation. So, she had to use the time for
16  that.
17      Q.  Now, at that point -- well, what was
18  the next thing that happened?
19      A.  Well, she brought her findings to Mary
20  Brown. And then Mary Brown made a decision that
21  we should meet with Nancy, to bring these issues
22  to her, and see what she would have to say about
23  it.
24      Q.  Okay. And did you attend this meeting

---

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

MNA & MERCY HOSPITAL
June 10, 2003

Page 58

1    signing those notes?
2        A.    No. Just, as Kathy would update, I
3    would be in the room with Kathy's updating. But
4    it was only as a sheer, I guess you would say,
5    FYI, or courteous --
6        Q.    What do you mean, "as Kathy would
7    update"? What was Kathy doing?
8        A.    After this meeting, Kathy was then,
9    which I think she's already testified, did an
10   investigation. And she was reporting back to
11   Mary on what she would find. And I would usually
12   be in the room.
13       Q.    Okay. And was another meeting
14   scheduled?
15       A.    Yes, there was.
16       Q.    Okay. And is this the second meeting
17   that's referred to in Exhibit 14, that you took
18   notes of?
19       A.    I took notes on that meeting.
20   Correct.
21       Q.    Okay. And so far as you know, is this
22   an accurate representation of what happened at
23   that meeting?
24       THE ARBITRATOR:  This is August 29th?

Page 59

1        THE WITNESS:  Yes. Yes. And I signed
2    it. It's my signature. And Addie typed it for
3    me.
4        Q.    (By Mr. Cahillane) Now, in between
5    the -- well, was it your understanding that in
6    between the meetings, Ms. Hutchins had further
7    looked into the records concerning these
8    patients?
9    .  A.    Correct.
10       Q.    And what was the purpose in doing
11   that, as you understood it?
12       A.    Well, Nancy had given us feedback in
13   her answers to our questions. So, what we did
14   was Mary asked Kathy to then look further into
15   those answers that she gave us, so that we could
16   then respond.
17       Q.    Okay. And did that include the
18   situation with the bolus and the drip?
19       A.    Yes.
20       Q.    And was that discussed at the meeting?
21       A.    Yes, it was.
22       Q.    Okay. And what do you recall about
23   that?
24       A.    It turned out that after trying so --

Page 60

1    trying as hard as I did to understand it, it
2    turned out the patient didn't even have an IV
3    that day. The IV had been discontinued.
4        Q.    And was that related to Nancy Default
5    at the meeting?
6        A.    That was relayed to her by Mary Brown.
7        Q.    And what did Ms. Dufault say?
8        A.    As well as I can remember, without my
9    notes in front of me, she said, "That's how I
10   remember it. I can't --" she kind of said, "I
11   can't say anything else. That's how I remember
12   it."
13       Q.    And how did that meeting end?
14       A.    Again, I would say there was four or
15   five things brought to Nancy's attention.
16       There was two new cases presented at
17   that time, that Kathy had found in the two days
18   that were of concern.
19       We brought everything back to her, got
20   her input again. And at the end of that, there
21   was nothing really to tell us where the drug was.
22   We had no idea where the drug was.
23       And there was no documentation in the
24   med sheet. Mary made the decision to ask

Page 61

1    Nancy -- to terminate Nancy. I shouldn't say
2    ask. Strike it. To terminate Nancy.
3        Q.    And do you recall anything else that
4    Nancy Default said at that meeting?
5        A.    No. I don't. She just kept referring
6    to the fact that she had charted -- it was a
7    documentation issue. It was a charting issue.
8    That she had given the drugs.
9        But at this meeting, there was also
10   more evidence brought in that there was a lot of
11   drug taken out that wasn't even ordered.
12       For instance, I remember: There was
13   probably five or six morphine tubes that were
14   taken out. The order was only for one milligram.
15   And there was no documentation of where the waste
16   on that was.
17       So, we brought to Nancy's attention
18   that it's hospital policy, and it's policy across
19   the nation, that when a nurse has wasted a
20   narcotic, they have to have a second signature.
21       Not only did she not document it, but
22   she also did not have a second signature.
23       So, it was a narcotic that was
24   totally -- we couldn't account for it. So, we

16 (Pages 58 to 61)

MNA & MERCY HOSPITAL
June 10, 2003

**Page 70**

1    Q.    -- those discrepancies?
2    A.    Correct.
3    Q.    You did not, following the
4    investigation, or during the investigation,
5    advise Mary Brown that the proper result in this
6    case was to terminate Nancy Dufault?
7    A.    No. Never.
8    Q.    You didn't suggest that some other
9    level of discipline was appropriate?
10    A.    We didn't do levels of
11    appropriateness.
12        Again, the information was brought to
13    Mary. She made the decision. She did not ask my
14    advice.
15    Q.    And you didn't offer it without being
16    asked?
17    A.    I did not offer my advice.
18    Q.    Do you have an understanding of why
19    Nancy Dufault was terminated?
20    A.    Of course I do. Yes.
21    Q.    Okay. And what's the basis of your
22    understanding?
23    A.    My understanding would be --
24    Q.    I'm not asking what your understanding

**Page 71**

1    is. I'm asking how you came to an understanding.
2    A.    I don't understand.
3    Q.    Did somebody tell you, or is this
4    based on your observation of the process?
5    A.    Did someone tell me why she was being
6    terminated? Is that what you're asking?
7    Q.    Yes.
8    A.    Yes. Mary Brown told me she was being
9    terminated.
10    Q.    And when did she tell you that?
11    A.    She would have told me on the day
12    after our last meeting with Nancy. That was
13    exactly when she told me.
14    Q.    So, August 30th?
15    A.    I don't have anything in front of me.
16    Q.    Sure. If I suggest to you that there
17    were two meetings with Nancy, August 27th and
18    29th --
19    A.    Right. After the second one.
20        THE ARBITRATOR: Don't step on his
21    questions because --
22        THE WITNESS: I know. I'm sorry.
23        (Off-record discussion.)
24    Q.    (By Mr. Hickernell) So, is it your

**Page 72**

1    testimony then that Mary didn't tell you why
2    Nancy had been terminated until after she had
3    been terminated?
4    A.    Mary did not tell me that Nancy was
5    being terminated until after the second meeting.
6    That was the question you asked me. And that's
7    what I answered.
8        Mary did not tell me she was
9    terminating Nancy until after the second meeting
10        Are you asking now if she told me why
11    she was terminating her?
12    Q.    My question is as to why. Yes.
13    A.    At that point, did she tell me why?
14    Q.    Yes.
15    A.    Yes. She told me -- and again, we had
16    the notes from the second meeting at that point,
17    where there were significant discrepancies, time
18    and time again, between drugs taken out of the
19    machine, and Nancy not documenting the drugs
20    being given to a patient.
21        So, as is policy at any hospital I've
22    worked at, a nurse takes a drug out, and doesn't
23    chart it, it's not been given. So, we did not
24    know where the narcotics were.

**Page 73**

1        So there, we made the -- Mary made the
2    decision, based on policy, that Nancy would be
3    terminated.
4    Q.    And what specific policy are you
5    referring to, when you say, "based on policy"?
6    A.    What I just referred to in my head was
7    nursing policy. I did not refer to Mercy policy
8    at all. So, I should say standard nursing
9    practice.
10    Q.    When did you first learn that Nancy
11    Dufault either would be or had been terminated?
12    A.    After the second meeting.
13    Q.    The day after the second meeting?
14    A.    The day -- no. After the second
15    meeting. So, after we left that meeting, Mary --
16    I went to Mary's office, and she told me.
17    Q.    And were you present throughout the
18    second meeting?
19    A.    Yes, I was.
20    Q.    And is it your testimony that Nancy
21    was not informed that she was being terminated at
22    the second meeting?
23    A.    At the second meeting -- and again, I
24    don't have my notes -- Mary said to Nancy, at the

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

MNA & MERCY HOSPITAL
June 10, 2003

**Page 74**

1  very end, when Nancy had no answers to where all
2  the drugs had gone, that Mary said to Nancy that,
3  "There's a lot of discrepancies. We can't
4  account for them. You have to answer for them.
5  So, at this point, we're going to terminate you."
6      The Union rep was in the room, as was
7  human resources. Mary then offered Nancy to talk
8  to anybody in the room privately, if she wanted.
9      She chose not to. And we all left.
10 And I believe she stayed behind with the Union
11 rep.
12     Q.  So, is it fair to say then that you
13 learned that Nancy was being terminated during
14 the second meeting?
15     A.  It would have been at the very end,
16 when she said it to Nancy. Correct.
17     Q.  Right. I'm going to show you Joint
18 Exhibit 2, please.
19     A.  Mm-hmm. Mm-hmm.
20     Q.  Have you seen that before?
21     A.  Yes.
22     Q.  And what is it?
23     A.  It's a -- it's what we use to
24 discipline, written warnings, up to and including

**Page 75**

1  termination.
2      Q.  And do you have a memory as to whether
3  Mary Brown gave that to Nancy at the second
4  meeting?
5      A.  No. I honestly do not.
6      Q.  Do you remember the first time you saw
7  that document?
8      A.  No. I honestly do not. I would say
9  it was very soon after. It was a long time ago.
10 It was very soon after this whole -- this last
11 meeting, which was the 29th of August.
12     So, it would have been soon thereafter
13 the 29th of August that I would have signed this.
14     Q.  And does your signature appear on
15 there?
16     A.  Mm-hmm.
17     Q.  And is there a date next to your
18 signature?
19     A.  There's a date on -- not right next to
20 my signature. No. Is that what you're asking?
21     Q.  Did you write a date yourself at the
22 same time you wrote a signature?
23     A.  No, I did not.
24     Q.  So, you don't have any way of telling,

**Page 76**

1  from that document, whether you signed it on the
2  29th, as well?
3      A.  I can tell you I signed it before Bev
4  Ventura did. And Bev Ventura signed it 8/29/02.
5      Q.  Based on that recollection, do you
6  conclude that you signed it on the 29th?
7      A.  Based on that, I would say I signed it
8  on the 29th.
9      Q.  And did you review it --
10     A.  Yes.
11     Q.  -- prior to signing it?
12     A.  It was only one sentence long.
13 Correct.
14     Q.  And the one sentence long on the
15 second side of the page --
16     A.  Mm-hmm.
17     Q.  -- does that sentence summarize your
18 understanding of the reasons that Nancy was
19 terminated?
20     A.  Correct.
21     Q.  Okay.
22     THE ARBITRATOR:  For convenience's
23 sake, could I ask you to read that sentence into
24 the record.

**Page 77**

1      THE WITNESS:  Sure. "Failure to
2  adhere to the standards of narcotic/controlled
3  substance administration -- suspected drug
4  diversion."
5      Q.  (By Mr. Hickernell) And did your
6  signature indicate that you agreed with the
7  contents of the document?
8      A.  My signature, as I understand it, on
9  these things, is that I'm a -- that Nancy refused
10 to sign, and that I am a witness that -- to two
11 things.
12     I was a witness to the August 29th
13 meeting, where she was given the information as
14 to why she was being terminated; as well as being
15 the manager of the ICU, and signing it.
16     Q.  So, your signature doesn't indicate
17 one way or another whether you agree with the
18 contents of the document; is that what you're
19 saying?
20     A.  No. I would say it does agree with
21 the contents. I'm sorry if I said that wrong.
22     Q.  So, if you agreed that that was the
23 reason for which she was being terminated, and
24 that termination was appropriate for that, could

20 (Pages 74 to 77)

MNA & MERCY HOSPITAL
June 10, 2003

---

**Page 78**

1 you explain to us what your understanding of
2 suspected drug diversion was.
3     A.    To me, suspected drug diversion, in
4 any situation, is when we have narcotics taken
5 out of -- right now, it's Omnicell -- and yet,
6 they are not charted in the medical record as
7 being given.
8         And by medical record, I mean our
9 standard med sheet, which is our MAR here.
10    Q.    And is it your testimony that
11 suspected drug diversion does not mean that Nancy
12 was suspected of having removed the drugs for her
13 own use, or for the use of someone other than the
14 patient?
15        MR. CAHILLANE: Objection.
16        THE ARBITRATOR: Sustained. It's a
17 compound question. Ask it again.
18 *   Q.    (By Mr. Hickernell) All right. Do I
19 understand, from your last answer, that suspected
20 drug diversion does not mean, to you, that Nancy
21 was suspected of having taken the drugs for her
22 own use?
23        MR. CAHILLANE: Objection.
24        THE ARBITRATOR: Basis?

---

**Page 79**

1        MR. CAHILLANE: I just think he's
2 mischaracterizing her prior testimony.
3        MR. HICKERNELL: Well, I'm asking her
4 though.
5        THE ARBITRATOR: This is cross. You
6 have a certain amount of latitude.
7        Did you understand the question?
8        THE WITNESS: Could you repeat it,
9· please.
10        *(Question read.)
11        THE WITNESS: I don't get the
12 question. Okay. Let me think. If you're asking
13 me, right now, if I think that drug diversion
14 means that Nancy was taking the drug --
15    Q.    (By Mr. Hickernell) I'm asking what
16 your understanding was, not right now, but at
17 that time.
18    A.    At that time, drug diversion means it
19 was diverted away from the patient.
20        Nancy had the drug. The patient
21 didn't get the drug. So, somehow, it was
22 diverted away from the patient. That's how I
23 understand it.
24    Q.    Okay. And does your definition of

---

**Page 80**

1 drug diversion include an instance in which
2 Nancy, or somebody else, had removed the drug
3 from the Omnicell, and given it to the patient,
4 as ordered, but failed to record it in the MAR?
5     A.    I would have no way of knowing that.
6     Q.    I didn't ask you if it happened. I
7 asked you if that would be included in your
8 definition of drug diversion.
9     A.    I don't understand the question.
10    Q.    Okay.
11        THE ARBITRATOR: Try again.
12        MR. HICKERNELL: I'll try again.
13    Q.    (By Mr. Hickernell) You have
14 testified so far, and please correct me if I
15 mischaracterize you, that Nancy Dufault was fired
16 for, among other things, suspected drug
17 diversion.
18    A.    Mm-hmm.
19    Q.    And that you agreed that that's what
20 she had been fired for?
21    A.    Correct.
22    Q.    And you agreed that that's what had
23 happened; is that right?
24    A.    Yes. Correct.

---

**Page 81**

1    Q.    Okay. And you've told us that when
2 the drugs disappear, basically, that that's
3 diversion?
4     A.    Correct.
5     Q.    Now, I'm trying to -- well, you don't
6 care what I'm trying to do. I'll just ask you
7 questions.
8        THE ARBITRATOR: Her definition of
9 suspected drug diversion is that it was diverted
10 away from the patient.
11        MR. HICKERNELL: Right. But she's
12 given a couple different answers.
13    Q.    (By Mr. Hickernell) So, are you
14 saying that drug diversion does not include
15 instances in which the patient received the drug,
16 but it was not recorded properly in the MAR?
17    A.    I would have no way of knowing, if it
18 wasn't recorded in the MAR, is what I'm saying.
19 If you're saying if that were to occur.
20        THE ARBITRATOR: No, no, no. That's
21 not the question.
22        THE WITNESS: I'm trying to answer it
23 though.
24        THE ARBITRATOR: Listen to it

---

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

MNA & MERCY HOSPITAL
June 10, 2003

Page 90

1  Mary Brown took the lead in speaking for the
2  Hospital?
3      A.   Yes. Correct.
4      Q.   And did you have a significant part in
5  the discussion?
6      A.   I would say I didn't say much.
7      Q.   And I don't see, in the first or the
8  second line, that Kathy Hutchins was present. Is
9  that --
10     A.   No, she wasn't.
11     Q.   Okay. So, she didn't say anything?
12     A.   Un-huh. Excuse me. No. She didn't.
13     Q.   Okay. And based on your review of the
14  second two pages of this document, and of your
15  recollection of the meeting, is it fair to say
16  that these two pages are not a verbatim
17  transcript of the second meeting?
18     A.   Only where I have quotes are they
19  verbatim. If they're quoted, then that's exactly
20  what they said, and I wrote it down as such.
21     Q.   Okay. And if you didn't write
22  anything down, then you don't know what was said?
23          MR. CAHILLANE:  Objection.
24          THE WITNESS:  Yeah. I guess I need

Page 91

1  that clarified.
2      Q.   (By Mr. Hickernell) Okay. Did you
3  write everything down that was said at the
4  meeting?
5      A.   No.
6      Q.   Okay. And in fact, had you written
7  everything down, not only would your fingers
8  likely have fallen off, but it would be a much
9  longer document than a page and a half?
10     A.   Right.
11     Q.   Okay. And looking at this -- well,
12  are you skilled in shorthand?
13     A.   No.
14     Q.   Okay. What did you do when you were
15  taking notes during the second meeting to
16  indicate that it was a direct quote?
17     A.   I'm sorry. I didn't really understand
18  the question.
19     Q.   When you were taking the notes during
20  the second meeting --
21     A.   Mm-hmm.
22     Q.   -- this reflects that -- actually,
23  almost everything you wrote down has quotation
24  marks on it.

Page 92

1      A.   Mm-hmm.
2      Q.   Do you have a specific recollection --
3  well, strike that. Let me find a quote.
4          Actually, let me go back to the first
5  two pages. I'm sorry.
6      A.   Mm-hmm.
7      Q.   Now, you testified that during the
8  meeting, Mary gave Nancy the evidence that had
9  been collected up to that point?
10     A.   She went over each incidence with her.
11     Q.   Okay. And with regard to the first
12  numbered incident --
13     A.   Mm-hmm.
14     Q.   -- here, do you recall what
15  documentation, or other evidence, Nancy was
16  given?
17     A.   No, I do not.
18     Q.   And do you recall what documentation
19  she was given for any of the instances?
20     A.   You mean handed to her?
21     Q.   Yes.
22     A.   No. I don't remember. I don't
23  remember -- I remember Mary going over the
24  situations, and Nancy replying to the situations.

Page 93

1          I don't remember her ever giving
2  anything. And I don't remember Nancy ever asking
3  for anything.
4          It was pretty much: "This is what
5  happened." And then she would reply what had
6  happened.
7      Q.   Okay.
8      A.   Nancy understood, when Mary said,
9  "This instance." She understood. She didn't ask
10  for any further explanation.
11     Q.   And what makes it possible for you to
12  state what Nancy's understanding was?
13     A.   I would say clearly, because I was
14  sitting in the room. And when Mary asked the
15  question, Nancy would respond very strongly that
16  that was the situation. "I did this," or, "I
17  didn't do this," or "I need to get better at it,"
18  or, "I'm not good at it."
19          She never said, "I don't remember."
20  She never said, "I can't recall." She never
21  said, "I don't know what you're talking about."
22  She never said, "Give me further --" so, from
23  where I was sitting, it looked like she clearly
24  understood what was going on. She responded

24 (Pages 90 to 93)

MNA & MERCY HOSPITAL
June 10, 2003

**Page 94**

1   appropriately.
2       Q.   So, as far as you could tell, at a
3   meeting on August 27th, 2002, Nancy, without the
4   benefit of any document, any review of charts --
5       A.   Mm-hmm.
6       Q.   -- remembered specifically the
7   incident on June 19th?
8           MR. CAHILLANE:  Objection.
9           THE ARBITRATOR:  Overruled.  This is
10  cross.
11          THE WITNESS:  I believe Nancy -- the
12  way Mary presented it, Nancy was speaking to her
13  practice, not necessarily the date of June 19th.
14          Mary presented June 19th as a
15  situation.  Nancy presented her answer as how she
16  went about it.
17          MR. HICKERNELL:  Okay.
18          THE WITNESS:  I'm not saying she
19  specifically remembered, on June 19th, she did
20  this.  No.  Not at all.
21          MR. HICKERNELL:  I think I'm almost
22  done.  Can we just go off the record for a
23  moment.
24          (Recess taken.)

**Page 95**

1           THE ARBITRATOR:  Okay.  Back on.
2           MR. HICKERNELL:  Just a few more
3   questions.
4           THE WITNESS:  Sure.
5       Q.   (By Mr. Hickernell) Directing your
6   attention to the August 27th meeting, the first
7   meeting with the Grievant.
8       A.   The first meeting.  Correct.
9       Q.   You said, if my notes are accurate,
10  that at the end of that meeting, no one asked for
11  anything; that is to say neither the union rep,
12  nor Nancy asked for anything.  Is that correct?
13      A.   Correct.
14      Q.   Had Mary Brown or anybody else from
15  the Hospital told them, by the end of that
16  meeting, that termination was contemplated?
17      A.   Let me think.  I remember Mary making
18  it very clear that disciplinary action, up to and
19  including termination -- I don't -- I don't -- I
20  cannot say she said that.  But I do believe that
21  she said that disciplinary action would be
22  considered.
23      Q.   And do you remember her --
24      A.   Exact words?  You would have to ask

**Page 96**

1   her.
2       Q.   I'd have to ask her if you remember
3   them?
4       A.   Oh, no, no, no.  I thought you said
5   what she said.
6       Q.   Do you remember or not?
7       A.   Do I remember what Mary said?
8       Q.   Yes.
9       A.   No.  That's what I meant by you'd have
10  to ask her.  Ask her what she said.
11      Q.   Okay.  So, you don't remember?
12      A.   I really -- I think I do, but I don't
13  want to go on record.
14      Q.   Well, if you think you do --
15      A.   I want to be 100 percent sure.  I'm
16  under oath.  So, I don't want to say something
17  that's not completely accurate and correct.  I
18  mean, I want to be completely truthful.  And I am
19  being completely truthful.
20          So, for me to say something that I'm
21  not absolutely, 100 percent sure of, I'm not
22  going to say that.
23          I can tell you that I think, rather
24  strongly, that Mary did.

**Page 97**

1       Q.   But you don't recall, as you sit here
2   today --
3       A.   Correct.
4       Q.   -- the exact words she used?
5       A.   Correct.  Correct.
6       Q.   Okay.  And directing your attention
7   back to Hospital 14, the first page, Case 1.
8       A.   Mm-hmm.
9       Q.   That June incident, is that the same
10  incident that you testified you had previously
11  met with Nancy about?
12      A.   Correct.
13      Q.   That is the same incident?
14      A.   Yes.  I can tell, because within one
15  minute's time, she had taken out quite a bit of
16  Lorazepam.
17          MR. HICKERNELL:  Okay.  That's all the
18  questions I have.  Thank you.
19          THE ARBITRATOR:  Anything on redirect?
20          MR. CAHILLANE:  Yes.  A few questions.
21
22          * * * * *
23
24      REDIRECT EXAMINATION BY MR. CAHILLANE

25 (Pages 94 to 97)

MNA & MERCY HOSPITAL
June 10, 2003

---

**Page 98**

1    Q.  Ms. D'Espinosa, when Mary Brown asked
2    you to call Nancy Dufault and tell her she was
3    being placed on administrative leave, what did
4    Nancy Dufault say to you?  Do you remember?
5    A.  I called Nancy.  She had worked the
6    night before, because I remember thinking I was
7    going to wake her up.
8        And I did.  And I remember saying that
9    we were going to put her on administrative leave
10   because there was some issues with Omnicell and
11   medication administration records.
12       I remember her saying specifically,
13   "What?"  And I remember saying that there were
14   discrepancies that we were looking at, and that
15   we would put her on administrative leave until we
16   had the investigation completed.
17   Q.  Okay.  Anything else?
18   A.  No.  That was all I said on the phone.
19   Q.  Well, my question was specifically
20   what she said.
21   A.  Oh.  No.
22   Q.  Okay.  With respect to the two
23   meetings that were held on August 27th and
24   August 29th --

**Page 99**

1    A.  Mm-hmm.
2    Q.  -- there were different Union
3    representatives present at those meetings?
4    A.  Yes.  One was Mona.  And the second
5    one was Dave Powers.
6    Q.  And do you recall either of them
7    saying anything during either meeting?
8    A.  Yes.  The second meeting, David Powers
9    was the rep.  And when we talked about the one
10   that I had said earlier referred to as I didn't
11   understand why she would ever do that, when Mary
12   was presenting it, and said that she looked back
13   at the patient, and Nancy was giving her
14   explanation, Dave Powers looked at her and said,
15   "Why would you do that?" out loud.
16   Q.  Looked at who?
17   A.  Looked at Nancy during the meeting,
18   and said, "Why would you do that?"
19   Q.  And that was with respect to which of
20   these incidents?
21   A.  It was with respect to Scenario
22   Number 1 on August 29th, when Mary asked her
23   about giving the 6 milligram boluses through an
24   IV drip of Ativan that was already infusing.

**Page 100**

1        MR. CAHILLANE:  That's all I have.
2        THE ARBITRATOR:  This is regarding
3    Scenario Number 1?
4        THE WITNESS:  Correct.  On
5    August 29th.
6        THE ARBITRATOR:  I'm sorry.  Anything
7    more?
8        MR. CAHILLANE:  No.  No other
9    questions.
10       THE ARBITRATOR:  Anything on recross?
11
12   RECROSS EXAMINATION BY MR. HICKERNELL:
13
14   Q.  When you took the notes for the second
15   meeting, were you attempting to make an accurate
16   record of what happened at the meeting?
17   A.  Yes.
18   Q.  And you didn't include the remark that
19   you just related by Dave Powers in your notes?
20   A.  No.  I didn't think it was relevant.
21   Q.  Okay.  And was there something that
22   spurred your recollection of that particular
23   comment?
24   A.  At the time, I thought it was odd that

**Page 101**

1    her union rep would say to her, "Why would you do
2    that?"  So, I remembered that, as bad as my
3    memory is.  That shocked me.
4        And I was very shocked that her Union
5    rep would look at her, and ask her why she would
6    do something like that.
7        So, it stayed with me, yes.  It stayed
8    with me a very long time.
9    Q.  And since it stayed with you, can you
10   show us where, in the discussion of this Scenario
11   Number 1, Mr. Powers said that?
12   A.  It was Scenario Number 1.  Mary was
13   going over, if you look at Scenario Number 1,
14   paragraph number 1, Mary goes over the situation
15   with Nancy.
16       Nancy says, "Yes.  I remember that
17   situation."
18       Mary goes on to say, "You went on to
19   tell us this was possible because what you had
20   done," I've already said it, "was giving
21   6 milligram boluses through the IV drip of
22   Ativan."
23       It was in that time frame of that
24   paragraph that Dave looked at Nancy, and said,

---

26 (Pages 98 to 101)

Page 126

1  it.
2       And she also showed me a couple of
3  examples where, again, she documented giving
4  narcotics prior to taking them out of the
5  Omnicell.
6    Q.   Now, prior to this meeting, the second
7  meeting, had you considered what action you would
8  or would not take with respect to Nancy Dufault?
9    A.   Yes.  I had weighed the seriousness of
10  what -- and the discrepancies of the first
11  meeting, and had a lot of concern about that.
12  And I did speak to my vice president.
13    Q.   And who is that?
14    A.   That's Beverly Ventura.
15    Q.   And what happened when you talked to
16  her?
17    A.   She also -- you know, I reviewed the
18  meeting, and Nancy's responses.  And
19  at that point, we were very suspicious that we
20  had some type of drug diversion going on.
21    Q.   Okay.  Was any decision made as to
22  what you would do at the August 29th meeting?
23    A.   In my conversation with Beverly, we
24  discussed a couple of options.

Page 127

1       One was that if, in fact, Nancy was in
2  trouble of some type -- and I'm talking about
3  substance abuse -- that we would recommend that
4  she go on a leave of absence, pending completion
5  of what they call here the SARP, the Substance
6  Abuse Rehabilitation Program through the Board of
7  Registration of Nursing.
8    THE ARBITRATOR:  SARP?
9  ·    THE WITNESS:  SARP is the Substance
10  Abuse Rehabilitation Program.  That was one
11  option that Beverly and I had discussed and
12  agreed to.
13       The other option was that if we could
14  not resolve the discrepancies at the second
15  meeting that was scheduled for the 29th, that we
16  would have no option but to terminate Nancy,
17  based on suspected drug diversion, and report
18  her.
19    Q.   (By Mr. Cahillane)  Okay.  Now, going
20  into Hospital Exhibit Number 14, was she, again,
21  questioned concerning the incident on the patient
22  PR at that meeting?
23    MR. HICKERNELL:  Which meeting?  I'm
24  sorry.

Page 128

1    MR. CAHILLANE:  Scenario Number 1.
2    THE WITNESS:  The patient PR.
3    MR. HICKERNELL:  The second meeting?
4    MR. CAHILLANE:  The second meeting, on
5  the 29th. ·
6    THE WITNESS:  Yes.  I told Nancy I was
7  very concerned about the explanation that she had
8  given me; and that after further investigation,
9  the IV had, in fact, been discontinued the day
10  before.
11       So that the explanation she had given
12  me on the 27th could not be possible, that she
13  had bolused through the IV.
14    Q.   (By Mr. Cahillane)  And what was her
15  response to that?
16    A.   She said that -- she had no answer.
17  That's what she recalled.
18    Q.   And then, was there another matter
19  that you brought up here, referred to as Scenario
20  Number 2?
21    A.   Yes.  This is a case where, again,
22  there had been Ativan -- I'm sorry; this was
23  morphine -- morphine removed at 6:20 in the
24  morning.  And she had documented that she gave it

Page 129

1  at 2:00 a.m.
2       In that particular report, there was
3  no other -- that I had presented to her, there
4  was no other morphine removed on that patient.
5    Q.   Okay.
6    A.   And I presented her three other
7  similar scenarios, where she documented giving
8  morphine prior to removing it from the Omnicell
9    Q.   And did she have a response to that?
10    A.   That those are the times that she
11  charted, and it must have been wrong in her
12  charting.
13    MR. HICKERNELL:  And if the record
14  could continue to reflect that the witness is
15  referring to Hospital Exhibit 14.
16    Q.   (By Mr. Cahillane)  And was there
17  still another scenario that you also presented
18  her with at that time?
19    A.   Yes.  On that particular patient, on
20  May 14th, she took out morphine three times on
21  the patient.
22       At 11:41 p.m., she took out
23  2 milligrams.  It was not charted.  At 1:39 a.m.,
24  she took out 4 milligrams.  It was not charted.

MNA & MERCY HOSPITAL
June 10, 2003

Page 130

1   And seven minutes later, at 1:46 a.m., she took
2   out 10 milligrams. And it was not charted.
3       And I asked how she could take out, in
4   seven minutes, 14 milligrams of morphine on the
5   same patient. She did not have an explanation.
6       And certainly, that was over the
7   amount that the doctor had ordered on that
8   patient.
9       THE ARBITRATOR: Let me interrupt for
10  one second. Do we have a patient initials for
11  Scenario 3?
12      MR. CAHILLANE: Yes. Actually, it is
13  the patient on the other exhibits whose initials
14  are CI.
15      THE ARBITRATOR: Okay.
16      MR. CAHILLANE: And I see that we just
17  missed on the redacting of the last name up
18  there.
19      THE ARBITRATOR: Okay. I wasn't sure
20  if that's the case.
21      MR. CAHILLANE: I think that's Patient
22  Number 5 on the prior exhibits.
23      Q.  (By Mr. Cahillane) So, at that time,
24  Ms. Brown, did you make a decision as to what to

Page 131

1   do?
2       A.  Yes. Since there was no plausible
3   explanation that I could see for any of this;
4   there was so many cases where medication was
5   taken out, documented it had been given
6   previously; the comments about bolusing through
7   the IV could not be accurate because the IV had
8   been discontinued; there were too many
9   discrepancies at that point, without any
10  explanation.
11      So, the decision was made to terminate
12  Nancy for failing to adhere to our administration
13  policy, and suspected drug diversion.
14      Q.  At either of these meetings, was there
15  any other explanation given by Nancy Dufault or
16  the union representative concerning these matters
17  that was not recorded in these notes?
18      A.  No.
19      Q.  Or that you have not testified to?
20      A.  No.
21      Q.  Did either Ms. Dufault or the union
22  representative ask for anything else at either
23  meeting?
24      A.  No.

Page 132

1       Q.  And I take it that you then procured a
2   disciplinary action form, which is, I believe,
3   Joint Exhibit Number 2?
4       A.  That's correct.
5       Q.  Okay. You might want to look at the
6   other side.
7       A.  Mm-hmm. That's correct.
8       Q.  One other thing, Ms. Brown: Does the
9   hospital have policies regarding medication
10  practice, in terms of giving it to patients?
11      A.  Yes, it does.
12      Q.  I'm just going to show you a copy of a
13  document, and ask you if that is the nursing
14  department policy with respect to medications?
15      A.  Yes, it is.
16      MR. CAHILLANE: And I would like to
17  introduce that.
18      THE ARBITRATOR: Let's identify it as
19  Hospital 15.
20      MR. HICKERNELL: Can I have a moment
21  to review it, please.
22      Can I have voir dire on this, please?
23      THE ARBITRATOR: Yes. Is Hospital 15
24  being offered into evidence at this time?

Page 133

1       MR. CAHILLANE: Oh, I'm sorry. I
2   thought I had. Yes. I am offering it as
3   evidence.
4       THE ARBITRATOR: Okay. Voir dire
5   questions.
6
7       VOIR DIRE BY MR. HICKERNELL:
8
9       Q.  Okay. Ms. Brown, is this the policy
10  that was in effect in 2002?
11      A.  Yes.
12      Q.  And has it been revised since?
13      A.  No.
14      Q.  So, it's still in effect?
15      A.  This is still in effect.
16      Q.  There's some references in the
17  document to appendixes and attachments?
18      A.  There's an Appendix C. It looks like
19  it's a chemotherapy order form. I didn't attach
20  that in. It's a written standard order form for
21  chemotherapy.
22      Q.  On the second page, the last bullet
23  point, there's a reference to Attachments 1 and
24  2. What are those?

34 (Pages 130 to 133)

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

MNA & MERCY HOSPITAL
June 10, 2003

**Page 150**

1  are not a verbatim transcript of the first
2  meeting?
3      A.   No.  There was no verbatim transcript
4  of the meeting.
5      Q.   And in fact, a verbatim transcript
6  would be substantially longer than the two pages
7  here?
8      A.   Mm-hmm.
9      Q.   Did you consider, at any time, asking
10 Nancy Dufault to undergo a drug test?
11     A.   No.  We didn't ask her -- we didn't
12 ask her.
13     Q.   And did you consider asking her?
14     A.   No.  That was not part of the initial
15 consideration.  And it did not come up in further
16 conversations, because of the responses that we
17 received in those meetings, which was pretty much
18 stating that she either couldn't recall, or she
19 had bad documentation.
20         It did not seem to be something that
21 was appropriate to ask at that time, since she
22 was claiming all of this was just poor
23 documentation.
24     Q.   So, fair to say that with regard to

**Page 151**

1  the issue of substance abuse and SARP, you were
2  asking for Nancy to state that she needed help?
3      A.   We were asking for an explanation for
4  the scenarios that we presented to her around
5  numerous discrepancies between the medication she
6  removed from the machine, and what she
7  documented.
8          And I was not asking her to step
9  forward to tell me, you know, if she was using
10 the drugs.  I simply was asking, in the meetings,
11 for an explanation of the discrepancies.
12     Q.   Right.  But you told me a few minutes
13 ago about your meeting with Ms. Ventura.
14     A.   Mm-hmm.
15     Q.   And as I understood it, you discussed
16 the possibility of SARP.  And there was an
17 agreement that if she asked for help, you would
18 at least consider putting her on a leave of
19 absence while she underwent the SARP program.  Is
20 that correct?
21     A.   Correct.
22     Q.   So then, is it fair to say that with
23 regard to the issue of substance abuse, you were
24 waiting for her to ask for help?

**Page 152**

1      A.   I did give her, I thought, an
2  opportunity.  At the end of the -- which I forgot
3  to tell you.  You asked that.
4          At the end of the August 29th meeting,
5  which the HR person was there, myself, Jean, her
6  Union rep, and Nancy, before we concluded the
7  meeting, I did ask her if she would like to have
8  a private conversation with anyone that was
9  present in the room, including HR.
10         And I was trying to give her an
11 opportunity, that if she had an issue, and wanted
12 to bring that forward, that any one of us would
13 have been available to sit with her.
14         But at that point, she only remained
15 in the room with Dave Powers, who was the MNA
16 rep.
17     Q.   Did you ever observe in Nancy, or have
18 anyone report to you, an observation of an
19 erratic behavior consistent with drug abuse?
20     A.   No.
21     Q.   Can I direct your attention to Joint
22 Exhibit 1, please.
23         THE ARBITRATOR:  Joint Exhibit 1 is
24 the collective bargaining agreement?

**Page 153**

1      MR. HICKERNELL:  Yes.
2      Q.   (By Mr. Hickernell)  And specifically
3  referring to Section 6.09 on page 17.
4      A.   Mm-hmm.
5      Q.   And in your current position, are you
6  generally aware of the terms of the collective
7  bargaining agreement?
8      A.   Yes, I am.
9      Q.   All right.  And are you specifically
10 aware of the existence of Section 6.09?
11     A.   Yes, I am.
12     Q.   And was that section in existence in
13 2002?
14     A.   Yes.
15     Q.   And did you consider invoking that
16 section in dealing with Ms. Dufault?
17     A.   There was not a question of fitness
18 for duty at that time.  We were questioning drug
19 diversion.
20         She did not have anything that made me
21 think, clinically, that she was involved in --
22 that it was a fitness for duty issue.
23     Q.   Okay.  During the August 27th meeting,
24 when you were presenting the cases to Nancy, the

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

**Page 70**

1    A.  I did come up with one that had
2    multiple -- I had removed multiple vials of
3    Ativan, and thinking, at the time, that it might
4    send a trigger off to pharmacy.
5         But as I wanted accountability for my
6    med, that I had signed off.
7    Q.  And what did you do next?
8    A.  The weekend went by.  And I got a call
9    from Mary Brown on Monday morning at 8:30 in the
10   morning, setting up the meeting for 8/27 at
11   10:00 o'clock.
12   Q.  And as best you recall, what did she
13   say when she called you?
14   A.  This was my chance to dispute the
15   discrepancy, or give my explanation of the
16   transgressions that they had found between the
17   Omnicell and my SMS documentation.
18   Q.  And what did you say, if anything?
19   A.  I don't think I said anything special.
20   Nothing that I can recall.
21   Q.  What happened next?
22   A.  I went to the meeting the next
23   morning.  Mona, the union rep, Jane D'Espinosa
24   was there, Mary Brown, and myself.

**Page 71**

1    Q.  And as best you can recall, will you
2    tell us what happened at the meeting, identifying
3    specific speakers when possible.
4    A.  Mary Brown sat to my left.  On my
5    right, immediate right, was Mona, the Union rep.
6    And Jean was on her right.
7         At the meeting, Mary presented me with
8    Omnicell readouts, which was the first time I had
9    ever seen any of those sheets, and our MARs or
10   SRS readouts of documentation of the medications
11   that were administered to the patients.
12   THE ARBITRATOR:  Had you seen MAR
13   readouts before?
14   THE WITNESS:  Yes, I had.  Those are
15   our work sheets that we use on the unit.
16   THE ARBITRATOR:  But the readouts you
17   had seen before?
18   THE WITNESS:  Right.
19   THE ARBITRATOR:  But not the Omnicell
20   readout?
21   THE WITNESS:  Right.
22   Q.  (By Mr. Hickernell)  And what
23   happened?  Can you describe more specifically
24   what happened as she made that presentation to

**Page 72**

1    you?
2    A.  The meeting lasted between 30 to 40
3    minutes.  She would present -- show me the
4    Omnicell, show me the SMS, and then expect me to
5    recollect what had transpired on this or caused
6    me this discrepancy.
7    Q.  And did the cases that she showed you
8    correspond to the cases set forth by the Hospital
9    in its presentation here?
10   A.  Yes, they did.
11   Q.  And other than the Omnicell and the
12   SMS printout, what documents were you shown?
13   A.  None.
14   Q.  Was there no case in which you were
15   shown any other documents?
16   A.  No, there was not.  Not at the first
17   meeting.
18   Q.  And were you able, on the 27th, to
19   recall the specific instances that were presented
20   to you?
21   A.  I tried to give responses to what
22   could have happened, or what could have caused
23   this discrepancy on them.
24        But not knowing who the patients were,

**Page 73**

1    or even being able to associate, even if they
2    gave me a name, what the patient was -- I mean,
3    most of the events were two months prior.
4    Q.  So, were you able to recall the
5    specific instances?
6    A.  Example:  The Ativan that they
7    questioned me about, the 320 milligrams, I said I
8    must have mixed -- I had removed from the
9    Omnicell 320 milligrams at 6:34, thereabouts,
10   according to the Omnicell readout.
11        I said, "I must have mixed two drips
12   at 160 concentration, that I would have failed to
13   sign one drip out, depending on when the time was
14   calculated, what the drip was," which Jean
15   informed me was 25 ccs an hour.
16        So that, it would be, for my 12-hour
17   shift, I would need 300 milligrams.  And I had
18   taken 320 out.
19   Q.  And as you made those statements at
20   the meeting, did you have a specific recollection
21   of what had happened?
22   A.  Not really.  Not even of the Ativan.
23   I would just surmise that that is what I did with
24   the -- took out the 320, and mixed two drips, one

MNA & MERCY HOSPITAL
June 11, 2003

Page 74

1  being for when I would need it, whatever time on
2  my shift.
3       Because hopefully, this drip which was
4  already infusing, going at 25 an hour, whatever
5  time the previous nurse to me would have hung it
6  depending on when I would have signed it out, or
7  would need it in the SRS, and then leave a
8  courtesy, or enough medication, so they don't
9  immediately, upon assumption of the patient care,
10  have to mix a bag.
11       Q.    And was anybody taking notes at that
12  meeting?
13       A.    Jean D'Espinosa.
14       Q.    Anybody else?
15       A.    Not that I can recall.  Oh, and Mona
16  was, the Union --
17       Q.    I'm going to show you what's been
18  marked as Hospital Exhibit Number 14.  And
19  specifically, the first two pages.
20       Drawing your attention to Case 1,
21  there's a quotation attributed to you there.  Did
22  you say that?
23       THE ARBITRATOR:  Read it into the
24  record, just so it's clearer.

Page 75

1       Q.    (By Mr. Hickernell)  The quotation
2  attributed to Nancy says, "I gave the drug --
3  just didn't chart it," unquote.
4       A.    I cannot recall if I said those words
5  specifically.  I know that I asked Jean if it was
6  not documented in the nurse's flow sheet that the
7  drip was going at 25 an hour.
8       And her response to me was that, "If
9  it's not charted, it's not documented," that,
10  "The nurse's notes is not a legal part of the
11  chart."
12       Q.    Drawing your attention to Case
13  Number 2, there's a quotation attributed to you.
14  Quote, "Equal to the dose ordered," unquote.  Did
15  you make that statement?
16       A.    I could have.
17       Q.    And in the second part of Case 2,
18  there's a quote attributed to you.  Quote, "Have
19  no answer for that," unquote.  Did you make that
20  statement?
21       A.    They expected me to recall patients,
22  that in administering this medication to this
23  patient, I could not lie and say that I
24  remembered medicating Shelly's patient for her.

Page 76

1  So, I may have said, "I have no answer for this."
2       Q.    On the second page, in Case 3, there's
3  a quotation attributed to you.  "I guess I didn't
4  chart it .... Bad documentation on my part,"
5  unquote.  Did you say that?
6       A.    On this instance, I asked Jean if
7  there was nothing charted around the nurse's
8  notes around the time x-ray comes through.  She
9  said there was not.
10       It is not my practice with an orientee
11  to document, unless something is transgressing,
12  or I need to intervene.
13       So, I can't imagine that I said, "Bad
14  documentation on my part," because I would have
15  expected Tawnia to be doing the documentation.
16       Q.    And you referred to your practice.
17  What was your practice with regard to documenting
18  while you were precepting another nurse?
19       A.    Unless I had to intervene to do
20  something, say a doctor was giving the nurse a
21  hard time, or the patient was overcomplicating
22  the orientee, as a preceptor, I did not step in.
23  I allowed them to be able to manage their time
24  and their skills.

Page 77

1       Q.    Drawing your attention to Case
2  Number 4, there's a quotation attributed to you.
3  "I bolused through the IV drip ... Used 999 to
4  bolus at 8:12 and 4:30 ... Then used the 18
5  milligrams to replace the IV," unquote.  Did you
6  say that?
7       A.    What I said was something similar to
8  that.  This was the only account, in the time
9  that they had placed me on administrative leave,
10  of my being able to recall anything that might be
11  alarming to the pharmacy, which is what Jean said
12  had -- something had triggered the pharmacy's
13  readouts.
14       And I said that I did recall this
15  instance and what I had done with the medication.
16  Mary Brown is the one who told me how much
17  medication I had removed from the Omnicell.
18       I did say that I bolused through the
19  drip, hanging drip.  I do not recall saying that
20  the drip was running.
21       However, I did not go any further,
22  when I thought about what I had done, because of
23  my practice issues regarding adding medication to
24  an existing IV drip.

20 (Pages 74 to 77)

MNA & MERCY HOSPITAL
June 12, 2003

*Vol. III*

**Page 86**

1  came from specific medical records, correct?
2      A.   The Omnicell readouts and the SMS that
3  she showed me.  Yes.
4      Q.   And during and after that meeting, you
5  did not ask for copies of those records or of any
6  further records from those patients, did you?
7      A.   No, I did not.
8      Q.   All right.  And at the first meeting,
9  you had a union representative there with you?
10     A.   Yes, I did.
11     Q.   Did the union representative ask for
12  copies of those medical records?
13     A.   I do not believe she did.
14     Q.   And at the second meeting, you again
15  had a union representative there, present with
16  you, did you not?
17     A.   I did.
18     Q.   And neither you nor the Union
19  representative, at or after the second meeting,
20  asked for copies of the medical records that were
21  being shown to you?
22     A.   We did not.
23     Q.   And that's because you already knew
24  that what was going on here was that you had

**Page 87**

1  overmedicated the patients?
2      A.   I've never heard of a nurse being
3  fired because they made a med error, in my 25
4  years at Mercy.
5      Q.   Well, what if the overmedication was
6  because the nurse didn't agree with the doctor's
7  order, and thought the patient was agitated or
8  disturbed and needed more?  Would that be grounds
9  . for termination, do you believe?
10         MR. HICKERNELL:  Objection.
11  Foundation. How is she in a position to
12  administer discipline?
13         MR. CAHILLANE:  I'm asking her opinion
14  of whether or not it would be grounds for
15  termination if a nurse decided to administer more
16  medication to the patient than had been ordered
17  by the doctor.
18         THE ARBITRATOR:  Is the Hospital now
19  saying that this Grievant was terminated for
20  suspected overmedication?
21         MR. CAHILLANE:  No.  What happened, I
22  thought that the Grievant freely admitted in her
23  direct testimony, was that the explanation for
24  the missing narcotics is that she gave too much

**Page 88**

1  to the patient.
2         THE ARBITRATOR:  Listen to the
3  questions carefully.
4      Q.   (By Mr. Cahillane)  Well, would you
5  agree that if a nurse decided to give more
6  medication, particularly a narcotic, to a patient
7  than was prescribed by the doctor, that that
8  could be grounds for termination?
9      A.   Again, I have never heard of this.
10  And I can't imagine a nurse doing that.
11     Q.   Now, if we could just go to the case
12  of the patient PR, which is on Hospital Exhibit
13  Number 5.
14         MR. CAHILLANE:  And am I correct,
15  Mark, Union Exhibit 5?
16         MR. HICKERNELL:  I'll have to check.
17  I think PR may be in Union Exhibits 5 and 6.
18  Would you like the witness to be given both of
19  those?
20         MR. CAHILLANE:  Well, she might want
21  them in front of her.
22     Q.   (By Mr. Cahillane)  On August 27th,
23  you were presented with some information by Mary
24  Brown concerning this patient and what had

**Page 89**

1  occurred between June 19th and June 21st,
2  correct?
3      A.   Information being the Omnicell readout
4  and the SMS readout.
5      Q.   And did you not testify that you
6  yourself, at the time, in August, questioned your
7  own practice with respect to the time when you
8  state that you bolused the medication into the
9  patient?
10     A.   I questioned my practice of
11  administering or adding to the bag medication,
12  yes.
13     Q.   And you said, in fact, that it was not
14  a common practice?
15     A.   Absolutely.
16     Q.   And in fact, it's not a proper
17  practice, is it?
18     A.   No.  As I had never done it before, I
19  would say no.
20         THE ARBITRATOR:  Do we have a
21  definition of bolusing in the Hospital records,
22  so that we all know what bolusing is?  What's the
23  definition?
24     Q.   (By Mr. Cahillane)  As you understand

CATUOGNO COURT REPORTING, INC.
Springfield, MA     Worcester, MA     Boston, MA     Providence, RI

Page 154

1  of the termination, correct?
2      A.   Correct.
3      Q.   And that used the term suspicion of
4  diversion of controlled substances, correct?
5      A.   Question of.
6      Q.   Question of.  And at that point, or
7  shortly thereafter, you and/or the Union, on your
8  behalf, filed a grievance concerning your
9  termination, correct?
10     A.   I believe that's proper practice.
11     Q.   Well, that's what happened, correct?
12         MR. HICKERNELL:  Just answer the
13  question.
14     Q.   (By Mr. Cahillane)  You filed a
15  grievance?
16     A.   I told David to file a grievance.
17  Yes.
18     Q.   And in the grievance procedure, when
19  you were terminated, you first had a chance to
20  have your grievance heard internally, at the
21  Hospital, by, I believe it's the Hospital
22  president, or his designee, correct?
23     A.   Because this was a termination, I
24  understand it goes straight to Step 3?  Is that

Page 155

1  what you're asking?
2      Q.   Yes.
3      A.   Correct.
4      Q.   Okay.  But at that point, you have the
5  opportunity, do you not, together with the Union,
6  to present your case for why you should not have
7  been fired?
8          THE ARBITRATOR:  At the Step 3
9  hearing?
10         MR. CAHILLANE:  Yes.
11         THE WITNESS:  I would not know what
12  the protocol is.  But if you're telling me that's
13  it, yes.  If that's the Union, yes.  Correct.
14     Q.   (By Mr. Cahillane)  Well, let me ask
15  you this:  Did you understand that the grievance
16  proceedings provided you with an opportunity to
17  make your claim that the Hospital had violated
18  the contract by terminating you?
19     A.   Correct.
20     Q.   Did you go to the Step 3 hearing?
21     A.   Yes, I did.
22     Q.   And when you went to the Step 3
23  hearing, did you indicate, in any way, that,
24  "This is just a matter of my having made a

Page 156

1  medication error"?
2      A.   No, we did not.
3          THE ARBITRATOR:  Now, medication
4  error?  Is that what you meant?
5          MR. CAHILLANE:  Yes.
6          THE ARBITRATOR:  As opposed to
7  documentation error?
8          MR. CAHILLANE:  Yes.
9          THE ARBITRATOR:  Okay.  Keep me on
10  board.  Those are two different things.
11     Q.   (By Mr. Cahillane)  Well, you
12  understood, at this point, by the time of the
13  Step 3 grievance, you understood that you had not
14  been fired just for a documentation error?
15     A.   That they were accusing me of
16  diversion of controlled substance, either using,
17  or in some way inaccountability for medication
18  that I had withdrawn from the Omnicell.  Correct.
19     Q.   Okay.  So, you understood that.  But
20  you didn't indicate, at the Step 3 hearing, that,
21  "There's no just cause for my termination,
22  because this, in fact, was just a medication
23  error on my part," or errors?
24          THE ARBITRATOR:  Wait, wait, wait.

Page 157

1  Now are you misspeaking yourself.
2          MR. CAHILLANE:  No.  That's exactly
3  what I mean.
4          THE ARBITRATOR:  Okay.  Medication
5  error.  The question is -- state the question
6  again.
7      Q.   (By Mr. Cahillane)  Well, do I
8  understand that here, in these proceedings,
9  Miss Dufault, it's your contention that whatever
10  discrepancies exist in the record as to the
11  amount of drugs withdrawn, versus the amount of
12  drugs given the patient are explainable by
13  inadvertent medication errors on your part?
14          THE ARBITRATOR:  What is a medication
15  error, by your definition?
16          MR. CAHILLANE:  Giving a patient too
17  much or too little of the drug that was
18  prescribed to them.  Or not giving it at all.  Or
19  giving a medication that had not been prescribed.
20          THE ARBITRATOR:  That's a lot of
21  different kinds of medication errors.
22     Q.   (By Mr. Cahillane)  Well, in this
23  case, let me amend my question to be:  Is it your
24  contention, here and now, that whatever

MNA & MERCY HOSPITAL
June 12, 2003

**Page 162**

1  is the responsibility of the nurse to document
2  all meds/IVs given prior to leaving the hospital,
3  and when the next shift's MAS are printed. RNs
4  on the night shift will check all physician's
5  orders written," I take it it is during, "the
6  past 24 hours, and the medication administration
7  schedule to assure accuracy."
8    Q.   (By Mr. Cahillane) Do you see that
9  paragraph, Miss Dufault?
10   A.   Yes, I do.
11   Q.   Now, the MAS is, is it not, a medical
12 administration sheet?
13      THE ARBITRATOR:  Is that synonymous
14 with the SMS.
15      MR. CAHILLANE:  I'm going to ask that
16 question next.
17      THE WITNESS:  That's the med sheet
18 that we get, the MAS.
19   Q.   (By Mr. Cahillane)  Right.  And is the
20 MAS, the med sheet, is it like this document
21 here?
22   A.   Yes, it is.
23   Q.   One of the --
24   A.   Well, what we've been calling the SMS,

**Page 163**

1  which is the equivalent with the MAR?
2    Q.   Yes.
3      MR. HICKERNELL:  Can you tell us what
4  document you just showed her, for the record.
5      MR. CAHILLANE:  Well, this one happens
6  to be -- I didn't write that exhibit on it.  But
7  it regards patient B.  I believe this one is --
8  well, it's the July 17th incident.  This must be
9  patient BB.  It's page 2.
10     But what I'm showing is a medical
11 administration sheet, that I believe there is one
12 contained in the records that we have in both
13 exhibits for every single patient.
14      THE ARBITRATOR:  Except that there,
15 it's called the MAR, instead of the MAS.
16      MR. CAHILLANE:  Correct.  I just want
17 to ask her about that.
18      THE ARBITRATOR:  Okay.
19   Q.   (By Mr. Cahillane) Those medical
20 administration sheets, Miss Dufault, are the
21 computer's record of the medicine that's been
22 administered to that patient, correct?
23   A.   Correct.
24   Q.   And they are part of the MAR, or the

**Page 164**

1  SMS computer record, correct?
2    A.   The SMSs that you show us, we have a
3  work sheet that we work off, that that gets
4  discarded.
5    Q.   Well, this document, which is labeled
6  the, "Medical Administration Record," this is
7  what the policy here is referring to, the same
8  thing as what the policy here is referring to as
9  MAS, correct?
10      MR. HICKERNELL:  And can the record
11 just reflect that Mr. Cahillane is holding up
12 Union Exhibit 21, page 2.
13   Q.   (By Mr. Cahillane)  Let me ask you
14 this, Miss Dufault:  Is it not the case that each
15 day, there is a medical administration sheet
16 printed off the computer?
17   A.   That goes into the permanent record?
18   Q.   Well, is one printed off?
19   A.   One that we write on and discard, that
20 the secretaries run off at the beginning of the
21 shift.
22   Q.   And that is printed off of the
23 computerized record, correct?
24   A.   Correct.

**Page 165**

1    Q.   Okay.  So, the information concerning
2  medication administration that is inputted by you
3  or other nurses into the computer is printed out
4  on a daily basis?
5    A.   Correct.
6    Q.   And it's there for the nurses' and the
7  doctors' use?
8    A.   If they needed it.  I don't ever
9  recall a nurse going back into the permanent
10 record to see.  But I guess, yes.  Correct.
11   Q.   That's the permanent record.  I'm
12 talking now about the medical administration
13 sheet that's printed each day.
14   A.   You throw that out at the end of each
15 shift.
16   Q.   Okay.  But it's printed up for a
17 reason, isn't it?
18   A.   For you to work off for whatever shift
19 you're there.  And then it's discarded.
20   Q.   Okay.  So, every day, with respect to
21 the patient, you're printing, out of the
22 computerized record, the record that the computer
23 has of the medicine that's been administered to
24 that patient, correct?

42 (Pages 162 to 165)

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

IN RE: DUFAULT & MERCY HOSP. ARBITRATION - DAY IV
July 2, 2003

---

Page 18

1  as far -- what did that consist of at Mercy
2  Hospital?
3      A.    Going way back, it was usually a --
4      Q.    Well, let me just say, the last year
5  that you were in active practice.
6      A.    At Mercy --
7          MS. BUTLER:  Are we going back now
8  to 2000?  Just to keep me oriented in time.
9          MR. CAHILLANE:  Well, why don't I --
10 I don't want to go through 30 years.
11     A.    I could summarize if you'd like.
12     Q.    (By Mr. Cahillane)  Are you familiar
13 with what would have been -- what was being done
14 at the hospital with respect to documentation of
15 controlled substances in 2002?
16     A.    I believe so, sir, yes.
17     Q.    Okay.  And what record would the
18 physician have had to look at with respect to the
19 administration of a controlled substance in 2002?
20     A.    Basically, there were two sources
21 that I would usually turn to.
22         And if I can modify, briefly, my
23 previous testimony:  My active practice
24 terminated July 2001.  I hoped to return -- and

---

Page 19

1  actually provided care for a couple weeks in
2  August of 2001, after the first of two back
3  operations that year.  The second occurred on
4  9/11/2001, that famous day.  And I did
5  subsequently operate in 2002 on two physicians'
6  wives, in the process of hoping to return to
7  active practice.  And I think it was in the
8  process of doing those procedures that it became
9  obviously apparent that I was not going to be
10 able to sustain the levels of practice to have an
11 active surgical practice that would produce
12 enough to cover the expenses and the income.
13         To continue back to the question
14 that you addressed, there were two sources that I
15 would generally turn to.  The SMS system is a
16 computer system for recording administered
17 medications.  And I believe the record is called
18 the MAR, or the medicine administration record.
19 That was a printed out every 24 hours and would
20 be put in the patient's record.  So that if I
21 wanted to know what the patient received prior --
22 or somewhere up to the time of that being printed
23 out, I would go to that.  And that would give me
24 a summation of what the patient received and

---

Page 20

1  when.  Be it antibiotic, pain medication, blood
2  pressure supportive medication, every medication
3  would be there.
4          If I needed something within the
5  preceding several hours, I would then, basically,
6  access the MAR, where this was on computer and
7  had not yet been printed out.  Many times, I
8  would either go to -- I would -- I would many
9  times talk with the nurse or go to that record.
10         But that record was what I expected
11 to tell me, as the responsible physician, what
12 happened from the day that patient came in to the
13 moment that I looked at her.
14     Q.    And would --
15         MS. BUTLER:  And there was a second
16 record, you said.
17         THE WITNESS:  I'm sorry?
18         MS. BUTLER:  You said the doctor
19 looks at two sources.
20         THE WITNESS:  Well, it's the same
21 record, but because it's printed out every
22 24 hours, in the chart there is an actual
23 printout.  On the computer system -- from
24 the time that was printed out until the

---

Page 21

1  time the next printout occurs is on the
2  actual computer SMS system.
3          MS. BUTLER:  Okay.  So the second
4  source would be, if you didn't find out or
5  you weren't fully satisfied, you would go
6  to the computer itself.
7          THE WITNESS:  Yes.
8          MS. BUTLER:  That was what you meant
9  by second source.
10         THE WITNESS:  Yes.
11         MS. BUTLER:  Okay.
12         THE WITNESS:  And that would cover
13 from the time the patient was admitted to
14 the very moment that I was looking at the
15 patient.
16     Q.    (By Mr. Cahillane)  And would a --
17 would it be fair to say that a physician might
18 well be relying on that record, or records, in
19 making decisions as to patient care?
20     A.    Absolutely.
21     Q.    And would that be important with
22 respect to the administration of controlled
23 substances?
24     A.    Yes, it is.

---

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

**Page 30**

1    (Robert J. Kasper, M.D., stepped down from
2    the witness stand.)
3
4         MR. CAHILLANE: I should get my next
5    witness.
6         MS. BUTLER: Yes, please.
7         MR. HICKERNELL: In the meantime,
8    can we enter this as a union exhibit?
9         MS. BUTLER: Okay. What would it
10   be? Where are we up to now? I see a Union
11   21. That may be the last one.
12        MR. HICKERNELL: I think that's the
13   last one.
14
15        (Union Exhibit 22, Pharmacy
16   Department Medication Events and Adverse
17   Drug Reactions Policy, admitted)
18
19        MS. BUTLER: Let the record show
20   Union Exhibit 22 is admitted without
21   objection.
22        (Pause in proceedings)
23
24

**Page 31**

1    (Patricia Duclos-Miller, R.N., approached
2    the witness stand.)
3         MS. BUTLER: Please stand and rise
4    your right hand.
5         Do you swear, or affirm, the
6    testimony you're about to give in this
7    arbitration hearing will be the truth, the
8    whole truth, and nothing but the truth, so
9    help you God?
10        MS. DUCLOS-MILLER: I do.
11        MS. BUTLER: Thanks.
12
13   PATRICIA DUCLOS-MILLER, R.N., Witness,
14   having been duly sworn, testifies and states as
15   follows:
16
17   DIRECT EXAMINATION BY MR. CAHILLANE
18
19   Q.    Could you state your name, please?
20   A.    Patricia Duclos-Miller.
21   Q.    And what is your address?
22   A.    15 Maplewood Road in Farmington,
23   Connecticut.
24   Q.    And what is your present employment

**Page 32**

1    position?
2    A.    Director of quality improvement for
3    the Sisters of Providence Health System.
4    Q.    And could you just -- if you could,
5    briefly describe your education and what degrees
6    you hold.
7    A.    Graduate of St. Anselm College, with
8    a baccalaureate degree in nursing. Boston
9    University with a master's. And I'm certified in
10   nursing administration by the Academy.
11   Q.    And have you been a practicing
12   registered nurse?
13   A.    For over 30 years.
14   Q.    Okay. And what positions have you
15   held?
16   A.    I've been director of organizational
17   systems, director of specialty services, nurse
18   manager, staff nurse, former assistant professor
19   at various collegiate programs in the state of
20   Connecticut, and director of nursing.
21   Q.    And when were you first employed by
22   the Sisters of Providence Health System?
23   A.    December 2001.
24   Q.    And just so I'm sure that it's ever

**Page 33**

1    been on the record, but Mercy Hospital is part of
2    the Sisters --
3    A.    Correct.
4    Q.    -- of Providence Health System?
5         And what are your job duties at
6    Mercy Hospital, or Sisters of Providence Health
7    System?
8    A.    To provide resources, in
9    collaboration with quality improvement projects,
10   data management. I've lectured, worked with and
11   facilitated root cause analysis, intensive
12   investigations. I work with physicians on peer
13   review committees and facilitate all of the
14   quality improvement councils.
15   Q.    And have your duties included
16   holding in-service projects regarding proper
17   practice?
18   A.    Yes.
19   Q.    Including proper practice for
20   registered nurses and LPNs?
21   A.    Yes.
22   Q.    And are you, from your position
23   here, familiar with the standards at Mercy
24   Hospital with respect to the administration of

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

IN RE: DUFAULT & MERCY HOSP. ARBITRATION - DAY IV
July 2, 2003

Page 34

1  and documentation of controlled substances?
2      A.    Yes.
3      Q.    With respect to the administration
4  of medication by a registered nurse, are you
5  familiar with something called the Five Rights?
6      A.    Yes.
7      Q.    And what are they?
8      A.    Right patient, right dose, right
9  medication, right route, right time.
10     Q.    And is this a standard which all
11 nurses -- all registered nurses have to follow?
12     A.    All nurses. All licensed nurses,
13 including licensed practical nurses.
14     Q.    Now, and I take it that those
15 standards apply for any narcotic or other
16 dangerous drug?
17     A.    That's correct. It's a fundamentals
18 of nursing, in one of your first nursing courses.
19     Q.    Now, with respect to the
20 administration of a controlled substance by a
21 registered nurse at Mercy Hospital, are you
22 familiar with where the registered nurse who
23 administers a controlled substance is supposed to
24 document that?

Page 35

1      A.    Yes.
2      Q.    And where is that?
3      A.    In the computer, in what's called
4  the MAR module of the computer.
5      Q.    And is that also referred to as the
6  SMS?
7      A.    Well, that's the -- the SMS is the
8  computer vendor that we currently utilize. The
9  MAR is a module within that computer.
10        MS. BUTLER: But they're sometimes
11     used synonymously.
12        THE WITNESS: Yes.
13     Q.    (By Mr. Cahillane) And is that
14 system at Mercy Hospital, is it relied upon by
15 physicians and nurses, in order to determine what
16 medications a patient has or has not received?
17     A.    That's correct.
18     Q.    Would it be inappropriate
19 practice -- well, is there also on the floor a
20 written medical record that nurses sometimes
21 make?
22     A.    Documentation in the progress notes?
23     Q.    Yes.
24     A.    Sometimes a nurse will document in

Page 36

1  the progress notes.
2      Q.    Would it be an appropriate practice
3  for a nurse administering a controlled substance
4  to document it in the nursing notes, but not in
5  the MAR?
6      A.    No, that is not the correct method.
7      Q.    Would it be appropriate for a nurse,
8  in documenting the administration of a controlled
9  substance, to not put the amount of the dosage
10 given to the patient?
11     A.    That is an improper method of
12 documentation.
13     Q.    Would it be a proper -- proper for
14 the nurse to not put the correct time at which
15 the controlled substance was administered?
16     A.    That is an improper way to document.
17     Q.    Would it be acceptable for the nurse
18 to sometimes document the administration of a
19 controlled substance in the nursing notes, but
20 not in the MAR?
21     A.    No, that is unacceptable. It is not
22 the policy or the standard.
23     Q.    Would it be an acceptable practice
24 for a nurse to -- in administering a controlled

Page 37

1  substance, to take out additional medication
2  ahead of time, in anticipation that there might
3  be in the future an increase in the dosage for
4  the patient?
5      A.    No. That is improper.
6      Q.    If a patient were receiving a
7  controlled substance by means of a drip, an IV
8  drip, and the physician ordered the drip
9  discontinued, would it be appropriate for the
10 nurse to later -- who later has an order for an
11 IV push for a dose of that drug, to use the
12 discontinued drip?
13     A.    No. That is an incorrect and
14 improper method.
15     Q.    And would it be fair to say that a
16 registered nurse would be obligated to follow the
17 physician's order with respect to that drip?
18     A.    That is correct. The physician's
19 order said "IV push."
20     Q.    Would it be appropriate for a nurse
21 to have a different standard of documentation
22 with respect to the administration of a
23 controlled substance for a patient who was a DNR?
24     A.    No. There should be no difference

10 (Pages 34 to 37)

IN RE: DUFAULT & MERCY HOSP. ARBITRATION - DAY IV
July 2, 2003

*IV*

**Page 38**

1  in standard.
2      Q.    Are you familiar with there being
3  such a practice or standard at Mercy Hospital?
4      A.    No.
5          MR. CAHILLANE:  That's all.
6          MS. BUTLER:  You have to answer for
7  the record.  Your answer was?
8          THE WITNESS:  No.
9          MS. BUTLER:  Okay.
10          Your witness, Mr. Hickernell.
11          MR. HICKERNELL:  Just have a
12  two-minute break?
13          MS. BUTLER:  Two-minute break.
14          (Pause in proceedings)
15          MR. CAHILLANE:  I do have one other
16  question that I forgot to ask, if I may.
17          MS. BUTLER:  Okay.  Back on the
18  record.  An afterthought type question.
19      Q.    (By Mr. Cahillane) Ms. Duclos, if a
20  registered nurse has, for whatever reason,
21  withdrawn more narcotic than what is prescribed
22  and in fact only gives what is prescribed, what
23  is the standard of practice as to what she does
24  with the additional narcotic?

**Page 39**

1      A.    The additional narcotic --
2      Q.    Or controlled substance.
3      A.    -- controlled substance needs to be
4  wasted, and that needs to be countersigned by
5  another registered nurse.
6          MR. CAHILLANE:  That's all.
7          MR. HICKERNELL:  All set for cross?
8          MS. BUTLER:  Okay.  Yes, go ahead.
9
10  CROSS-EXAMINATION BY MR. HICKERNELL:
11
12      Q.    Good morning.
13          Where is your current place of work?
14      A.    Here.  My office is here, but I work
15  for the Sisters of Providence Health System, of
16  which Mercy Medical Center is part of that
17  system.
18      Q.    And, as a director of quality
19  improvement for the system, are you responsible
20  for other hospitals as well?
21      A.    Providence, which is considered part
22  of Mercy Medical Center.  I'm a resource to the
23  long-term care facilities, which are part of the
24  health system, and the home care agency,

**Page 40**

1  Community Home Care, Incorporated.
2      Q.    Are you here every day of the week,
3  or are you --
4      A.    Yes, I am.  Unless I go out to
5  meetings off-site.
6      Q.    And how often do you do that?
7      A.    Probably twice a month, over to
8  Providence.
9      Q.    And you sort of went through,
10  briefly, your resume as a practicing registered
11  nurse.  Where did you work as a staff nurse?
12      A.    Newton Wellesley Hospital, in
13  Massachusetts.  New Britain General in New
14  Britain, Connecticut.  Bristol Hospital in
15  Bristol, Connecticut.  And John Dempsey Hospital
16  in Farmington, Connecticut.
17      Q.    And when you were a nurse manager,
18  where did you practice?
19      A.    Bristol Hospital.
20          MR. HICKERNELL:  That's all the
21  questions I have.  Thank you.
22          MR. CAHILLANE:  Just with respect to
23  her background, I do have one question.
24          MS. BUTLER:  Mm-hmm.

**Page 41**

1  REDIRECT EXAMINATION BY MR. CAHILLANE:
2
3      Q.    Do you hold any leadership positions
4  in nursing?
5      A.    Yes, I do.  I'm currently the
6  president of the Connecticut Nurses Association.
7          MR. CAHILLANE:  Okay.
8          MS. BUTLER:  The equivalent of the
9  Massachusetts Nursing Association?
10          THE WITNESS:  No.  The Massachusetts
11  Nursing Association --
12          MS. BUTLER:  Which is a union.
13          THE WITNESS:  That's right.  They --
14          MS. BUTLER:  So that's why I was
15  wondering.
16          THE WITNESS:  They separated from
17  the American Nurses Organization, which is
18  the national organization.  Each of the
19  states belong to the national organization,
20  but Massachusetts and California no longer
21  belong to the American Nurses Association.
22          MS. BUTLER:  Okay.  I guess what I
23  was confused about was whether the
24  organization that you're president of is

CATUOGNO COURT REPORTING, INC.
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI

IN RE: DUFAULT & MERCY HOSP. ARBITRATION - DAY IV
July 2, 2003

*IV*

### Page 66

1  bottle except where your IV tubing goes in. So
2  she would have had to disconnect, keep this --
3  focus on keeping this totally sterile, which is
4  hard. Alcohol your top of the bottle anytime
5  you're going to reconnect or add something.
6  Excuse me. With the needle. Take alcohol to
7  clean it.
8          Put your needle in and deliver it.
9  Let the medicine go in, in this case the 18 cc's
10  of volume. She had 18 milligrams of the drug.
11  Let it all go in there. Disconnect.
12          Which I'll just insert -- say, at
13  this point, that we try to get out of using
14  needles here whenever possible. And, in this
15  case, by doing it this way, you would have to use
16  the needle. And it's just general nursing
17  practice nowadays, you try to avoid using
18  needles, at whatever cost, because of sticks. So
19  you cap off the needle so no one else sticks
20  themselves.
21          So you added the medication. Then
22  you would have to take this spike, which is the
23  end of the -- one -- the other end of your IV
24  tubing, and reinsert it into the bottle. And

### Page 67

1  that just is a basic principle of nursing, that
2  you don't ever want to spike and respike, for
3  infection control purposes.
4          And then hang the bottle up and
5  leave it there. And it's unused, so I'm baffled
6  by why you added medication when you were --
7  according to Nancy's testimony, there was already
8  enough in there. But -- so she added the
9  medication, and it just stayed there, unused.
10      Q.   Well, let me ask you. I mean, in
11  terms of -- at least from -- from the record and
12  from the prescription that was given, is there
13  any apparent purpose for adding 18 milligrams to
14  that bottle?
15      A.   No apparent purpose because the
16  order was already DC'd, so it shouldn't have been
17  used in the first place. Plus, if she did
18  administer the controlled -- the Ativan in this
19  method, she documented in the computer already
20  that she gave it at 8:00 and at 12:00. So as far
21  as her accountability, her record of
22  administration, it was already there. So there
23  is no -- in my mind, any purpose why she would
24  take it out and then add it to something that's

### Page 68

1  not even being used.
2      Q.   Okay. I think that's all with
3  respect to the IV.
4          With respect to documentation, when
5  the nurse has administered Ativan or morphine or
6  any controlled substance, she's supposed to
7  document it where?
8      A.   I'm sorry, can you repeat the
9  question.
10      Q.   When the nurse has administered any
11  controlled substance, she's supposed to document
12  it where?
13      A.   In the computer, in the medication
14  administration record.
15      Q.   Okay. And with respect to that
16  computerized record, is there any part of that
17  record that the nurses, and possibly physicians,
18  would be relying on during their shift, in order
19  to see what the patient has or should get?
20      A.   Yes. There's, actually, two pieces.
21  As Dr. Kasper pointed out, there is the
22  medication administration record, which gets
23  printed out during the night shift. And that is
24  everything that's received, for example,

### Page 69

1  yesterday. It gets printed out last night, in
2  the middle of the night. The secretary or nurse
3  will file it in the chart. So physicians and
4  nurses can look at that medication administration
5  record to see everything the patient received
6  yesterday.
7          Now, as far as for today, there's
8  two ways that a nurse will look up what's
9  happening today. One, they can use that
10  medication administration schedule. And that's,
11  actually, kind of our -- the nurse coming on,
12  that's their bible of what meds the patient is
13  doing. And I shouldn't use the word "bible."
14  Their schedule of drugs: When the patient --
15  what the patient is on and when they're due. And
16  also on that med administration schedule is what
17  the patient most recently received, by the
18  previous shift.
19          MS. BUTLER: So the med
20  administration schedule --
21          THE WITNESS: Yes.
22          MS. BUTLER: -- is synonymous with
23  what we've sometimes called the flowchart?
24  Or not.

18 (Pages 66 to 69)

Page 70

1    THE WITNESS: No. We have the
2 bedside flowchart, which in the ICU we use
3 to document all our active, current vital
4 signs, etc. Our assessment findings. So
5 that's a bedside chart. And I know that
6 confused you in the past. No, it's not
7 always kept at the bedside. It's kept on a
8 clipboard. So sometimes it's at the
9 nurses' station, but many times the nurse
10 carries that yellow flowsheet into the room
11 to document things. Okay.
12    MS. BUTLER: Now, there's --
13 medication administration schedule is what?
14 And what does that look like?
15    Q.    (By Mr. Cahillane) Well, did you
16 procure an example of one of these?
17    A.    Yes. I took one -- printed one out.
18    Q.    I'd ask if you can identify that
19 as --
20    A.    Yes. This is a medication --
21    Q.    -- as an example of --
22    A.    -- administration schedule.
23    Q.    And --
24    MS. BUTLER: Well, I'm --

Page 71

1    MR. CAHILLANE: Yes, I'd like to
2 enter that as a hospital exhibit.
3    MS. BUTLER: Hospital 17, perhaps?
4    MR. CAHILLANE: Yes, I believe that
5 would be it.
6    MS. BUTLER: Okay. We're
7 identifying this exhibit as Hospital No.
8 17. And this is something called the
9 medication administration schedule. Shall
10 we call it the MAS?
11    THE WITNESS: Yes.
12
13    (Hospital Exhibit 17, medication
14 administration schedule, marked for
15 identification)
16
17    Q.    (By Mr. Cahillane) And is that, in
18 fact, what it's referred to as, the MAS?
19    A.    Yes. Nurses usually call it their
20 med sheet.
21    Q.    And this med sheet is printed out
22 from the computer.
23    A.    That is printed out from the
24 computer -- usually by the secretary, if there's

Page 72

1 a secretary, or the nurse will have to print it
2 out -- within the first hour of their shift. So,
3 for example, I'm working days today at 7 a.m.
4 Between 7:00 and 8:00 myself or the secretary
5 will print out my med sheet, my medication
6 administration schedule, for me for my shift. So
7 I will know everything the patient is due. Like
8 on page 1 of that it shows all the drugs, my
9 dosages, when it was started. And, also, in this
10 example, where it says date, June 12th, it shows
11 the times that the patient is due for them. So,
12 in this case, these are routine orders, scheduled
13 drugs. And page 2 also has some more scheduled
14 drugs.
15    Page 3 has the PRN order. And, in
16 this case, many of the examples we are referring
17 to are PRN orders.
18    Q.    And I take it that the accuracy of
19 the information on this MAS is dependent upon the
20 accuracy of the information that has been put
21 into the MAR computer.
22    A.    One hundred -- totally. Right.
23    MS. BUTLER: Remind me again what
24 "PRN" stands for.

Page 73

1    THE WITNESS: "PRN" stands for
2 medications that are ordered by the doc
3 that are given by the nurse only when the
4 patient needs them, according to certain
5 parameters.
6    MS. BUTLER: "Per required" --
7    THE WITNESS: Or "per RN," I've
8 always assumed. I'm not really sure. A
9 lot of these are Italian terms. The nurse
10 makes the -- Italian, sorry. Latin.
11    MS. BUTLER: PRN -- well, just so it
12 can stick in my unmedical mind, per patient
13 request?
14    THE WITNESS: Sometimes it's
15 request. Sometimes it's a need that the
16 nurse determines. For example, a
17 medication like -- we'll use this page.
18 Page 3, the second one down, is the
19 lorazepam, the Ativan. Or if we look at
20 the third one down, Ativan. It's
21 .5 milligrams P.O., by mouth, every four
22 hours PRN. And it says down at the bottom
23 there, "for anxiety." So, in other words,
24 if someone is not anxious, we're going not

19 (Pages 70 to 73)