UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-30014-MAP

| | | |
|---|---|---|
| THE MERCY HOSPITAL, INC., | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | **PLAINTIFF'S OBJECTION TO THE** |
| MASSACHUSETTS NURSES | ) | **REPORT AND RECOMMENDATIONS** |
| ASSOCIATION, | ) | **OF THE MAGISTRATE** |
| Defendant | ) | |

Plaintiff, Mercy Hospital, hereby objects, pursuant to F.R.C.P. 72(b) and Rule 3(b) of the

Rules for United States Magistrates in the United States District Court for the District of

Massachusetts, to the Report and Recommendations With Regard to Plaintiff's Motion To

Vacate and Defendants' Motion to Confirm Arbitration Award. Plaintiff specifically objects to

these findings:

- The Report's decision that *Eastern Associated Coal Corps.* v. *United Mine Workers of America*, 531 U.S. 57, 62 (2000) ("*Eastern*") does not support the plaintiff's position.

- The Report's decision that *Boston Med. Ctr.* v. *SEIU Local 285*, 260 F3d. 16, 21 (1st Cir. 2001) ("*BMC*") does not support the plaintiff's position.

- The Report's decision that other applicable case law does not support the plaintiff's position.

- The Report's factual statement at page 4 of the Report that the arbitrator found that other nurses had deviated from procedures in the manner that the grievant had.

1

- The Report's factual statement at page 7 of the Report that the arbitration found that the grievant had committed *only* documentation errors (emphasis supplied).

Beyond these specific objections, the plaintiff objects to the Report and to the Arbitration Award because it is evident even on the face of the award that the arbitrator has prohibited the Hospital from disciplining a registered nurse who had, on multiple occasions, violated the statutory and regulatory standards for the control, withdrawal, documentation and administration of controlled substances.

## STATEMENT OF FACTS

The plaintiff and the defendant are parties to a collective bargaining agreement (Exh. 1, p. 2). The defendant, Massachusetts Nurses Association, is the representative of all registered nurses at Mercy Hospital (Exh. 1, p. 2).

On August 29, 2002, registered nurse Nancy Dufault, a member of the bargaining unit, was terminated for "failure to adhere to the standards of narcotic/controlled substance administration - suspected drug diversion." (Exh. 1, p. 2). The Hospital's accusation was that Ms. Dufault had, according to the Hospital's computerized record of controlled substances, consistently removed controlled substances and in amounts exceeding the proper dosage as prescribed by the physician or at times that did not correspond to the prescribed dosage (Exh. 2, pp. 4-5).

The Hospital did not specifically contend or attempt to prove that Ms. Dufault was a drug user or that she was impaired at work. The Hospital's position was that it had a legal and ethical obligation to monitor the use of controlled substances at the Hospital and that it could not ignore the grievant's failure to follow proper procedures in the dispensing of those controlled substances

in circumstances where withdrawal of excess drugs in Ms. Dufault's care, left those substances unaccounted for, and suggested diversion. The Hospital did not know what Ms. Dufault was doing with those excess drugs, but there were at least three possibilities:   (1) that she was taking them for her own use; (2) taking them for the use of someone else; or (3) giving an overdose to the patient. There was no way the Hospital could determine which of those possibilities were the reason - but all of those possibilities were unacceptable. Nonetheless, the arbitrator effectively assigned the hospital the burden of proving use or impairment by the grievant and dismissed as meaningless the failure to follow procedures dictated by law to safeguard the use of controlled substances (Exh. 1, pp. 13-14).

The grievant had been a registered nurse at Mercy Hospital since 1977 and had worked the night shift in the Intensive Care Unit (Exh. 1, p. 2). In 2001 the Hospital introduced a computer system called "Omnicell" for the purpose of monitoring the use of controlled substances and other medications (Exh. 1, p. 3). It was required to do so, as the use of controlled substances is strictly regulated under federal and state law. *See eg, 21 U.S.C. §301 et seq; 21 U.S.C. §801 et seq, M.G.L. c. 94C §1-48, M.G.L. c. 112 §80B, 244 CMR §9.03.* Omnicell was a locked cabinet containing the controlled substances and medicines used in the Hospital and access was controlled by an attached computer. Nurses who were responsible for administering prescribed medications to patients would obtain the medications by entering their code and the patient's code into the computer and requesting the prescribed drug (Exh. 1, p. 3). The computer would then open access to the cabinet for the amount of the substance requested (Exh. 1, p. 5). It contemporaneously recorded and kept a record of the nurse opening it, the substance taken, the

3

amount of substance withdrawn, the patient and the time (Exh. 1, p. 3)[1]. The nurse would then administer the drug and record its administration in a separate computerized medical record referred to either as "MAR" or "SMS" (Exh. 1, p. 3). This computerized medical record was the official medical record and was used by doctors and nurses on the floor to verify what medications had been given to the patients (Exh. 3, Tr. Vol. I, p. 59, Vol. III, pp. 162-165, Vol. IV, pp. 19-21, 68-72).[2] Administration of medication was also sometimes recorded by nurses in nursing notes which included other information. The arbitrator conceded that the MARS/SMS was the proper place to record administration (Exh. 1, p. 10, n. 1).

After discrepancies in the records were first discovered in June and July of 2002, the supervisor (D'Espinosa) had nurse Cindy Gallant review the medical records of Ms. Dufault's patients to see if the withdrawals corresponded to the amounts prescribed and administered to the patients. What she then found were a large amount of drugs being withdrawn that were not administered to patients according to the medical record (Exh. 3, Tr. I, p. 26). The supervisor presented this information to her supervisor, Mary Brown, Director of Medical Surgical Nursing (Exh. 3, Tr. Vol. I, p. 27).

Ms. Brown placed Ms. Dufault on administrative leave pending further investigation (Exh. 1, p. 4). The grievant was told that there was a discrepancy between her withdrawals from Omnicell and the medical administration record (Exh. 1, p. 4-5). The Hospital investigated Ms.

---

[1] The nurse could not manipulate the time or amount recorded in the Omnicell - it was kept automatically. There was no dispute as to the accuracy of these items at the hearing.

[2] Here as elsewhere in its brief the plaintiff makes reference to portions of the exhibits or testimony at the arbitration hearing. This is not an attempt to retry factual issues decided by the arbitrator. Rather, it is a reference to undisputed portions of the record in order to explain the context of the findings in the opinion, to the extent they are not explicitly stated.

4

Dufault's Omnicell records for the period of time from April 1 to August 21. Comparison of

these records with the medical records of the patients revealed numerous disparities which could

be summarized as follows:

- Ativan and Morphine withdrawn by Ms. Dufault without any record of administration to the patient;

- multiple withdrawals of Ativan with a record of it being administered, but no record of the dose administered;

- withdrawals of Ativan or morphine from the Omnicell made several hours after the medical record showed an administration to the patient had already occurred.

- two situations where the grievant, when working with a nurse in training, withdrew the prescribed dosage of a drug, when the trainee had already withdrawn the drug and the trainee had administered it, with no record of Ms. Dufault administering what she took out (which would have made for a double dose if she had);

- a withdrawal of Ativan for a patient that the grievant was not responsible for, with a corresponding withdrawal and administration by the responsible nurse;

- withdrawal of a double dose with a record of administering a single dose and no record of a waste of the additional drug; and

- withdrawal of large amounts of morphine in excess of the prescription, with no record of the dose given the patient.

    (See Exhibit 4)

A meeting was then held with Ms. Dufault where Mary Brown presented to her, together

with the supporting documentation, the Hospital's findings as to the discrepancies (Exh. 1, p. 5,

Exh. 4). Present with Ms. Dufault was her union (MNA) representative. Ms. Brown showed Ms.

Dufault the records in question and asked for her explanation (Exh. 1, p. 5, Exh. 4). Ms. Dufault

gave a variety of responses either admitting she must have failed to record an administration of

the drug, that she failed to record a waste (where an excessive amount had been withdrawn) or that she "had no answer for that" (regarding her withdrawal of a dose of Ativan for a patient who was not her patient and whose nurse had already withdrawn and administered the proper dosage) (Exh. 1, pp. 5-6, Exh. 4).

The findings of fact make reference to Ms. Dufault's asking questions about the flow-in sheets and nurse's notes. (The actual testimony was that she questioned this regarding two of the incidents, not all of them (Exh. 3, Tr. Vol. II, 72-76)). Much is made of this by the arbitrator who goes on to state in the opinion that the Hospital "refused" to give the grievant these notes (Exh. 1, p. 10). What the findings of fact do not explicitly state (the evidence was undisputed on this point) is that neither Ms. Dufault or her representative ever *asked* or said they needed to see any other document other than the Omnicell and medical records that were being shown to her.[3] (Exh. 1, p. 7).

Likewise, the union representative present with Ms. Dufault did not request to see any other records (Exh. 1, p. 7, Exh. 3, Tr. Vol. I, pp. 72-80, 92, 131-132). The same is true of the second meeting on August 29th (Exh. 4). She again was represented by an MNA representative, asked one question about her notes, was told they did not contain an explanation, and did not ask to see anything (Exh. 1, p. 7, Exh. 3, Tr. Vol. I, pp. 92-95, 72-80, 131-132). Neither did the MNA representative ask (Exh. 1, p. 7, Exh. 3, Tr. Vol. I, pp. 72-80, 92-95, 99, 131-132). In the

---

[3]It is clear that the arbitrator understood and agreed that Ms. Dufault never asked for the nursing notes, or ever suggested she could answer the questions with them (Exh. 1, p. 7). Footnote 1 on page 10 carefully refers to this as "refusing to provide her with copies of these notes even after she asked *what they said.*" The arbitrator clearly understands that Ms. Dufault never asked to see these notes and never said to the Hospital that she needed to see them to give an explanation. She was informed of the content of the notes and did not inquire further (Exh. 4).

time between the two meetings, neither Ms. Dufault nor the MNA asked to see her nursing notes, or suggested they were necessary for her to respond.

A second meeting was then convened on August 29, 2002. Again, the grievant was represented by the MNA at the meeting (Exh. 4). Ms. Brown confronted the grievant with the fact that the IV bag or bottle drip that she claimed she had used had been discontinued. (Exh. 3, Tr. Vol. I, p. 128). Ms. Dufault said she "had no answer"; "I cannot recall that", and "I really think that is what I did". (Exh. 1, p. 6, Exh. 4). At the same time, even the MNA representative, Mr. David Powers, expressed incredulity at the grievant's explanation for how she used the existing drip to deliver the medication ("You did what?"). (Exh. 3, Tr. Vol. I, p. 99).

The conduct of these two meetings as described above, was not materially disputed at the arbitration hearing. Ms. Dufault asserted that at least at the first meeting, she was upset and could not recall some of the incidents. (Exh. 3, Tr. Vol. I, pp. 72-80). However, no one disputes that at the time she was informed of the charges, the grievant did not request to see or review any records to jog her memory, or to attempt to explain them further. Neither she nor her union representative suggested that she needed either time or information to furnish an explanation (Exh. 1, p. 7). There was no dispute that the grievant offered no more of an explanation than is indicated in Exhibit 4.

Ms. Brown then decided to terminate the grievant and she explained her decision as follows:

> ... Since there was no plausible explanation that I could see for any of this; there was so many cases where medication was taken out, documented it had been given previously; the comments about bolusing through the IV could not be accurate because the IV had been discontinued; there were too many discrepancies that point without any explanation. So the decision was made to terminate,

7

mainly for failing to adhere to our administration policy and suspected drug
diversion. (Exh. 3, Tr. Vol. I, p. 131).

Following her termination, Ms. Dufault filed a grievance under the collective bargaining
agreement. The process provided Ms. Dufault with additional opportunities to explain the
discrepancies. Still, neither she nor the MNA requested to see any other records or attempted to
provide any other explanation (Exh. 3, Tr. Vol. III, pp. 151-156).

It is clear from the opinion itself that the discrepancies at issue were more than merely the
possible documentation errors of misstating or neglecting to write in the medical record the
correct amount to be administered to the patient. This is evident from the arbitrator's discussion
on pages 13-15, that she accepts the testimony of hospital witness Kathy Hutchins that the
grievant was not acting in accordance with the physician's orders. On page 6 of the opinion
(Exh. 1, p. 6), the arbitrator describes another situation presented to the grievant which involved
the *amount* of morphine she had withdrawn for a patient, not documentation. (Exh. 1, p. 6).

With respect to the incident where the grievant had, according to the Omnicell,[4]
withdrawn multiple doses of Ativan at 2:20 a.m., for a patient who had already received all the
dose ordered (confirmed by both the medical record and Omnicell), the arbitrator "accepts" the
grievant's explanation that she placed the substance into a *discontinued* IV bag that was hanging
in the room, because she alleged that she had previously and improperly (*by her own admission*)
used the IV to deliver prior doses (Exh. 1, p. 14, Exh. 4). Even putting aside the fact that this

---

[4]As plaintiff's Exhibit 4 shows (Scenario, #3, p. 4) the issue was the withdrawal of more
morphine than had been ordered by the physician and not just the failure to document
administration.

"explanation" makes no sense at all (what would be the point in withdrawing new medication in order to place it into a discontinued and soon to be disposed IV bag?); this cannot in any way be construed as a "documentation" issue. That fact is clear from the arbitrator's opinion itself, because on page 13 of the Opinion, the arbitrator states:

> "The second witness on rebuttal, Patricia Duclos-Miller testified that it was not "proper" for nurses to record the administration of controlled substances in nurses' notes and it was not "proper" to take out additional medications ahead of time or to use a discontinued IV drip where the physician's order was for an IV push and that the extra narcotics (*i.e.,* those not administered) should be wasted in the presence of (and countersigned by) another R.N."

> (Exh. 1, p. 13)

Withdrawing additional medication before it is needed and allegedly throwing it away, is not a documentation issue. Adopting the grievant's assertion, as the arbitrator does, that she improperly administered a controlled substance in contravention of the physician's order, is not a documentation issue. The arbitrator finds "credible" the hospital testimony as to proper procedure but absolves the grievant from any consequences on grounds that the hospital did not show that her actions were "impossible" or "medically lethal" (Exh. 1, pp. 13-14).

The arbitrator's ultimate reliance on the notion that it is acceptable for a registered nurse to administer controlled substances to severely ill patients in any manner that is "possible" and "not fatal" is not a documentation issue. It is instead a complete rejection of the Hospital's effort to comply with Federal and State laws and regulations regarding the use of controlled substances, and nursing practice.

9

# I.     THE REPORT MISCONSTRUES THE EFFECT OF THE EASTERN ASSOCIATED COAL CORP. AND THE BOSTON MEDICAL CENTER CASES

In the Report and Recommendation the Magistrate relies on the decision of the Supreme Court in *Eastern Associated Coal Corp. v. United Mine Workers of America*, 531 U.S. 57 (2000). The Eastern decision does not contradict the plaintiff's position but instead supports it.

With respect to the *Eastern* decision, the Report states at page 7:

> "However, because no law mandated the discharge of an employee who tested positive for drug use, the court found that the order to reinstate the employee did not violate public policy."

*Report and Recommendation,* p. 7

This is not a correct statement of the *Eastern* holding, because it effectively states that Eastern requires that unless a positive law mandated the dismissal of an employee who (in that case) tested positive for drugs, no arbitration decision short of that could be challenged, or in other words, that only violations of positive law are subject to challenge. The *Eastern* court specifically rejected this approach:

> We agree in principal that the court's authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law. *id.* at 63.

The adoption of this principle is clearly intentional as the concurring opinion of two justices takes issue with this very point. *id.* at 67-68.

What the *Eastern* court does reject is the notion that arbitration decisions can be challenged on the basis of "general considerations of supposed public interests." *id.* at 62 stating:

> "The Court has made clear that any such public policy must be "explicit", "well defined", and "dominant". *Ibid.* It must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."
>
> *id.* at 62.

The *Eastern* court then goes on to describe the issue as whether the "agreement to reinstate" (in that case, but here the agreement to not only reinstate but also prohibit discipline for) "violates public policy". *id.* at 62-63:

> To put the question more specifically, does a contractual agreement to reinstate Smith with specific conditions...run contrary to a explicit, well-defined and dominant public policy, as ascertained *by reference to positive law* and not from general considerations of supposed public interests.
>
> *Id.* at 63 (emphasis supplied)

The court here requires a *reference* to positive law, not an absolute violation of it per se. The requests that the reference be to an explicit well-defined and dominant public policy is a requirement which the plaintiff in this case has manifestly demonstrated (see below).

Even more to the point, the Report misses the thrust of *Eastern* by claiming it is distinguishable from the present case by reference to different facts, i.e., that Nancy Dufault was not proven to be actually using controlled substances herself. *Eastern* turned on the court's determination that the statute in question specifically did not require dismissal of the employee and that the arbitrator's approach: suspension with conditions, was actually *in concert* with the statutory scheme which had specifically rejected dismissal and encouraged rehabilitation. *id* at 64-66.

11

That is not the situation here. In *Eastern* the employee won an arbitration award in which the arbitrator did not condone the employees behavior. Instead, the arbitrator fashioned a remedy that the court determined was consistent with the public policy at issue because those policies favored rehabilitation, specifically rejecting a requirement of dismissal and instead leaving decisions on reinstatement "to management/driver negotiations." *Eastern* at 64-65. As the court stated:

> The award before us is not contrary to these several policies taken together. The *award does not condone Smith's conduct* or ignore the risk to public safety that drug use by truck drivers may pose. Rather, the award punishes Smith...
>
> *Eastern,* at 65 (emphasis supplied)

Here the arbitration award does just the opposite: it does condone specific violations of public policy and assess no penalty against the offender. The statutory and regulatory scheme requires the following:

> Each nurse licensed by the Board and engaged in the practice of nursing shall have knowledge and understanding of the Standards of Conduct for Nurses set forth in 244 CMR 9.00, all state laws and Board regulations governing the practice of nursing, and all other state and federal laws and regulations related to the practice of nursing. . . .
>
> Adherence to Standards of Nursing Practice. A nurse licensed by the Board shall engage in the practice of nursing in accordance with accepted standards of practice. . . .
>
> > (a) A nurse who holds a valid license shall comply with M.G.L. c. 11: §§74 through 81C, as well as with any other laws and regulations related to licensure and practice. Examples of such laws include, but are not limited to, the following: . . .
> >
> > 8.    M.G.L. c. 94C (Controlled Substances Act - requirements for possession, dispensing, administering, and prescribing controlled substances); . . .

12

(10) Acts within Scope of Procedures. A nurse who holds a valid
license and is engaged in the practice of nursing in Massachusetts
shall perform acts within the scope of nursing practice as defined
in M.G.L. c. 112, §80B and 244 CMR 3.00. ...

(35) Security of Controlled Substances. A nurse licenses by the Board
and engaged in the practice of nursing shall maintain the security
of controlled substances that are under his or her responsibility and
control. ...

(37) Unlawful Acquisition and Possession of Controlled Substances. A
nurse licenses by the Board shall not lawfully obtain or possess
controlled substances.

(38) Administration of Drugs. A nurse licensed by the Board shall not
administer any prescription drug or non-prescription drug to any
person in the course of nursing practice except as directed by an
authorized prescriber. ...

(39) Documentation of Controlled Substances. A nurse licensed by the
Board shall document the handling, admission, and destruction of
controlled substances in accordance with all federal and state laws
and regulations and in a manner consistent with accepted standards
of nursing practice.

*244 C.M.R. §9.03*

These explicit standards are repudiated by the arbitrator's opinion because the Hospital is

prohibited from disciplining a nurse for violation of these very standards. Nancy Dufault was

terminated for "failure to adhere to the standards of narcotic/controlled substance administration

- suspected drug diversion" (Exh. 3, p.6). The arbitrator finds that Ms. Dufault did indeed fail to

adhere to the proper standards, but excuses those failures as essentially, no big deal. The

arbitrator finds that the nurse in this case:

- misstated the time and amount of dosages of controlled substances she

13

administered (Exh. 1, p. 13). *See 244 C.M.R. §9.03 (39)*

- failed, completely on some occasions, to record her administration of controlled substances in the medical record (SMS/MAR) where it was to be properly recorded (Exh. 1, pp. 12-15). *See 244 C.M.R. §9.03 (35) (39)*

- withdrew "additional" medications prior to the time they were needed (Exh. 1, pp. 12-15). *See 244 C.M.R. §9.03 (35) (39)*

- used a "drip" discontinued by the physician to deliver a controlled substance to a patient, i.e., in the opposite of the manner prescribed by the physician.[5] (Exh. 1, pp. 14-15). *See 244 C.M.R. §9.03 (38)*

- further ignores the fact the Ms. Dufault failed to document and have witnessed (by signature) the waste of narcotics or controlled substances where more was withdrawn than was necessary.[6] (Exh. 1, pp. 12-14).

Each of these actions is specifically prohibited by the regulations. Maintenance of the

---

[5]This is no mere technicality. Even the arbitrator notes it was not "good practice" because of the difficulty of controlling the speed of injection into the body. The arbitrator makes it seem as if this was just a disagreement about methodology, or a shortcut. Ms. Dufault *agreed* it was an improper practice and that Ms. Hutchins (who the arbitrator said was credible on this issue) testified that the method used would have delivered the medication at *nine* times the proper speed. (Exh. 3, Tr. Vol. IV, pp. 57-58). Failure to give the medication in the manner prescribed by the physician is specifically prohibited by *244 C.M.R. §9.03 (38)*.

[6]This too is no technicality. It is specifically prohibited by *244 C.M.R. §9.03 (39)*. Often times medication comes in sizes larger than the prescribed dose. Consequently, nurses are required to give the required dose only and with a witness present and signing off, waste the remainder *and* record the waste in the Omnicell. The arbitrator neglects to include in her opinion the undisputed fact that in the entire five month period examined in her Omnicell record, the grievant never *once* recorded a waste. Without adherence to these required procedures any nurse could continually take additional narcotics, and "claim" it was waste, and there would be no way to dispute it.

security of controlled substances required proper documentation and adherence to procedures for waste (*244 C.M.R. §9.03 (35) (39)*). Drugs are to be administered only *as* directed by an authorized prescriber (*244 C.M.R. §9.03 (38)*), not by shortcuts.

Nowhere in the statutes or regulations is such conduct excusable on grounds that no one was killed. The Hospital has an obligation to follow the law and to maintain proper procedure for the use of controlled substances. The arbitrator says it cannot enforce that standard. Indeed, the arbitrator openly mocks the concept of "proper" procedures, not just as to documentation but with respect to witnessing the waste of additional medication and following the physician's orders (Exh. 1, 13-14). The hospital witnesses may have been correct as to the proper procedure, the arbitrator finds, but because the grievant's actions were not "impossible" or "medically lethal", there was no just cause to dismiss her. The arbitration award takes the state's requirements for the handling of controlled substances and dismisses them as too much to ask of busy nurses.

These are not generalized concerns about the public interest or even just patient safety, although those issues certainly are implicated. This case involves an arbitrator mockingly dismissing specific regulatory standards for the use of controlled substances by registered nurses.

It may be claimed that the arbitrator's "due process" analysis provides an independent basis for the award that does not violate public policy. This is not so. What the arbitrator creates as due process requirements would completely frustrate a hospital in monitoring the use of controlled substances. The arbitrator holds that even though the grievant didn't ask to see any further records, they should have been immediately given to her anyway. This would mean that in order to investigate a discrepancy, a hospital would have to provide copies of all the complete

15

medical records for a nurse to review before it is allowed to take action, merely on the off chance that the nurse might have reason to look at them. Such a standard would frustrate reasonable attempts to monitor the use of drugs. Ms. Dufault was provided *two* meetings where she was represented where she was confronted with the evidence against her and given the chance to explain. No one suggested then that she needed time or more documents. She had further opportunity to explain in the grievance process. The further suggestion by the arbitrator that the hospital should not be able to reference events just two months old further stifles proper investigation. Not every discrepancy can be uncovered immediately. Looking at an event that is two months old is not regarded as unfair in any other legal context. It should not be here.

This case also differs from *Boston Medical Center* v. *Service Employees International Union*, 260 F3d 16 (1st Cir. 2001). The "public policy" at issue there was a general standard of "competence" and the arbitrator, as in *Eastern,* had assessed a stiff penalty in that case, a nine month suspension. *id.* at 20. The court decided that the Massachusetts statute which made nurses "accountable for safety of nursing care..." (*G.L. c. 112 §80B*), was not an "explicit, well defined and dominant public policy" ... that prohibited reinstatement "in these circumstances..." *id.* at 25 (i.e., a nurse who had committed one serious act of negligence). The court referred to the policy as a "general public policy promoting the competence of nurses" and held that:

> Here the Hospital is arguably correct in asserting the regulations established a public policy that RNs be competent. Even assuming that there is such a policy, however, the Hospital has not shown reinstatement of [the grievant] would clearly violate the policy. The arbitrator did not find that [the grievant] was incompetent to properly carry out the basic responsibilities of an RN...
>
> In the absence of such findings we cannot conclude that Hartney's one act of professional negligence during her 10 year career,

16

serious though it was, means her reinstatement violates the public policy of Massachusetts promoting the competence of nurses and patient safety.

> serious though it was, means her reinstatement violates the public
> policy of Massachusetts promoting the competence of nurses and
> patient safety.

*Boston Medical Center* at 26-27.

The court also stated that the analysis should be a "fact specific approach to considering the consequences of reinstating an employee found to have engaged in misconduct." *Id* at 26.

In this case the arbitrator found that the grievant committed acts which violated specific public policies, gave the grievant no penalty at all and thumbed her nose at the proper procedures as too much for a busy nurse to have to worry about.

The Report and Recommendation does not attempt the kind of analysis envisioned by *Eastern* or *Boston Medical Center*. Instead, it only compares the findings as to drug use between the two cases. This misses the point on several levels. First, the Report, like the arbitrator, emphasizes the inability of the hospital to prove that the grievant was *using* drugs and thus compares the case unfavorably to *Eastern*. However, the hospital has a broader obligation than merely seeing to it that employees are not themselves using drugs. A diversion is occurring whenever the drug is not given to the patient as prescribed. Whether the grievant was taking drugs for herself, giving them to others or over-dosing the patient, there is no material difference to the hospital, since all of these are unacceptable (and illegal) outcomes. Grievant's misuse of drugs and administrative procedures to safeguard them cannot be excused by a belief that she did not herself use them.[7]

---

[7]In this respect it should be remembered that the grievant was not fired for being impaired on the job. She was fired for "failure to adhere to the standards of narcotic/controlled substance administration - suspected drug diversion."

Secondly, the report further compares this case to *Eastern* by stating that the grievant "was found by the arbitrator only to have committed documentation errors" (Report p. 7). As noted above, this is not so. The arbitrator's complete findings include more than mere documentation errors, and only by so finding such errors could the arbitrator have concluded as she did. The arbitrator's findings are consistent with the hospital's stated reason for dismissal: "the failure to adhere to the standard of narcotic/controlled substance administration" (which in turn created the suspicion of drug diversion). This is clear from the opinion itself. The arbitration concedes the fact of discrepancies in the medication record. On page 4, the arbitrator finds that discrepancies were found in July 2002 between withdrawals and administration, and the grievant was informed of this (Exh. 1, p. 4). The arbitrator found, not that there were only documentation errors in these, but "that, in all likelihood *most* of the discrepancies *could* be accounted for as simple inaccuracies or omissions when she was filling out the SMS/MAR on the computer at the nurses station at the end of her long (12 hr.) shift." (Exh. 1, p. 9).

That the arbitrator's findings go beyond issue of documentation is clear from the discussion on pages 13 and 14 of the opinion where she describes non-documentation issues such as: "taking out *additional* medications ahead of time"; using a discontinued IV drip instead of a push, in violation of the physician's orders; and the failure to waste excess narcotics in the presence of a witness (Exh. 1, p. 13).

None of those are documentation issues. They are all issues as to how nurses are required by law to handle controlled substances. The arbitrator specifically finds the hospital testimony "credible" but discounts it *because* the grievant deviated from the requirements:

18

> This testimony while credible, is non-dispositive. It in no way
> disproves the grievant's testimony that she (and other RN's)
> occasionally deviated from proper procedures by using short cuts,
> or by helping each other out during breaks, and so forth.
> (Exh. 1, p. 13-14)[8]

Again, with respect to the grievant's attempted explanation for her withdrawal of an

additional unprescribed dosage of ativan at 2:20 a.m.,[9] and Nurse Cathy Hutchins description of

how the practice would have been improper, the arbitrator stated:

> Although she disagreed with the method the grievant said she used
> in administering an addition 18 mg of ativan that she removed
> from the Omnicell, Hutchins did not testify that it was impossible
> or medically lethal to do what the grievant thought she did.
> (Exh. 1, p. 14).

The arbitrators standard: not "impossible" and not "lethal" makes a farce of the regulatory

standards for the control and administration of controlled substances.

## II.   APPLICABLE CASE LAW DOES SUPPORT VACATION OF THE AWARD

The Report and Recommendation asserts that the cases relied on by the plaintiff are either

distinguishable or abrogated by the *Eastern* or *BMC* decisions. The Report, for instance, states

that *Delta Airlines, Inc.* v. *Air Line Pilots Ass'n Int'l*, 861 Fed. 665 (11th Cir. 1988) and *Iowa*

---

[8]It should be noted as well that the only "shortcut" practice that the arbitrator specifically found other nurses to have engaged in, was preparing additional medication ahead of time (Exh. 1, p. 12).

[9]The grievant had contended that she had withdrawn additional ativan not needed by the patient to put the medication into a discontinued IV bag which she said she had used earlier to administer the medication, even though the method would have contravened the doctor's orders (Exh. 1, pp. 13-14, Exh. 4). The grievant claimed she had done this for the sake of convenience, although it is obvious from the arbitrator's description of the procedure on page 14 that it would have been much more inconvenient that the single injection that was ordered.

19

*Elec. Light and Power Co.* v. *Local Union 204 Int'l Bhd. Of Elec. Workers*, 834 F.2d 1424 (8th

Cir. 1987) were "explicitly" not followed by the 1st Circuit in *BMC*. But in *BMC* the court stated

with respect to those cases:

> The conclusions of other courts that the pubic policies of other
> states forbid the reinstatement of an employee *in circumstances
> distinguishable* from those we have before us are not persuasive in
> deciding the instant matter."

*BMC* at 25, n. 7

The court, therefore, did not reject the reasoning or principle of these cases, but rather

found both the public policies and the facts different from the situation in *BMC*. *BMC* concerned

a general policy of safe nursing case and a single act of negligence. *This* case is much more like

the *Iowa Elec. Light and Power Co.* case than the *BMC* case. Here the arbitrator explicitly

*rejects* specific public policies for the control of dangerous medications and allows no discipline

for their violation. The arbitrator here finds that proper nursing practices were not followed, but

says "so what." Likewise in *Iowa*, the court rejected the arbitrator's exoneration of an employee

who breached specific required safety protocols. *Iowa* at 1427.

The Report also rejects *Russell Mem'l Hosp. Ass'n* v. *United Steelworkers of American*,

720 F. Supp. 583 (E.D. Mich. 1989), because it relies on *Delta* and *Iowa*. But the situation here

is more persuasive than in *Russell,* which involved negligent administration of medication in

violation of a general policy of safe nursing. *Russell* at 584-586. Even there, the arbitrator denied

back pay, effectively giving the employee a lengthy suspension. *Russell* at 583. Here the

arbitration award contains no sanctions at all, because the arbitrator rejects the notion that nurses

20