should have to comply with the specific regulations on the handling of controlled substances whether the failure was negligent or intentional.

The Report attempts to distinguish *Illinois Nurses Ass'n* v. *Bd. Of Trustees of the Univ. of Ill.*, 741 N.E. 2d. 1014 (Ill App. Ct. 2001) on grounds that the Illinois statute explicitly provided a public interest in "safe nursing" that the Report claims is not present in Massachusetts. This is not so. The *BMC* case recognizes that Massachusetts *does* have such a policy. *BMC* at 24-25. However, the *BMC* court held that the policy was not clear enough or specific enough for there to be a public safety violation for reinstatement (albeit with punishment) for "one act of negligence in a ten year career." *BMC* at 26-27. In contrast, in this case, specific and explicit regulations regarding proper handling of controlled substances were violated by the grievant but exonerated by the arbitrator. So here both a general and a specific public policy is violated. In *Illinois Nurses*, the conduct of the nurses was similar to the grievant's conduct here, but less egregious as it involved general nursing practice rather than regulation of controlled substances (e.g., negligent care, failure to follow doctor's orders, falsifying a chart). *Illinois Nurses,* at 1017-1020. That court rejected the argument that a state statute would have to mandate a discharge:

> Tomanek also argues that no explicit provision in the Nursing Act mandates discharge for those who violate the Act. Tomanek's argument is irrelevant to the issue on appeal. The relevant question is whether Tomanek's reinstatement violates a well-defined and dominant public policy. Here, Tomanek jeopardized the lives of two patients in a three-day period; her reinstatement violates the public policy favoring safe nursing care...
>
> *Illinois Nurses* at 1024

21

The *Illinois Nurses* court noted, as the plaintiff does here, that in the *Eastern* case, the court found that the arbitrator's award was not contrary to the public policy at issue. No such finding could be made here. The arbitrator accepts that proper procedures were not followed.

## CONCLUSION

For the reasons stated above, the District Court should deny the Report and Recommendation and vacate the arbitration award.

THE PLAINTIFF, THE MERCY HOSPITAL, INC.
BY ITS ATTORNEY

Dated:    February 2, 2005

Maurice M. Cahillane, Esq., BBO# 069660
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served this 2nd day of February, 2005, on all parties, by First Class Mail, postage prepaid, to:  Mark A. Hickernell, Esq., McDonald & Associates, 153 Cordaville Road, Suite 210, Southborough, MA 01772

Maurice M. Cahillane

0423-020804\84018.wpd

22

AMERICAN ARBITRATION ASSOCIATION

In The Matter Of The Arbitration Between:

| | |
|---|---|
| MASSACHUSETTS NURSES ASSOCIATION | ) )
) |
| and | ) OPINION AND AWARD |
| MERCY HOSPITAL | ) )
) ) |

Re: AAA Case No. 11 300 02745 02
Before: Arbitrator S. R. Butler, Ph.D., J.D.
Date of Award: December 22, 2003

Duly appointed by the American Arbitration Association pursuant to the above-listed Parties' January 1, 2001 Collective Bargaining Agreement, the Undersigned held hearings in Springfield, Massachusetts on February 21, June 10, 11, 12, and July 2, 2003. Witnesses at the hearing were sworn. A written transcript was produced covering the last four (4) of the five (5) days of hearing. Both Parties submitted post-hearing briefs. The record was declared closed on December 1, 2003, with the Opinion and Award due on or before January 5, 2004.

## APPEARANCES

For the MNA: Mark A. Hickernell, Esq.  McDonald & Associates

For the Hospital: Maurice M. Cahillane, Esq. Egan, Flanagan and Cohen, P.C.

## APPEARANCES

| For the MNA: | Stephen Mikelis, MNA Chairperson
Andrea Fox, MNA Associate Director
Patricia Jacque, RN
Beverly Thomas, RN
Nancy Dufault, RN, Grievant |
|---|---|
| For the Hospital: | Robert Lewandowski, Director of Pharmacy |

Beverly A Ventura, V.P. Patient Care Services
Jean M. D'Espinosa, Nurse Manager, ICU
Kathy Hutchins, Clinical Nurse Specialist
Mary Brown, RN, Director Medical Surgical Nursing
Robert J. Kasper, MD, Interim V.P. Medical Affairs
Patricia Duclos-Miller, Director of Quality Improvement

## STIPULATED ISSUES

Was the termination of the Grievant for just cause?  If not, what should be the remedy?

## THE AGREEMENT

The Parties' January 1, 2001 – December 31, 2003 Collective Bargaining Agreement provides in pertinent part (Jt. Ex. 1)

Article XIV

14.01 Management Rights

The Association recognizes that the Hospital has the obligation of serving the public with the highest quality efficient and economical medical care and in meeting medical emergencies . . . The Association further recognizes the right of the Hospital to  . . . discipline or discharge employees for just cause . . .

## THE FACTS

This case involves the August 29, 2002 discharge of Nancy Dufault, a Registered Nurse, for "failure to adhere to the standards of narcotic/controlled substance administration – suspected drug diversion," specifically, failure to administer certain drugs that doctors had ordered for five (5) different patients under her care. The Grievant had been employed by Mercy Hospital in Springfield, Massachusetts ("the Hospital") since 1977. At the time of her termination, she had been working as a nurse in the Hospital's Intensive Care Unit (ICU) on the night shift (7 p.m. to 7 a.m.) caring for patients many of whom were critically ill and/or in the last stages of dying – all involving the

administration of various pain/anxiety-reducing drugs such as Ativan, Lorezapam, and morphine.

It is undisputed that the Grievant was required, amongst her other duties, to act as a preceptor of other nurses new to the ICU, and that in this role she was to oversee the patient care given by the new nurse ("the orientee"). It is also undisputed that the Grievant was given no formal training in "precepting " *per se* and that the Hospital had no written guidelines or policies as to who is responsible for the documenting of medications given by a preceptor and/or an orientee. It appears that the Grievant, an older, experienced RN, may have been viewed as somewhat intimidating by some of the younger nurses at the Hospital, but she was commended for her work as a preceptor in 1995. (MNA Ex. 2) The Grievant's last performance evaluation prior to her termination showed that she had, overall "[met] the standards" expected by the Hospital and that she had "exceed[ed] standards" in documenting, amongst other duties. In sum, the evaluation stated (MNA Ex. 3):

> Nancy is a very strong expert critical care nurse. She cares very solidly for her patients and their dignity. Nancy usually works on CCU sick and helps her colleagues as a resource on nights. Most recently she has rotated to the ICU when needed which has been very helpful. She picks up a lot of extra time which also displays her concern for the unit. Nancy keeps her skills very sharp, always aware of the latest and greatest new thing. She does follow through to assure all her patients' needs are met. She excels at attendance and punctuality -- again always picks up extra time.

It is further undisputed that, during the fall of 2001, the Hospital introduced a new machine to the ICU, the Omnicell -- an ATM-like machine that keeps track of the nurse removing medications from it, the patient for whom the medications are being removed, and the name and quantity of medications removed. The Grievant and others were given brief, introductory training on how to operate the Omnicell itself, but there were no changes made in the various documenting forms used by the Hospital for some time, i.e. forms such as the "Medication Administration Record" ("SMS" or "MAR"), filled out by nurses at the computer in the nurses' station, and/or the "Flow Sheet" ( a four-sided document filled out by hand in small spaces indicating the patient's blood pressure,

4

temperature, heart rate, vent data, lab data, nursing care and treatments, pulses, medication intake, urine, etc. output, lines, physical assessment data, and nurses notes. (Jt. Ex. 4)

In June of 2002, Cindy Gallant, a nursing supervisor, brought to the attention of Jean D'Espinosa, another nursing supervisor, something that appeared to be a discrepancy between what the records showed the Grievant had withdrawn from the Omnicell and what had been administered. It was Ms. D'Espinosa's testimony that she questioned the Grievant about what seemed like a large amount of Ativan having been withdrawn, but she thought the Grievant's explanation was reasonable, and she let it pass. Specifically, she attested (Tr. I, p. 22):

> Q. Now, did anything else come of this incident?
> A. No.
> Q. And why didn't you do anything else?
> A. I felt really comfortable with her answer. She had been a nurse a very
> long time in the ICU. There was no reason to believe anything else.

In late July of 2002, however, Ms. Gallant again brought up the matter of apparent disparities involving the Grievant's withdrawals from the Omnicell. This time D'Espinosa directed Gallant to review the medical records of the relevant patients, and she obtained pharmacy records for Gallant's review. At the end of August, Gallant presented the results of her review to D'Espinosa. D'Espinosa concluded that the Grievant had failed to chart some of the medications she had withdrawn, and she took the matter up with Director of Medical/Surgical Nursing, Mary Brown.

On or about August 21, 2002, Brown directed that the Grievant be put on administrative leave immediately, pending a further investigation by Kathy Hutchins. When the Grievant called D'Espinosa to ask why she was being put on administrative leave, she was told that there had been a discrepancy found between what she had removed from the Omnicell and what the SMS showed she had administered and that she would be called in for a meeting hopefully by the end of the week. The Grievant testified that she then "tried to think of Omnicell things that I had taken out that I might not have signed out in

the SMS system that would warrant such an action by the hospital." (Tr. II, p. 69) All she could think of was one instance where she had removed "multiple vials of Ativan." (Id., p. 70)

On Monday, August 26, 2002, Director Brown called the Grievant and set up a meeting with her for 10 a.m. the following morning, August 27, 2002. According to the Grievant, Brown told her that "this was my chance to dispute the discrepancy, or give my explanation of the transgressions that they had found between the Omnicell and my SMS documentation." (Id.) The meeting the next morning was attended by the Grievant, a MNA representative, Mona Karkut, D'Espinosa, and Brown. Brown presented the Grievant with Omnicell readouts (documents the Grievant had never seen before) and SMS readouts (documents filled out by the Grievant that she had seen before). According to the Grievant, the meeting lasted between 30 and 40 minutes.

> A. [Brown] would present -- show me the Omnicell, show me the SMS, and then expect me to recollect what had transpired on this [day] or caused me [to make] this discrepancy...

> Q. And were you able, on the 27th, to recall the specific instances that were presented to you?

> A. I tried to give responses to what could have happened, or what could have caused this discrepancy on them. But not knowing who the patients were, or even being able to associate, even if they gave me a name, what the patient was -- I mean, most of the events were two months prior. (Tr. II, pp. 72-73)

The Grievant further attested that she was shown no other documents besides the Omnicell and SMS readouts and that, when she asked what the flow sheets or her nurse's notes said, D'Espinosa said that, "'If it's not charted, it's not documented,' that 'The nurse's notes is not a legal part of the chart.'" (T.II, p. 75) The Grievant offered her best recollections and speculations as to what she might have done in the various cases where the records seemed to show discrepancies. The meeting ended inconclusively.

It was Mary Brown's testimony that she then met with the Hospital's Vice President, Beverly Ventura, told her about the Grievant's responses at the meeting and "at that point, we were very suspicious that we had some type of drug diversion going on." (T I, p. 126) Brown attested that she and Ventura agreed on two solutions: either the Grievant would be allowed to take leave pending completion of the Substance Abuse Rehabilitation Program (SARP) or "if we could not resolve the discrepancies at the second meeting that was scheduled for the 29th, that we would have no option but to terminate Nancy, based on suspected drug diversion, and report her." (T I, p. 127)

On August 29, 2002, a second meeting was held with the Grievant. In attendance were the Grievant, a MNA representative, Dave Powers, D'Espinosa, and Brown. Brown informed the Grievant that one of her explanations had essentially been disproved because records showed that the i.v. drip she had claimed to have bolused had in fact been discontinued on that patient some time earlier. Brown also brought up two new discrepancies. The Grievant again asked if her nurse's notes explained why she had taken out a certain amount of morphine for one patient, and was told that they did not. The meeting ended with the Grievant being offered an opportunity to meet with Brown privately. Then she was presented with a termination notice and a final paycheck. The effective date of discharge was the same day: August 29, 2002. The reason for termination given on the termination notice was (Jt. Ex. 2):

> Failure to adhere to the standards of narcotic/controlled substance administration – suspected drug diversion.

It is undisputed that the Hospital did not ask the Grievant to take a drug test before terminating her. It is further undisputed that the Grievant had herself tested twice at her own expense for substance abuse, including Ativan, Ativan-like substances, and morphine, within a week of her termination, and both tests were negative. The MNA states that a hair follicle test which can determine whether the subject has taken any drugs in the prior six months was done in March of 2003, and that it, too, was negative.

## THE POSITIONS OF THE PARTIES

The Hospital: It is the position of the Hospital that there was just cause for the Grievant's termination. Briefly summarized, the arguments put forward by the Hospital are the following:

First, while there is no dispute that the Hospital bears the burden of proof in a discharge case such as this, arbitrators do not agree as to what evidentiary standard applies: preponderance of the evidence, clear and convincing evidence, or beyond a reasonable doubt. The Hospital maintains that the proper standard here is the preponderance of the evidence. This is so, the Hospital argues, because (Hosp. Brief, p. 8)

> A hospital is not in the same position as other employers with respect to the subject employee use and/or possession of drugs and/or controlled substances. Unlike other employers, a hospital is actually involved in the dispensing and administration of these substances. . . . In a hospital, unlike other places of employment, employees have access to controlled substances, and the hospital has a special duty to monitor their use. . . Therefore, the hospital must be permitted a high standard for employee behavior in the handling of controlled substances and not be burdened by a higher than usual burden of proof in matters related to the dispensing of controlled substances.

Second, it is the Hospital's contention that the evidence it presented combined with the Grievant's inability to explain what happened to the missing drugs amply demonstrates that there was just cause to terminate her employment. "Investigation of the medical records demonstrated that the grievant had a pattern of practice which could only be explained by some form of diversion on her part." (Ibid., p. 9) Even though she was accompanied by a Union Representative at the time she was confronted with the charges against her, the Grievant never suggested that she might be able to explain if she were provided with certain records. In fact, the Grievant never was able to explain the discrepancies between the drugs she removed from the Omnicell and the drugs she showed as administered – even at the arbitration hearing after she had had considerable time to examine all the relevant records. It is irrelevant that the Grievant passed a drug test after her termination. It matters not what happened to the missing medications. The Hospital is only responsible to see that all drugs are properly administered to its patients.

Where the Grievant was unable to account for all the drugs she withdrew, her termination was fully justified.

The MNA: It is the position of the MNA that the Grievant's discharge was without just cause. The MNA contends as follows:

First, the grievance is sustainable on due process grounds alone. Where, as here, the employer failed to give the employee a fair chance to be heard, or where, as here, the employer failed to conduct an adequate investigation before imposing discipline, arbitrators have overturned the discipline on due process grounds alone. (Citations omitted.) In this case, "the termination of Nancy Dufault shocks the conscience" because, despite the fact that she had been employed at the Hospital since 1977 and was well known for her competence and devotion, the Hospital neither gave her a fair opportunity to respond to the charges against her, nor did it conduct an adequate investigation, including a drug test and interviews with relevant witnesses, nor did it consider progressive discipline before terminating her. "The most basic due process considerations should have compelled the Hospital to provide Dufault with the full patient records, including nurse's notes, for each of the alleged discrepancies between medications withdrawn from the Omnicell, and medications administered. Because it did not do this the discharge is without just cause." (MNA Brief, pp. 15-16)

Second, the grievance must be sustained because the evidence shows that the Grievant never diverted the drugs she was accused of diverting. In its termination notice, the Hospital effectively admitted that it had only reason to "suspect" that the Grievant might have diverted the seemingly missing medications. Nor did the Hospital present any persuasive *evidence* of drug diversion many months later at the arbitration hearing. Suspicion is not grounds enough. "It is appalling that the Hospital would have ruined the career and good name of an excellent nurse like Dufault when it knew that it had not *proven* any serious charge against her." (Ibid., p. 22, emphasis added)

Third, even if all of the charges against the Grievant are somehow found to be valid, termination was inappropriate. "Termination is an inappropriate punishment for the first offense of a reliable, long-term employee." (Id., p. 32)  In this instance, the Grievant's nearly thirty (30) years of service should be viewed as a mitigating factor. At a minimum, the Grievant's termination should be reduced to a more appropriate penalty.

In sum, for all of the aforestated reasons, the MNA asks that the grievance be sustained. As remedy it asks that the Grievant be reinstated without loss of seniority or other benefits, that she be made whole for lost earnings, including interest at the statutory rate of 12% and that she be made whole for the other costs, including private attorneys and stenographers incurred by the Grievant as a result of the Hospital's actions.  Finally the MNA asks that the Arbitrator retain jurisdiction over any disputes arising from the implementation of the remedy awarded.

## OPINION

It is undisputed that, to prevail in this matter, the Hospital must prove, at least by a preponderance of the evidence, that the Grievant committed the acts that formed the basis of her termination, namely that she knowingly engaged in drug diversion.  This the Hospital did not do. The Hospital's evidence consisted of little more than insistence that *only* drug diversion could explain the discrepancies involving the five (5) patients it had identified as apparently not receiving all of the medications taken out of the Omnicell for them.  It is simply not the case that this is the only explanation possible.  On the contrary, the Grievant never deviated from her first (and most plausible) explanation, namely that, in all likelihood most of the discrepancies could be accounted for as simple inaccuracies or omissions when she was filling out the SMS/MAR on the computer at the nurse's station at the end of her long (12 hour) night shift.  The fact that the Grievant was never able to recollect with any exactitude what she did with x amount of Ativan for y patient on z day in no way reduces her credibility.  It is common knowledge that the more routine a given task is, the more quickly it is forgotten.  The Grievant was an experienced nurse caring for a number of patients who were on various pain-alleviating drugs, and she

was administering varying small amounts (1-2 mg) of these drugs, some on an as-needed basis, some on a continuous i.v. drip, some by injection -- all as a *very routine* part of her normal duties as an ICU nurse.

It is undisputed that the Hospital never gave the Grievant copies of the relevant documents until months after her termination on August 29, 2002 just as the arbitration hearing in this matter was commencing in February of 2003.    When the Hospital confronted the Grievant on August 27 and 29, 2002 and expected her to remember accurately (without the assistance of her own notes[1] and without time to pore over the records) what she had done weeks, months, earlier, the Hospital was expecting too much. The Arbitrator finds that, when the Hospital refused to give the Grievant copies of ( or, at the very least, access to) her own nurse's notes, flow sheets and copies of the Omnicell and SMS readouts it said showed discrepancies, the Hospital committed a serious procedural error that severely prejudiced the Grievant's ability to defend herself. To put it more succinctly, the Hospital denied the Grievant her rights of due process. As stated above, it was unreasonable to expect the Grievant to be able to remember accurately what she did with respect to five (5) patients a few days earlier – never mind several months earlier.[2]  And it was doubly unreasonable and unfair for the Hospital to use the Grievant's good faith efforts to "think out loud" about what she "might" have done, about what she "probably" did, about what her orientee "should" have done, about what she "would" have done under similar circumstances, and so forth as if it were sworn testimony after being given time and opportunity to review all the relevant records. It was not.   The Grievant was simply speculating.   That she was unwise in speculating out loud while under such pressure is self-evident.   However, it was something the Hospital itself encouraged her to do by not allowing her to see her notes, and by leading her to believe

---

[1] Even accepting the Hospital's position that it was not proper to record medication administration in the nurses' notes section of the flow sheet (as opposed to the SMS/MAR), the point here is that it would have helped the Grievant remember what she did with respect to any given patient had she been allowed to read the nurses' notes regarding that patient. Again, refusing to provide her with copies of those notes, even after she asked what they said, was a serious violation of the Grievant's rights to due process, including her right to a fair investigation, before she was terminated.

[2] The investigation went back to early May of 2002.

that she was being accused only of poor documentation or questionable nursing practices, not a serious, reportable offense involving diversion of narcotics.[3]

The MNA is correct; the discharge in this case is without just cause on procedural grounds alone. However, as stated earlier, it is also without just cause on the merits because the Hospital failed to carry its burden of proof by a preponderance of the evidence. On the contrary, the preponderance of the evidence supports the position of the MNA. After finally being given the time and opportunity to study all the relevant documentation with care and reflection, the Grievant testified credibly and plausibly as to what probably[4] happened to the narcotic medications that she took out of the Omnicell for the five (5) patients in question.

For the following reasons, the Arbitrator finds the Grievant's testimony credible: First, the Grievant's demeanor and conduct from the beginning was consistent with someone who has been falsely accused, but who is genuinely uncertain as to what exactly she did or did not do over a period of time when she was working long (12 hour) night shifts in a busy ICU, on at least one occasion simultaneously orienting a new RN while on all occasions caring for a number of critically ill and dying patients -- and, often only at the end of the shift, catching up with paperwork, i.e. documenting medications administered in at least two different records, the computerized SMS/MAR and the handwritten Flow Sheet/Nurses Notes.

Second, Hospital Counsel subjected the Grievant to thorough cross-examination. The Grievant did not deviate. On the contrary, she continued to speculate, even acknowledging that she *might* have given one patient an extra milligram of Ativan after the physician had reduced the medication ordered. This is the testimony of a

---

[3] It is undisputed that the Grievant was not informed of the drug diversion charge until she was handed the termination notice and a final paycheck at the end of the meeting held on August 29, 2002, the day termination took effect.

[4] The Grievant's testimony at arbitration took place more than a year after the alleged incidents of drug diversion. She could not reasonably be expected by that time to do more than explain what "probably" happened. Her testimony made sense, however, and was generally corroborated by two RN's who were her co-workers in the ICU.

conscientious nurse who cares about her patients and wants to alleviate their pain, not the testimony of a nurse who diverted pain medication away from patients.

Third, notwithstanding their own credibility as managers, none of the Grievant's accusers had any basis other than the apparent discrepancies in the records for believing that the Grievant was engaged in drug diversion. None had seen or heard her behave in any way that indicated she was using or diverting drugs. Nor had the two fellow RN's, Pat Jacque and Beverly Thomas, who testified on behalf of the Grievant. On the contrary, all agreed that the Grievant was an exceptionally competent, hardworking, ICU nurse.

Fourth, two of the Grievant's co-workers, Jacque and Thomas, corroborated the Grievant's testimony as to routine practices on the ICU floor. Ms. Jacque testified that she had worked with the Grievant in the ICU for eighteen (18) years, regarded her as an exceptionally competent nurse, and that, until the Grievant was terminated, mixing of "courtesy bags" for the next shift was routine. Specifically, she attested (Tr. 2, p. 19):

> Prior to Nancy being terminated, because it's such a busy place, there's so much going on, if a patient was on any type of medication drip, whether it be a vasoactive medication, or like a morphine drip, or a sedative, just out of common courtesy, we would mix up another bag for the oncoming shift if we knew that that could run out fairly shortly. Even maybe a few hours ahead. . . . And we would tell the nurse. We'd say, "I've got a bag of this mixed up. I have a bag of that mixed up." And everybody did it.

> Once Nancy was terminated, nobody does it. Because if I took something out of the Omnicell, and put it on a bedside table, but I wasn't there on the next shift to hang it, I couldn't sign it off in the computer system. But the oncoming nurse would. And there would be a discrepancy there. There would be a discrepancy of, I was the one who signed it out in the Omnicell, but I wasn't the one who hung it.

> Now, because of Nancy being terminated, there is no common courtesy any more. We just tell -- there's a common courtesy, as far as I will say to someone, "There's 5 cc's left in your Ativan drip or . . . You need to go mix that up right away," instead of having it there for them.

Fifth, there is no independent evidence whatsoever that the Grievant herself was using controlled substances. On the contrary, the Grievant had herself tested shortly after her termination, and it is undisputed that the tests showed no drug use.

Sixth, the Grievant's testimony at arbitration was more corroborated than rebutted. The Grievant went through the records of each of the five (5) patients and offered step-by-step, specific explanations for what she believes probably happened to the "missing" medications in each instance. There is no evidence, or contention, that any of the five (5) patients suffered negative consequences as a result of the alleged drug diversion. There is no evidence that what the Grievant said probably happened could not possibly have happened. The first witness called by the Hospital on rebuttal, Dr. Robert Kasper, stated that, although he knew he could check the computerized or printed-out SMS/MAR if he wanted to see how much medication a given patient had received, he "would many times [just] talk with the nurse." (T IV, p. 20)  This corroborates the Grievant's testimony that physicians and nurses all understand that some time can go by before the nurse who administered x amount of medication to y patient finds the time and opportunity to record that fact on z document (be it the flow sheet, nurses' notes, or the SMS/MAR) -- and that physicians and nurses converse with each other during the course of their shifts in order to stay current with patient treatment, putting off the paper documentation tasks until later. This also corroborates the Grievant's testimony that she may have mis-stated the time(s) and/or amount(s) of dosages when she did her paperwork at the end of her shift; if she was operating mostly from memory by that time it would be surprising if she *could* remember *exactly* what she did when over the course of a 12 hour shift.

The second witness called on rebuttal, Patricia Duclos-Miller, testified that it was not "proper" for nurses to record the administration of controlled substances in nurses' notes, and it was not "proper" to take out additional medications ahead of time or to use a discontinued i.v. drip where the physician's order was for an i.v. push, and that extra narcotics (i.e. those not administered) should be wasted in the presence of (and counter-signed by) another RN. This testimony, while credible, is non-dispositive. It in no way disproves the Grievant's testimony that she (and other RN's) occasionally deviated from

proper procedures by using short-cuts or by helping each other out during breaks, and so forth.

Finally, the Hospital recalled Ms. Hutchins on rebuttal. Hutchins testified to the mechanics of i.v. drips (bags) vs. i.v. pushes (thumb-driven syringes). She stated that it would be improper practice for a nurse to administer a medication by drip if the physician had ordered a push. However, she also testified that the push required the nurse to stand at the patient's side with her thumb on the syringe for perhaps as long as three (3) minutes. She explained as follows (T IV, p. 51):

> Different medications have to be given at different speeds. Ativan, according to our policy, is given 2 milligrams over one minute. So, in this scenario, if you're going to give 6 milligrams, if you're allowed to give 2 milligrams over one minute, you would have to give the 6 milligrams over a three minute period of time. So the nurse would look at her watch second hand and give a little at a time, over a three-minute period. When she was done, she would disconnect. She would have another syringe of normal saline because there's still medication left in this little adaptor piece, and you have to make sure the patient receives the whole thing. Plus you always want to make sure you clean out that little piece so the clot . . . doesn't form in the catheter. So when you jut flush it. And Mercy Hospital has the policy that we flush it with 2 cc's of normal saline. So then after you gave your Ativan, you would also give this. And you would give this fairly slowly, too, because you have to remember you still have some medication in there. Then you would disconnect, and you would be done.

As to what the Grievant said she did in this instance (using a discontinued i.v. drip that was still in the room with the patient instead of an i.v. push), Ms. Hutchins acknowledged that this was possible to do, although certain steps had to be taken – it just was not regarded as "a good practice" – partly because the Grievant would have had to remain in the room during the 22 seconds it would take the machine before it changed to the "keep open" rate of 5 cc's per hour in order for her to turn off the machine. (Id., p. 60) Although she disagreed with the methods the Grievant said she used in administering an additional 18 mg. of Ativan that she had removed from the Omnicell, Hutchins did not testify that it was impossible or medically lethal to do what the Grievant thought she did. In sum, as with the testimony of the two other rebuttal witnesses, Hutchins' testimony

operates more to support the Grievant's account (that she and other busy nurses sometimes take technically improper short-cuts) more than it operates to rebut it.

Summary:

The Hospital failed to carry its burden of proof in this matter. The preponderance of the evidence in the record supports the Grievant's denial of any culpability with respect to the Hospital's charges of drug diversion. The Grievant was denied due process when she was not provided with all relevant records, including her own notes, until the arbitration hearing in this matter commenced approximately six (6) months after her termination and over nine (9) months after the period of time under investigation. In spite of being unable to examine all relevant records and in spite of the passage of time, the Grievant credibly testified as to what she believed were the most likely actions she took (or did not take) with respect to the narcotics she removed from the Omnicell and was accused of diverting.    In light of the Hospital's failure to submit a preponderance of evidence that contradicts the Grievant's account, much less any evidence whatsoever that the Grievant was using controlled substances herself, the termination of the Grievant is found to be without just cause.

## AWARD

The termination of the Grievant, Nancy Dufault, was not for just cause.

The grievance is sustained.

As remedy, the Hospital is directed to reinstate the Grievant immediately to her former position without loss of seniority or other benefits and to make her whole by paying her the difference between what she would have received had she not been terminated, including overtime, and what she actually earned from the date of her termination to the date of her reinstatement pursuant to this Award, plus interest at 12%. The request for reimbursement of the costs attendant to the Grievant's obtaining the services of private attorneys and stenographers is denied.

The Arbitrator retains jurisdiction with respect to any disputes involving the implementation of the remedy for a period of six (6) months from the date of this Award.


S. R. Butler, Ph.D., J.D.
Arbitrator


Boston, MA
Dated: December 22, 2003