AMERICAN ARBITRATION ASSOCIATION

M.N.A.            )
and               )         Case No.    11 300 02745 02
MERCY HOSPITAL    )

# BRIEF ON BEHALF OF MERCY HOSPITAL

## INTRODUCTION

This is a Grievance regarding the termination of Nancy Dufault, a registered nurse at Mercy Hospital. Mercy Hospital and the Massachusetts Nurses' Association are parties to a Collective Bargaining Agreement. (Jt. Exh. 1) After following the grievance steps, a demand for arbitration was made under Article XII. Hearing was held before Arbitrator, Suzanne R. Butler, Ph.D, J.D., over a period of five days. There is a transcript covering the last four days of the hearing.[1] The parties now submit their briefs.

## FACTS

The grievant, Nancy Dufault, served as a registered nurse at Mercy Hospital. She worked primarily on the night shift in the ICU/CCU, dealing with critically-ill patients. In that capacity, the grievant had access to and responsibility for dispensing medication and drugs to patients. The use of such controlled substances is strictly regulated by state and federal laws.[2] The hospital maintained a computerized system to monitor and control the use of these drugs.[3]

---

[1] That transcript is cited as follows: June 10: Vol. I, June 11: Vol. II, June 12: Vol. III, July 2: Vol. IV.

[2] See e.g. 21 U.S.C.A. §301 et seq; 21 U.S.C.A. §801 et seq; M.G.L.C. 94C §1-48.

[3] The workings of the system were described by hospital pharmacist, Robert Lewandowski and clinical nurse specialist, Kathleen Hutchins. There was no dispute as to the ability of the system to accurately produce the information described.

Mercy's system was called Omnicell, the name of the commercial manufacturer. Each nursing area had an Omnicell machine which consisted of a locked cabinet containing controlled substances and other medications and a computer which controlled access to and kept count of the drugs. A registered nurse could enter the system with a password dedicated to that nurse. The nurse would then enter the information about the patient and the needed medication. The Omnicell computer would tell the nurse in what amounts the requested drug was available and keep count as the requested drugs were removed from separate locked containers. The nurse would input the amount of drug needed. In those instances where the cabinet only contained portions larger than the amount requested, the computer would prompt the nurse to record the excess as waste. Where waste was necessary, nurses were required to not only record this in Omnicell, but to have a witness to their wasting of the controlled substance. The computer maintained a record of the time of every entry by a nurse. It was, therefore, possible for the system to subsequently print out reports by nurse, or by patient, showing all of the medications and drugs removed from the cabinet by a particular nurse, what time they were removed, in what amount, and for which patient.

While the Omnicell system kept track of the time and amount of drugs taken out by each nurse for each patient, it was not the same as the medical record of the patient.[4] Omnicell printouts were not used to maintain records on individual patients. For this, the hospital had a computerized medical record system referred to as MAR or SMS. Every nurse and doctor who testified (except the grievant) agreed that this was the proper and required place for a nurse to

---

[4] The medical record keeping system was described in the testimony of Kathleen Hutchins.

2

document medication given to a patient. (See testimony of Kathleen Hutchins, Mary Brown, Jean D'Espinosa, Patricia Duclos-Miller, Robert J. Kasper, M.D. and Patricia Jacque, Vol I, p. 59) In that system, a nurse was required to input the doctor's prescription, medication and drugs administered to patients, the dosage and the time. On a regular basis, medical administration schedules (also known as MAS) were printed out for use on the floor from the SMS/MAR record. (Hosp. Exh. 17) Those sheets showed orders for and medication given to patients and were used by physicians and nurses in reviewing a patient's status. (See e.g. Vol. IV, p. 19-21, p. 68-72). The grievant was aware of the use of these sheets. (Vol. III, p. 162-165).

The hospital was required by law and regulation to monitor the use of controlled substances by reviewing Omnicell reports as to drug usage. An ICU/CCU supervisor, Jean D'Espinosa, was responsible for seeing that these reports were reviewed for discrepancies. She either did this task herself, or with the assistance of nurse Cindy Gallant. In June of 2002, while reviewing these reports, Ms. Gallant brought to Ms. D'Espinosa's attention, an unusually large amount of Ativan that had been withdrawn all at once by Nancy Dufault. Omnicell showed that 320 mg. of Ativan had been taken at one time by Nancy Dufault. Withdrawal of such a large amount of a controlled substance at one time, violated hospital policy and proper practice (Testimony of Kathleen Hutchins). Ms. D'Espinosa talked to Ms. Dufault about the matter and let it go because of Ms. Dufault's level of experience as a nurse. (Vol. I, p. 23).

But in July, Cindy Gallant again noticed high dosages of controlled substances being withdrawn by Ms. Dufault. Ms. D'Espinosa asked Ms. Gallant to then check the medical records of the patients to see if the prescription and usage corresponded with the removal of these high

3

doses of drugs. What she found, Ms. D'Espinosa described as "awe-striking" – a lot of drugs being taken out of the Omnicell that were not charted in the patient's MAR. (Vol. I, p. 26).

Ms. D'Espinosa then took the matter to her supervisor, Mary Brown, Director of Medical Surgical Nursing. Ms. Brown placed Ms. Dufault on administrative leave, pending investigation. (Vol. I, p. 27). When informed of this by Jean D'Espinosa, Ms. Dufault seemed to immediately understand the implication of the leave, testifying herself that she asked if she was being accused of taking drugs. (Vol. I, p. 69). Ms. Brown decided to have clinical nurse specialist, Kathleen Hutchins, investigate the available records as to the grievant and the patients she was responsible for.

Ms. Hutchins obtained an Omnicell printout for Ms. Dufault's activities from April 1, 2002 to August 21, 2002 (the date of the printout). (Hosp. Exh. 1). She then cross-checked these entries against the medical records for the patients. What she found, were a large number of discrepancies which suggested that Ms. Dufault was diverting drugs. In particular, the review showed:

- Ativan and Morphine withdrawn by Ms. Dufault without any record of administration to the patient;
- multiple withdrawals of Ativan with a record of it being administered, but no record of the dose administered;
- withdrawals of Ativan or morphine from the Omnicell made several hours after the medical record showed an administration to the patient;
- two situations where the grievant, when working with a nurse in training, withdrew the prescribed dosage of a drug, when the trainee had already withdrawn the drug and the trainee had administered it, with no record of Ms. Dufault administering what she took out (which would have made for a double dose if she had);
- a withdrawal of Ativan for a patient that the grievant was not responsible for, with a corresponding withdrawal and administration by the responsible nurse;
- withdrawal of a double dose with a record of administering a single dose and no record of a waste of the additional drug; and

4

- withdrawal of large amounts of morphine in excess of the prescription, with no record of the dose given the patient.

Ms. Brown then conducted a meeting with the grievant on August 27, 2002. The grievant had an MNA representative with her at the meeting. The meeting is described in Hospital Exhibit #14. At the meeting, Ms. Dufault was presented with five (5) separate matters which the hospital had identified as suspicious. The suspicious matters and the supporting documentation were presented to the grievant. Aside from claiming in a few instances that she had only failed to document her administration of the medication, Ms. Dufault had no explanation for the discrepancies. In one case, (No. 4 on Hosp. Exh. 14) the grievant said she had actually used an existing bag or bottle (which had been there to administer the medication by continuous drip) and "bolused" the patient instead of giving the IV push that had been ordered. The grievant offered no other explanation. (Hosp. Exh.14). Neither she nor her Union representative requested any further details. They did not request to see the records of the patients or any other material. (Vol. I, p. 92). Ms. Dufault did not indicate any confusion as to what was going on. (Vol. I, p. 92). At the end of the meeting, Ms. Brown made it clear that disciplinary action was being considered. (Vol. I, p. 95).

After the meeting, the hospital continued the investigation and sought to verify what explanation the grievant had provided. In doing so, the hospital discovered that in the case where the grievant claimed to have "bolused" the patient through an existing IV drip, the record showed that there was no existing IV drip. It had been discontinued hours before. (Vol. I, p. 125). Additional suspicious incidents were discovered. (Vol. I, p. 125).

A second meeting was then convened on August 29, 2002. Again, the grievant was represented by the MNA at the meeting (Hosp. Exh. 14). Ms. Brown confronted the grievant with the fact that the IV bag or bottle drip that she claimed she had used had been discontinued. (Vol. I, p. 128, Hosp. Exh. 14). Ms. Dufault said she "had no answer"; "I cannot recall that", and "I really think that is what I did". (Hosp. Exh. 14). At the same time, even the MNA representative, Mr. David Powers, expressed incredulity at the grievant's explanation for how she used the existing drip to deliver the medication ("You did what?"). (Vol. I, p. 99).

The conduct of these two meetings as described above, was not materially disputed at the arbitration hearing. Ms. Dufault asserted that at least at the first meeting, she was upset and could not recall some of the incidents. (Vol. I, pp. 72-80). However, no one disputes that at the time she was informed of the charges, the grievant did not request to see or review any records to jog her memory, or to attempt to explain them further. Neither she nor her union representative suggested that she needed either time or information to furnish an explanation. There was no dispute that the grievant offered no more of an explanation than is indicated in Hospital Exhibit #14.

Ms. Brown then asked the grievant if she would like to speak privately with anyone at the meeting, including the Human Resources representative. (Vol. I, p. 152). Ms. Brown did this so that if Ms. Dufault wanted to discuss any issue of substance abuse in private, she could. (Vol. I, p. 152). The hospital did not accuse Ms. Dufault of abusing drugs herself, it had no way of knowing what she was doing with the missing drugs. (Vol. I, p. 151-153).

Ms. Brown then decided to terminate the grievant and she explained her decision as follows:

... Since there was no plausible explanation that I could see for any of this; there was so many cases where medication was taken out, documented it had been given previously; the comments about bolusing through the IV could not be accurate because the IV had been discontinued; there were too many discrepancies that point without any explanation. So the decision was made to terminate, mainly for failing to adhere to our administration policy and suspected drug diversion. (Vol. I, p. 131).

## ARGUMENT

### I. THE BURDEN OF PROOF

There is no dispute that in a discharge case the burden of proof is on the employer to show just cause for the discharge. In cases which involve employee actions which implicate the criminal law–in particular, matters involving drugs, arbitrators are split as to just what evidentiary standard applies. At times, they have applied each of these standards: preponderance of the evidence, clear and convincing evidence and beyond a reasonable doubt. *Elkouri and Elkouri, How Arbitration Works - 5th ed.*, 1997, p. 908. In matters involving potentially unlawful conduct, the greater weight of authority favors the "clear and convincing" and "preponderance of the evidence standards." *Id.* at 908, *Carter Wallace Inc.* 89 LA 587 (Katz, 1987) (preponderance of the evidence was the standard for drug possession at work that was in violation of company rules); *Litton Ingalls Shipbuilding*, 97 LA 30 (Nicholas, Jr. 1991) (clear and convincing standard used); *Dura Automotive Systems* 118 LA 692 (2003) (Browerman). ("clear preponderance of the evidence"); *Edgewater Systems* 117 LA 1677 (2002) (Moran) (clear and convincing standard for charge of patient abuse); *See also, Labor and Employment Arbitration* 2nd Ed., *Bornstein, Gosline and Greenbaum*, § 14.03 (2) (a).

The hospital submits that here, in choosing between these two established standards, that the preponderance of the evidence standard is the appropriate one. A hospital is not in the same position as other employers with respect to the subject employee use and/or possession of drugs and/or controlled substances. Unlike other employers, a hospital is actually involved in the dispensing and administration of these substances. It has a special duty to its patients and the public to see to it that these controlled substances are properly maintained and administered. A hospital should not be held to a higher than ordinary burden of proof on a matter that is of critical importance to its basic function. In a hospital, unlike other places of employment, employees have access to controlled substances, and the hospital has a special duty to monitor their use. The possibilities of excess drugs being taken out of the hospital, or of a patient not receiving a drug because it has been diverted, put hospitals at risk in a way no other employers are. Therefore, the hospital must be permitted a high standard for employee behavior in the handling of controlled substances and not be burdened by a higher than usual burden of proof in matters related to the dispensing of controlled substances.

The Hospital wishes to also note that while it appeared at some points during the hearing that the *grievant* was raising overdosing or over-medication as a kind of defense or explanation for several of the discrepancies, the record as a whole, especially in light of her subsequent denial of any intent to do so, makes clear that this is not being raised as a defense. The evidence and the grievant's inability to explain it are consistent with the grounds for termination as originally stated.

8

## II. THE GRIEVANT FAILED TO PROVIDE ANY CREDIBLE EXPLANATION FOR MISSING CONTROLLED SUBSTANCES IN HER CARE.

Investigation of the medical records demonstrated that the grievant had a pattern of practice which could only be explained by some form of diversion on her part. When one examines the explanations provided by the grievant at the arbitration hearing many months later, they do not and cannot credibly explain the missing drugs. It should be noted first that the hospital never received any substantive explanation from the grievant until her testimony at the arbitration hearing. Even at the arbitration, the Union deferred its opening until the close of the hospital's case. In August of 2002, however, the hospital did not have the luxury of waiting for an arbitration hearing to assess an explanation by the grievant. Instead, it faced a serious situation: unaccounted for controlled substances and an employee who had withdrawn them and could not provide a credible explanation for their use *and* who, when confronted, was not suggesting that either time or a review of records would result in an explanation. To whatever extent the Union argues that the grievant felt overwhelmed or distraught at the time of the meetings, the fact is that she had a Union representative with her and no one suggested that reviewing the records or jogging her memory would help provide an explanation. (Vol. I, pp. 131, 132). It could not be said that the grievant failed to understand the gravity of the situation. She herself raised the issue of diversion when told by Jean D'Espinosa that she was being placed on leave. (Vol. I, p. 69). There was no denial that on several occasions, at both August meetings, the grievant admitted she could not explain certain discrepancies. (Hosp. Exh. 14). The evidence is also undisputed that at the second meeting even the Union representative found one of her explanations to be incredible. (Vol. I, p. 99). Therefore, in August of 2002, the

9

hospital was confronted with an employee who offered no credible explanation for multiple discrepancies in her use of controlled substances. There was just cause for termination at that point. In any event, as shown below, the grievant never does credibly explain the discrepancies. The reason no explanation could be presented in August is that there is no credible explanation to be had.

The absence of any explanation from the grievant extended further into the grievance process. The grievant, even with union assistance, never provided any further explanation in the filing and hearing of her grievance at any step until the presentation of a defense at this arbitration.

Secondly, the Union has presented the grievant's testimony regarding a drug test that she took, presumably to show that she was not herself a user. This itself means little. If the grievant withdrew more drugs than were prescribed by the physician and did not administer them to the patient, then just what she did with them is not the issue. Anything other than proper administration to the patient is just cause for termination. The hospital is not in a position to know whether the grievant used the drugs herself, procured them on behalf of another, or tried to sell them. All of those alternatives are unacceptable to a health care employer, the possible exclusion of one means nothing.

Examination of each incident demonstrates just cause for Ms. Dufault's termination.

Incident 1A.

This matter occurred on June 19, 2002 and is documented in Hospital Exhibit #3 and summarized in Hospital Exhibit #5. On this date, the physician had prescribed 25 mg. per hour of Lorazepam (Ativan) for the patient P.R. The Omnicell record shows that the grievant

withdrew a total of 320 mg. of Ativan at 6:28 p.m. There is no documentation in the MAR/SMS of the administration of this drug and there is no record of any waste. This leaves 320 mg. of Ativan unaccounted for. This is not only a "documentation problem", as the grievant contends. Hospital policy did not permit the withdrawal of such a large amount of a drug at one time (Vol. I, p. 22). The removal of 320 mg. all at once for a patient who was prescribed 25 mg. per hour exceeded any need and violated hospital policy. Indeed, it was this incident which set off the inquiry into the grievant in the first place (Vol. I, pp. 22-26).

Ms. Dufault's explanation is that she must have given the drug, but failed to document it (Hosp. Exh. 14). That, however, is not an explanation as to why she would remove such a large amount of the drug when policy prohibited it, and only 25 mg. per hour were needed. At that rate, it would take over twelve hours to exhaust 320 mg. of Ativan. Grievant points to no reason for withdrawing that much at once. It could not be that she was only helping prepare the medication for the next shift, since 320 mg. exceeded what the next shift would need. No other nurse withdrew any more than 160 mg. at one time for the same patient under same physician's order. (Union Exh. 5, pp. 32-34).

Even the failure to document the administration of a large dose of this drug has other consequences–for if it had been given to the patient (and there is no way of knowing whether it was) no one else–nurses on a subsequent shift, or physicians making decisions throughout that time period, would know whether it had been given, or how much had been given–because it was not recorded in the MAR/SMS. Therefore, when the medication administration sheets were printed out for each shift there would be no record of the 320 mg. of Ativan (even Ms. Dufault

admits that these sheets–taken only from the MAR/SMS were used by doctors and nurses to track medication administration) (Vol. III, pp. 162-165).

Incident 1B.

This incident concerns the same patient and time period as Incident 1A. It is documented in Hospital Exhibits #3 and #4 and summarized in Hospital Exhibit #5. Later in the admission of patient P.R. (June 20, 2002 to June 21, 2002), the patient was given a prescription for 2-6 mg. of Ativan every four hours. The MAR/SMS record shows that the grievant entered an administration of the drug at 8:00 p.m. on the 20th, 12:00 a.m. on the 21st and at 4:30 a.m. on the 21st. That record, however, did not show the dosage given. (Hosp. Exhs. 3, 4 and 5) This was particularly problematic because the order was for a variable amount of 2-6 mg. every four hours. If there had been administrations at 8:00, 12:00 and 4:30, there was no way to tell how much had been administered. But that is not the major discrepancy. The Omnicell record shows that the only corresponding withdrawal of the drug occurred between 2:25 and 2:27 a.m., when the Grievant withdrew a total of 18 mg. of Ativan (Hosp. Exhs. 3 and 4). That does not correspond to any administration of the drug. Ms. Dufault could not have administered Ativan at 8:00 p.m and 12:00 a.m. when she never removed it from the Omnicell until 2:25 a.m. There is, therefore, 18 mg. of Ativan unaccounted for.

When first confronted with this record, the grievant told Mary Brown that she had used an existing IV drip to "bolus" the patient for the 8:00 p.m. and 12:00 a.m. doses. (Bolusing is discussed below.) She then claimed that she had used the 18 mg. taken by her from the Omnicell to "replace" the Ativan in the IV bag or bottle. Ms. Dufault reiterated this in the second meeting prior to termination. However, in checking the medical records between the two meetings, the

12

hospital discovered that the existing IV that Ms. Dufault claims she used had been discontinued some eight hours earlier (Hosp. Exh. 14, Testimony of Kathleen Hutchins, Vol. I, p. 125), as had the order for its use. Ms. Dufault responded "I have no answer, I cannot recall that" (Hosp. Exh. 14).

The grievant did attempt to offer further explanation at the arbitration hearing[5]. It is an explanation which defies reason and common sense as to the actual fate of the 18 mg. of Ativan withdrawn by her at 2:00 in the morning.

The grievant produced a chart in which she attempts to track the use of the Ativan throughout the patient's stay, including the 320 mg. she withdrew previously. This tracking is shown on Union Exhibit 7, written by the grievant. The grievant attempted to show that it was possible that, as of her shift on June 20-21, 2002, there *could* have been a bag or bottle of Ativan, with medication left in it, remaining in the patient's room at 8:00 p.m. No one disputes that the Ativan drip was discontinued at around noon of that day and that the physician had ordered it stopped. The documentary record unquestionably supports this. There is, however, no evidence that the bag or bottle was still present in the room as of 8:00 p.m., other than the grievant's own speculation.

What is not disputed is, that at 3:30 p.m., the physician had now given an order to administer only 2-6 mg. of Ativan by push (syringe), *and* that is what the nurse on the prior shift did, by the grievant's own admission (Vol. II, pp. 123-125). The grievant speculates that the prior nurse would want to see "how the patient responds to removal from this drip and, therefore,

---

[5]As noted above, explanations given at the arbitration are essentially irrelevant, since the hospital had to make a decision in August of 2002, when it knew only what Ms. Dufault offered in the meetings.

might not have removed it" (Vol. II, p. 124). There is no medical, nursing or hospital policy to suggest this, nor evidence that it actually occurred. There is only the grievant's own speculation that this is how a bag or bottle might have been left in the room.

The grievant then says she made an issue with the physician about the discontinuance of the drip and the lower amount of medication prescribed (Vol. II, pp. 127-128). Apparently, this caused the physician to change the order to every four hours. (Hosp. Exh. 4)

Ms. Dufault admits that the proper procedure for her to follow at 8:00 p.m. (and 12:00 a.m.) would have been to enter Omnicell, retrieve the needed Ativan, put it in a syringe and inject it into the patient. (Vol. III, pp. 98-100) Instead, the grievant alleges that she used the remaining bottle of Ativan supposedly left from the discontinued drip. Since the order was not for a drip but the administration of 2-6 mg. by syringe, she reconnected the bottle to the patient (which required her to first sterilize the IV) and then "bolused" the medication into the patient (i.e., "rapid infusion") by setting the IV machine to 999.[6] Ms. Dufault admits this would have been an improper practice (See Vol. II, p. 77, Vol. 3, p. 89) and conceded that from the start, she knew that her assertion that this is how she administered the drug would have been questioned. (See Vol. II, p. 77, Vol. 3, p. 89, Hosp. Exh. 14) She says she repeated this procedure at 12:00 a.m. and again at 4:00 a.m. Why would the grievant do this when she knew that it was improper practice, not what the physician had ordered, and not what the nurse before her had done? Ms. Dufault claims she did it for "convenience". The "explanation" makes no sense: it obviously could not have been more convenient to sterilize the IV, reconnect it to the patient, reset the

---

[6] As Ms. Hutchins noted in her testimony, setting the machine in this fashion would not provide an accurate dose to the patient, and, in fact, would deliver the medication at *nine* times the proper speed. (See Vol. IV, pp. 57-58).

14

machine, run the machine and then disconnect, all while attempting to discern if a proper amount infused. The alternative of retrieving the proper amount from Omnicell and injecting it with a syringe is, giving every possible benefit of the doubt to the grievant, at a bare minimum, equally convenient. It was, by her own admission, the normal and proper method. The incredibility of the grievant's explanation caused her own Union representative to say "you did what?" at the meeting with Mary Brown (Vol. I, p. 99).

Ms. Dufault also failed to record what dose was given in the SMS/MAR (Hosp. Exh. 4). Ms. Dufault says her practice was not to record the amount of the dosage in the SMS/MAR (Vol. III, p. 92). She claims this was her practice because she believed that the SMS/MAR was only a system for charging patients for the drugs and not a record of what was given (Vol. III, p. 92, Vol. II, pp. 130-131).[7] Determination of the amount used, she believed, could be cross-referenced with Omnicell. This explanation makes no sense, since it is itself an admission that the SMS/MAR would not have enough information to be a billing system, thereby making it silly to believe that the SMS/MAR was a billing system only. (Vol. III, pp. 92-94). Ms. Dufault, of course, was well aware that the dose given was not necessarily the same as the amount withdrawn from Omnicell and that the Omnicell would only reveal the amount taken out, not necessarily the amount given. In any event, if Ms. Dufault actually believed this was a billing system and that it was cross-referenced to Omnicell, she would not have chosen to use the existing bottle (presumably already withdrawn and "charged") and not record the dose given when she was then going to subsequently retrieve the 18 mg. from Omnicell to fill the bottle.

---

[7]This is contradicted by the grievant when she later admits that the nurses used medical administration sheets printed out of the SMS/MAR record to keep track of the drugs administered to the patient (Vol. III, pp. 162-165).

These contorted and illogical explanations fail to rebut the obvious: that not recording the dose and evading the proper methodology helps conceal what the nurse is doing with the drug. All of this in itself creates a legitimate reason to believe Ms. Dufault was diverting the drugs, but her explanation of what happened next defies all credibility and logic.

As long and complicated as Ms. Dufault's explanation of the 8:00 p.m. and 12:00 a.m. doses of Ativan is, it does nothing to explain why Ms. Dufault withdrew 18 mg. of Ativan at 2:25-2:27 a.m. If the patient had already received the medication at 8:00 p.m. and 12:00 a.m. from the supposedly existing bottle hanging in the room, and if the bottle still contained over 80 mg. of Ativan to cover future doses on her shift, there would be no reason to withdraw an additional 18 mg. from Omnicell in the middle of the night. (This required removal and mixing of *nine* vials. (Vol II, p. 132)) Nonetheless, Ms. Dufault says she withdrew the Ativan from the Omnicell at 2:25 a.m. and then followed another long procedure to place the 18 mg. into the *bottle* containing the discontinued drip. (Vol. III, pp. 100-101) Presumably, she means that she was now replacing what she had used (and would use at 4:00 a.m.) from the bottle. But this also makes no sense at all. The grievant would have been placing 18 mg. of newly withdrawn Ativan into a bottle which fed a now discontinued drip. That new medicine was doomed to be thrown away. It was highly unlikely that the drip would be restarted, given that the existing leftover Ativan, if indeed it were still there, had now been standing idle for sixteen (16) hours. More importantly, this "explanation" completely contradicts her reason for using the existing bottle in the first place—"convenience". Not only was it cumbersome to use the existing bottle to bolus in the first place (as well as being improper nursing practice), she had to then follow a whole new series of steps to place more Ativan back in the bottle. This obviously was not "convenient".

16

Ms. Dufault explains the bottle "refill" of the 18 mg. as somehow vaguely related to "being accountable" or "accountability". (Vol. II, p. 131, Vol. III, p.97). The way for the grievant to be "accountable" would have been for her to properly record the time and dosage given in the SMS/MAR. If she wished to be accountable for the method she used, she could make a note of what she had done in her nursing notes. Putting additional drug into a discontinued bottle at 2:27 a.m. (never to be used again) could only serve to help conceal what she had done at 8:00 p.m. and 12:00 a.m. The grievant's contorted and illogical explanation only serves to bolster the obvious conclusion: that she took the 18 mg. of Ativan at 2:25 a.m. for her own purposes. When later confronted with the fact that the hospital was able to track the amount and time of the withdrawal from Omnicell and that it did not correspond to the medical record, the grievant could only scramble for an explanation that cannot logically hold together, not in August of 2002 and not at the arbitration hearing. It may be possible that the IV drip was still in the room and possible that it was used by Ms. Dufault to medicate the patient, but if it were, the only reason for doing so was to find a way to medicate the patient while she withdrew the prescribed dosage from Omnicell for her own purposes.

Incident 2A

This incident occurred on July 15 and 16, 2002. It is summarized in Hospital Exhibit #7, documented in Hospital Exhibit #6. It concerned patient B.B., who was prescribed 2-4 mg. of both Ativan and morphine every two hours. At the time the grievant was working with a nurse in training, Tawnia Iwasinski. The record shows that Ms. Iwasinski made Omnicell withdrawals in an appropriate amount for Ativan at 10:01 p.m. and 12:52 a.m. and then recorded administration of those amounts in the SMS/MAR at a corresponding time. But the record also shows that the

17

grievant made a duplicate withdrawal at 11:51 p.m., without any record of administration of that dose, which in any event would not have been due at that time and would have constituted an overdose if it were given.

In this case, the grievant claims that there was "miscommunication" between her and Ms. Iwasinski as to who would document the administration of the medication and that Ms. Iwasinski should have, but failed to document an additional administration of Ativan by Ms. Dufault.[8] The additional 2 mg. of Ativan, Ms. Dufault says, was inadvertently not recorded. (Vol. II, p. 148). The order was for 2-4 mg. to be given PRN every 2 hours. Ms. Iwasinski gave 2 mg. at 10:00 p.m. (Vol. II, pp. 147-150). Ms. Dufault says that the patient then became agitated and that she and Mrs. Iwasinski decided that the patient could receive an additional 2 mg. and still be medicated again at 1:00 p.m. as scheduled. (Vol. II, pp. 147-150). "The orientee and I calculated the math." (Vol. III, p. 105) In fact, 4 mg. was given at 1:00 a.m., withdrawn and documented by Ms. Iwasinski (Hosp. Exhs. 6, 7). The problem with this explanation is that the alleged undocumented administration at 11:51 p.m. would mean that the patient received 6 mg. in two hours from 11:51 p.m. to 1:00 p.m. That represents an overdose. Even if 2 mg. could have been given at midnight without exceeding the maximum dose, the next administration could not have exceeded 2 mg. To this, the grievant responded "....so, we did the math wrong" (Vol. III, p. 106).

The "math" that Ms. Dufault claims both she and Ms. Iwasinski "did wrong", consisted of $2+2+4 = 8$. Ms. Dufault asks us to believe that *two* registered nurses, deliberately calculating doses they were giving, incorrectly came to the conclusion, that $2+2+4$ equaled 6. It is a highly improbable explanation at best, for a situation where Ms. Iwasinski's withdrawal and recorded

---

[8] Hospital policy was in fact that the nurse administering the drug was to document it.

18

administrations match the Omnicell and the physician's orders, and Ms. Dufault's withdrawal corresponds to nothing. Ms. Dufault is further asking us to believe that Ms. Iwasinski, who documented all the other administrations properly, just coincidentally missed the one Omnicell withdrawal that does not, in fact, correspond to the physician's orders.

Again, the grievant's improbable explanation compels the obvious conclusion that she took the opportunity to take the drugs when there were two nurses working with one patient and, without careful tracking, the additional withdrawal might never be missed.

Incident 2B.

This incident occurred on July 17, 2002 and is summarized in Hospital Exhibit #7 and documented in Hospital Exhibit #6. It concerns the same patient as Incident 2A and the same physician's order. However, at the time at issue, the patient, B.B., was not Ms. Dufault's patient, but Michelle Lunds'. Here again, there are duplicate withdrawals of Ativan by Ms. Lund and Ms. Dufault, and Ms. Dufault's withdrawal at 7:42 p.m. of 2 mg. of Ativan does not correspond to any documented administration. More significantly, it is not her patient. For this incident, Ms. Dufault has, in fact, no real explanation. She states that she cannot specifically remember the incident (Vol. II, p. 153). She then speculates as to what might have happened, arguing that it was a change of shift and that Michelle Lund might have been receiving a report when Ms. Dufault withdrew the 2 mg. from Omnicell at 7:42 p.m. However, in the same statement, Ms. Dufault says report would be from 7:00 to 7:30 p.m. (Vol. II, pp. 152-154), contradicting the assertion that she could have been helping with Ms. Lund's patient at 7:42 p.m. while Ms. Lund was taking report. In addition, if this is why Ms. Dufault removed the Ativan from Omnicell at 7:42 p.m., it fails to explain why Ms. Lund would then remove 4 mg. of Ativan at 8:12 p.m. and

19

administer it. It was, after all, Ms. Lund's patient and Ms. Lund documented the administration in SMS/MAR. Ms. Dufault's "explanation", based solely on her own speculation, is that Ms. Lund must have, between 7:42 p.m. and 8:12 p.m. secured a new physician's order (never recorded) to increase the dosage and therefore took out additional Ativan (Vol. II, p. 155) There is *nothing* in the record to support this, but it is apparently the only explanation Ms. Dufault could conceive of in the face of the record.

Here again, the obvious explanation is diversion; where the grievant removed drugs for a patient who was not hers, concerning which there is no record of administration, and where she offers only a fanciful and speculative explanation (and originally no explanation at all), it is fair for the hospital to conclude that an improper diversion occurred.

Incident 2C.

This incident also involves the patient B.B. and occurred on July 17, 2002. This is also summarized in Hospital Exhibit #7. The situation is quite similar to Incident 2A which occurred the night before. For the second night in a row, the record shows that Ms. Iwasinski withdrew an appropriate dose and properly recorded its administration (Hosp. Exh. 7). Shortly thereafter, Ms. Dufault withdrew the same dosage from Omnicell with no record of its administration, and if it had been administered, it would have constituted an overdose. Here, Ms. Dufault's explanation for a second consecutive discrepancy is that she withdrew the medication without knowing Tawnia Iwasinski already had. (Vol. II, p. 158) She says Ms. Iwasinski saw her and stopped her. (Vol. II, p. 158) Ms. Dufault claims that they consciously decided not to return the surplus medicine to the Omnicell on the *chance* that the patient might become agitated by an x-ray to be