given early in the morning and that the patient might therefore, need extra medication.[9] Ms. Dufault then says that she administered the additional Ativan and morphine at 5:15. (Vol. II, pp. 161-163) The 5:15 time is indicated on nursing notes, though never recorded in the SMS/MAR, as it should have been. Here again, the grievant asks us to believe that Ms. Iwasinski forgot to make a record in SMS/MAR for a drug supposedly administered by Ms. Dufault when Ms. Iwasinski had properly documented her administration in SMS/MAR in every other case. Apparently, Ms. Iwasinski was only failing to record in SMS/MAR the drug administrations that coincidently appear as surplus drugs withdrawn by Ms. Dufault.

Beyond this, the "explanation" fails because administration of another 4 mg. of both Ativan and morphine at 5:15 would have been an overdose. Would both nurses consciously decide to overdose the patient with two drugs, one a narcotic, on the *chance* that the patient would be agitated by an x-ray, where there was no physician's order for additional medication?

The timing of the withdrawal by Ms. Dufault makes no sense either. The medication was due at 4:00 a.m. when Ms. Iwasinski withdrew it and administered it. Ms. Dufault did not withdraw hers until 4:26 a.m. If she were withdrawing the medication that late, why would she not have checked either the SMS/MAR or the nursing notes, both of which clearly showed administration at 4:00 a.m.

Confronted in cross-examination with the fact that a 5:15 a.m. administration would have been a serious overdose, Ms. Dufault then claimed that the time reference in the nursing notes might not be accurate at all (Vol. III, pp. 110-115). In defense of this, Ms. Dufault claims that she just put it in the flow sheets, perhaps without an accurate time, to remind her to document in

---

[9] For which it should be added, there was no physician's order.

multiple occasions within a nine-day period, she "forgot" to witness and record her waste three or four times, "forgot" to record her administration in the SMS/MAR three times and "forgot" the proper dosage two times. The unlikelihood that so much would be forgotten for one patient over so short a period of time seems highly unlikely and again compels the conclusion that Ms. Dufault was in fact taking additional drugs.

Incident 4.

This incident occurred from May 4, 2002 to May 7, 2002 and is summarized in Hospital Exhibit #11 and documented in Hospital Exhibit #10. Here, patient, R.V., was prescribed 2-4 mg. of morphine per hour. On four separate occasions, during this time, the SMS/MAR record shows administration of the morphine *before* it has been withdrawn from the Omnicell. Withdrawals were consistently made after administration already occurred, without a corresponding subsequent administration.

Ms. Dufault claims that these discrepancies resulted from her failure to regard the SMS/MAR system as anything other than a charging or billing system, resulting in her only "guesstimating" the proper time, resulting in discrepancies from Omnicell. It is certainly remarkable that if Ms. Dufault's problem was her lack of concern about recording time and dosage in SMS/MAR, that almost all of the discrepancies resulting from this "guesstimating" should occur in one week for one patient on morphine.[10] Mistakes as to time seem feasible when they are within an hour, but even Ms. Dufault recognized that the discrepancy of four hours and twenty minutes (2:00 a.m. vs. 6:20 a.m.) required more of an explanation. She offers that she

---

[10]In fact, the SMS/MAR system asks the nurse to record the dosage. (Vol IV, p. 98)

mistakenly punched 6200 into the SMS/MAR as the time and it rejected the 6 and left 0200 (Vol. II, pp. 176-177), which she apparently chose not to correct.

However, when Kathleen Hutchins, on hearing Ms. Dufault's testimony, tried this on the SMS/MAR system, it did not convert 6200 to 0200 (Vol. IV, p. 97). In addition, leaving 0200 in the record, knowing it was wrong by more than four hours could have had serious consequences for a patient on morphine. Here again, the grievant's explanation defies logic. Suspicion of diversion was justified.

Incident 5.

This incident concerned the patient, C.I., and is summarized in Hospital Exhibit #13 and documented in Hospital Exhibit #12. Here, the physician's order was for 2-10 mg. of morphine every three hours. Omnicell reveals withdrawals of morphine by Ms. Dufault as follows:

| | |
|---|---|
| 11:41 p.m. | 2 mg. |
| 1:39 a.m. | 4 mg. |
| 1:46 a.m. | 10 mg. |

The SMS/MAR record shows an administration at 12:10 a.m. without noting a dose. (Hosp. Exh. 12). Presumably, this was the 11:41 p.m. withdrawal from Omnicell. But, the 1:39 and 1:46 a.m. withdrawals are unsupported in the SMS/MAR. The flow sheet showed a 1:00 a.m. administration of 2 mg. of morphine and a 5:00 a.m. administration of 2 mg. of morphine (Union Exh. 13, Hosp. Exh. 12, Vol. III, pp. 10-20). Consequently, the amount withdrawn from Omnicell, the SMS/MAR record and the flow sheet are all inconsistent with each other. Ms. Dufault could control the SMS/MAR and flow sheet, she could not control the Omnicell record.

24

For her part, the grievant presented no real explanation. She testified that she did not remember the patient. ("It was not that significant. Patient was a DNR, "comfort measures"." (Vol. III, p. 23)). At one point, she suggests the possibility that the Omnicell did not have the necessary size of morphine vials. (Vol. III, pp. 16, 19). This, it turns out, was not the case (Vol. IV, p. 87, Hosp. Exh. 18). She also suggests that she may have taken out additional morphine in anticipation of the patient needing a larger dose. (Vol. III, p. 19, Vol. IV, pp. 139, 146 and 149) Even this, she presents not as something that actually happened, but as a "plausible explanation". (Vol. IV, p. 140). But, it is not a plausible explanation. The grievant gives wildly contradictory testimony as to her speculative reason for withdrawing 14 mg. of morphine between 1:39 and 1:46 a.m. That testimony is contained in Vol. III, pp. 10-23. First, she notes that the flow sheet (Union Exh. 13, p. 5) shows an administration of morphine (2 mg.) at 1:00 a.m. (Vol. III, pp. 10-12)[11]. At 1:30 a.m., the flow sheet showed an increase in the patient's heart rate. (Vol. III, pp. 14-15). She says she then went to retrieve the morphine from Omnicell. She maintains that she doesn't know why she took out 14 mg. (Vol. III, pp. 15-16). She asserts when she returned to the patient she could not administer the morphine because the patient's blood pressure had dropped (Vol. III, p.19). She then speculates that she must have later given the medication between 2:00 a.m. and 4:00 a.m. (Vol. III, p. 21). She says *both* that she gave only 2 mg. and failed to record her waste (Vol. III, p. 21) and that she administered "the morphine that I took out" (Vol. III, p. 22). This, of course, is completely contradictory–but one must assume that the grievant means that she administered 2 mg. between 2:00 a.m. and 4:00 a.m. and "failed to waste" the remainder.

---

[11]As before, grievant argues that the times on her flow sheet are "rough", i.e. since she never cared to put an accurate time anywhere, she can expand or contract the time in the record to fit her "explanation".

25

By her own admission, the grievant's own flow sheet and notes (Union Exh. 13, pp. 5-6) do not support her story of a 2 mg. administration between 2:00 and 4:00 a.m., after the patient's heart rate declined. First, the patient's blood pressure decline to 64/31 does not, as grievant's testimony suggested, occur after her 1:30 a.m. and 1:46 a.m. withdrawals of morphine. Rather the flow sheet shows it occurred at 1:30 a.m., the same time as the elevated heart rate, not after. (Union Exh. 13, p. 5). Secondly, the flow sheet, which she wrote, shows administration of morphine of 2 mg. only at 10:00 p.m., 1:00 a.m. and 5:00 a.m. One could not conclude from this that there had been an administration at 2:00, 3:00 or 4:00 a.m. Contradicting the grievant even further are her own nursing notes which refer to an administration of morphine only at 11:00 p.m. and 12:00 a.m. (Union Exh. 13, p. 6). (highlighted parts).

To sum up: according to the grievant's testimony, she gave 2 mg. of morphine between 2:00 a.m. and 4:00 a.m. According to the grievant's contemporaneous flow sheet, she gave 2 mg. of morphine only at 1:00 a.m. and 5:00 a.m. According to her contemporaneous nursing notes, she gave 2 mg. only at 11:00 p.m. and 12:00 a.m. Even with the luxury of these contradictory records to choose from, the grievant cannot and does not explain why she took out 14 mg. between 1:39 a.m. and 1:46 a.m. when by her own records and admission, she used no more than 2 mg.

The grievant's "explanation" creates only confusion--it does nothing to explain the surplus narcotic or why she would have withdrawn such a large amount when it was not indicated. It should also be noted that the morphine prescription was for discomfort, not heart rate. Ms. Dufault had no business using morphine to control the patient's heart rate when again

26

by her own admission, another drug, Esmarol, was prescribed for that purpose. (Vol. III, pp. 13-18).

There is no record of the 14 mg. being administered. There is no record of waste. There is no reason to have withdrawn that amount and there is no logical explanation from the grievant. There is simply no reasonable explanation for why an excessive dose of morphine was ever removed from Omnicell and never administered.

The grievant has also raised the subject of other nurses having made mistakes with respect to documentation of controlled substances. By examining the complete medical record for all of the patients involved, the grievant finds several situations where the records seem to show some documentation problems. This whole analysis is irrelevant and mistaken for two reasons: First, if there were transgressions or errors by other nurses, those mistakes do not demonstrate an absence of just cause for the grievant's termination. That others made documentation errors cannot neither justify the grievant making errors nor explain missing drugs. If the point is to show that the grievant's actions (or at least her documentation) was consistent with regular practice, then the analysis fails completely. With the complete records of five different patients, the grievant can point to a few apparent mistakes by different nurses. The remainder of the records: the overwhelming majority of the content of the records, shows other registered nurses following hospital policy. A few documentation errors by other nurses pales in comparison to the grievant's "explanation" that she did not really believe there was *any place* where she had to correctly document what drug she gave, how much and when. It should be noted, as well, that this process does not allow for any explanation by these other nurses regarding what might be excusable errors.

Just as importantly, the whole analysis misses the forest for the trees. None of the other nurses demonstrate a pattern of conduct remotely similar to that of the grievant. At worst, several nurses made isolated mistakes. Many of the supposed errors cited are not, in fact, similar to the discrepancies in the grievant's records. For instance, the grievant cites cases where one nurse has withdrawn the drug and another recorded administration (whether it involved an orientee or not). That may represent a policy and documentation problem, but the problems presented regarding the grievant in Incidents 2A, 2B and 2C are not just one nurse withdrawing and another documenting–it is that *plus* the additional withdrawal by the grievant of a surplus of medication. Likewise, with time discrepancies of other nurses, while some may have put the wrong time in for administration of a medication, no one else presents the crazy scenario of Incident 1B, where she explains the time discrepancy by saying she decided, for some inexplicable reason, to take medication out of Omnicell and place it in a discontinued bottle drip. No one else continuously removed the same dose day after day without recording the necessary waste. (Incident 3). No one else presented *four* significant time discrepancies for a single patient–three of them in one day (Incident 4). And no one else removed extra narcotic (five times the dose given) hours before it could be needed (Incident 5). No one else presents a pattern of conduct as does the grievant: multiple scenarios involving multiple discrepancies, all within a two month time period and all involving the same issue over and over: an excess of Ativan or morphine withdrawn by the grievant and in some fashion unaccounted for and unexplained.

It should also be noted that there is no evidence of any bad faith or discriminatory motive on the part of the Hospital and the individuals who investigated this matter. None of them were shown to have any personal animosity toward the grievant. There is no evidence that any

28

management official acted on any basis other than the medical records before them. The person assigned to investigate those records (Kathy Hutchins) is a bargaining unit member. The Hospital acted in good faith on the basis of objective evidence and in accordance with its obligations to its patients and the law.

Finally, there should be no doubt that termination was the proper penalty and the only alternative the hospital could consider. Ms. Dufault was provided multiple opportunities to explain the discrepancies, but did not. If she had a personal problem with drug use, she had the opportunity to explain that. There are no grounds to challenge the penalty here--an arbitrator should not substitute his or her judgment for that of the employer unless the penalty is excessive, unreasonable or an abuse of discretion. *Franz Food Products* 28LA 543, 548 (1957); *Elkouri and Elkouri* at p. 911. The hospital was confronted with serious unexplained discrepancies that clearly pointed to diversion of controlled substances. There was just cause for the termination.

FOR THE MERCY HOSPITAL
Maurice M. Cahillane
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street
Post Office Box 9035
Springfield, MA 01102
Telephone: (413) 737-0260
Telefax: (413) 737-0121
BBO# 069660

0423-020804\55826.wpd

3

Page 22

1  of 320 milligrams?
2  A. It's hard to explain. 320 and 320
3  would be the same as 40 and 40, 80 and 80, 160
4  and 160, 320 and 320.
5      So, it's the same At. mixture. What
6  she was running it at would have been what the
7  patient received, not what she mixed it in.
8  Q. But did she mix it in a higher
9  quantity than what the patient was receiving?
10 A. Oh, she mixed it in a higher quantity
11 than is policy. That's the way I would say it.
12 She mixed it in a higher quantity than we
13 normally do.
14 Q. All right. And what was your
15 understanding as to what the policy was?
16 A. To be honest with you, at that point,
17 I was not sure how we did it.
18     And I asked Kathy Hutchins, who is our
19 clinical specialist, who you've already heard
20 from.
21     And she said that normally, 80/80
22 sometimes. 160/160, if it's a very -- if it's a
23 person that's going to go through a lot of Ativan
24 in a shift.

Page 23

1  Q. Okay. Now, what did Nancy Dufault
2  tell you?
3  A. She told me she had mixed it 320 and
4  320.
5  Q. Okay. And what did you tell her?
6  A. I told her -- at that time, I had not
7  talked to Kathy.
8      I told her, at that time, that it
9  sounded high to me. The mixture sounded high.
10 And that she should just refer to the policy, and
11 run it at that, even if it meant she would have
12 to change it quite frequently during the night.
13 Q. Now, did anything else come of this
14 incident?
15 A. No.
16 Q. And why didn't you do anything else?
17 A. I felt really comfortable with her
18 answer. She had been a nurse a very long time in
19 the ICU. There was no reason to believe anything
20 else.
21     And the patient was receiving a lot of
22 narcotic. And we do, often times, quadruple a
23 drip, even though 320/320 is even higher than a
24 quadruple.

Page 24

1  Q. Now, later in the summer, did a
2  problem regarding Nancy Dufault come to your
3  attention again?
4  A. Yes. Again, at the end of July, Cindy
5  came to me again, and said, again, she was
6  reviewing the record, the Omnicell reports. And
7  she had found a couple of Omnicell reports that
8  stuck out in her mind for the doses and the
9  times.
10     It was a large amount of doses in very
11 short periods of time. Like, minutes. One
12 minute apart. There were large doses taken out,
13 mostly Ativan.
14     And she was concerned about the
15 amounts that were taken out.
16 Q. Okay. And what did you do then?
17 A. Well, then, I thought, "Well, this is
18 the second time she's come to me. We should
19 probably look into it a little bit deeper."
20     So, I asked Cindy to do a -- I
21 wouldn't call it an investigation. I asked her
22 to look into some medical records for us, and
23 see, for the patients that she was identifying,
24 exactly what kind of documentation there was on

Page 25

1  that.
2  Q. Okay. And did you have any role in
3  procuring any records with respect to this at
4  that time?
5  A. Do you mean by procure, did I call and
6  ask for them?
7  Q. Call and what?
8  A. Ask for them.
9  Q. Yes.
10 A. Yes. I'm the one that called medical
11 records and asked that they be pulled.
12 Q. Okay. And what about the pharmacy?
13 A. And I called pharmacy, and asked them
14 to -- well, I did that first. I called pharmacy,
15 and asked them to run a report, so that I would
16 know which ones to pick from, and then gave that
17 list to medical records, so that I could get the
18 records.
19 Q. Okay. And did someone then go through
20 all those records?
21 A. Cindy did.
22 Q. Mm-hmm. And during what period of
23 time was Cindy doing this?
24 A. Cindy did that in the beginning of

MNA & MERCY HOSPITAL
June 10, 2003

Page 26

1  August. By the time we got the charts, got the
2  Omnicell reports, it was the beginning of August.
3      So, I would say middle of August,
4  maybe, by the time she started really getting
5  into it.
6      Q. And at some point, did Cindy come back
7  to you with any results or finding?
8      A. Yes. She had written her findings
9  down on a piece of paper for me that were kind of
10 awe-striking.
11     A lot of drugs being taken out of the
12 Omnicell, and not being charted on the MAR, which
13 is our med sheet.
14     THE ARBITRATOR: Remind me what MAR
15 stands for.
16     THE WITNESS: It's our med sheet. It
17 stands for medical administration report.
18     Q. (By Mr. Cahillane) And is that the
19 computerized hospital record?
20     A. Yes, it is. It's SAS. Yes.
21     Q. Now, when Cindy presented you with
22 this, what did you do then?
23     A. Well, when she came to me with these
24 issues, it was nearing the end of August. And

Page 27

1  like I said, it was pretty -- it was a lot of
2  drug.
3      So, I went to Mary Brown. And I
4  showed Mary Brown what we had.
5      And it was just a lot of drug with no
6  MAR. And as a nurse, I know that if you're going
7  to give a drug, you have to chart it in the MAR.
8  And that's our policy here, at Mercy. And it's
9  also a policy in nursing.
10     So, it wasn't charted. So, Cindy went
11 and looked at the MAR. They weren't charted.
12 There was a lot of drug not charted on the MAR.
13     And I went to Mary. And I said,
14 "Mary, these drugs aren't charted, and yet
15 they've been taken out of Omnicell, and I can't
16 account for them."
17     Q. Now, was any decision made then as to
18 what to do?
19     A. Mary asked me, at that point, to call
20 Nancy, and ask her -- not to ask her -- to tell
21 her that she was on administrative leave until we
22 were able to further investigate the situation.
23     Q. Was a decision made as to how to go
24 about a further investigation?

Page 28

1      A. Yes. We decided that Kathy Hutchins
2  would be the best person, because of her status
3  here, and because of her experience.
4      Q. And what do you mean her status and
5  her experience?
6      A. She's a clinical specialist. So, she
7  has had training in, obviously, advanced critical
8  care, medicine, and nursing.
9      And her job here is to, like mine, is
10 to check compliance. Hers is to check practice,
11 and make sure that people are adhering to
12 practice issues.
13     If we have a practice issue, we go to
14 Kathy Hutchins. And she looks into it for us.
15     Q. Now, who was Ms. Hutchins going to
16 report back to?
17     A. She reports to Mary Brown. And she
18 would have reported back to Mary Brown.
19     Q. Okay. And at some point, did you
20 learn that she had completed her investigation?
21     A. Yes. Kathy and Mary and I met. I
22 can't give you the exact date. It would probably
23 have been, if I had to guess -- I don't even like
24 to guess dates, especially when I'm sworn under

Page 29

1  oath. So, I'm not going to guess.
2      It was near the end of August. And we
3  all sat -- the three of us sat down. And Kathy
4  presented findings in a very, very specific, very
5  detail-oriented method.
6      She had everybody written out, that we
7  were able to follow very carefully.
8      It had taken her -- I bet it had taken
9  her five or six days to get through it. But as
10 she relayed to us, the handwriting was very, very
11 hard to read.
12     She had to go through medical MARs,
13 and she had to go through flow sheets, and she
14 had to go through a lot of different
15 documentation. So, she had to use the time for
16 that.
17     Q. Now, at that point -- well, what was
18 the next thing that happened?
19     A. Well, she brought her findings to Mary
20 Brown. And then Mary Brown made a decision that
21 we should meet with Nancy, to bring these issues
22 to her, and see what she would have to say about
23 it.
24     Q. Okay. And did you attend this meeting

**Page 58**

1  signing those notes?
2  A. No. Just, as Kathy would update, I
3  would be in the room with Kathy's updating. But
4  it was only as a sheer, I guess you would say,
5  FYI, or courteous --
6  Q. What do you mean, "as Kathy would
7  update"? What was Kathy doing?
8  A. After this meeting, Kathy was then,
9  which I think she's already testified, did an
10  investigation. And she was reporting back to
11  Mary on what she would find. And I would usually
12  be in the room.
13  Q. Okay. And was another meeting
14  scheduled?
15  A. Yes, there was.
16  Q. Okay. And is this the second meeting
17  that's referred to in Exhibit 14, that you took
18  notes of?
19  A. I took notes on that meeting.
20  Correct.
21  Q. Okay. And so far as you know, is this
22  an accurate representation of what happened at
23  that meeting?
24  THE ARBITRATOR: This is August 29th?

**Page 59**

1  THE WITNESS: Yes. Yes. And I signed
2  it. It's my signature. And Addie typed it for
3  me.
4  Q. (By Mr. Cahillane) Now, in between
5  the -- well, was it your understanding that in
6  between the meetings, Ms. Hutchins had further
7  looked into the records concerning these
8  patients?
9  A. Correct.
10  Q. And what was the purpose in doing
11  that, as you understood it?
12  A. Well, Nancy had given us feedback in
13  her answers to our questions. So, what we did
14  was Mary asked Kathy to then look further into
15  those answers that she gave us, so that we could
16  then respond.
17  Q. Okay. And did that include the
18  situation with the bolus and the drip?
19  A. Yes.
20  Q. And was that discussed at the meeting?
21  A. Yes, it was.
22  Q. Okay. And what do you recall about
23  that?
24  A. It turned out that after trying so --

**Page 60**

1  trying as hard as I did to understand it, it
2  turned out the patient didn't even have an IV
3  that day. The IV had been discontinued.
4  Q. And was that related to Nancy Default
5  at the meeting?
6  A. That was relayed to her by Mary Brown.
7  Q. And what did Ms. Dufault say?
8  A. As well as I can remember, without my
9  notes in front of me, she said, "That's how I
10  remember it. I can't --" she kind of said, "I
11  can't say anything else. That's how I remember
12  it."
13  Q. And how did that meeting end?
14  A. Again, I would say there was four or
15  five things brought to Nancy's attention.
16  There was two new cases presented at
17  that time, that Kathy had found in the two days
18  that were of concern.
19  We brought everything back to her, got
20  her input again. And at the end of that, there
21  was nothing really to tell us where the drug was.
22  We had no idea where the drug was.
23  And there was no documentation in the
24  med sheet. Mary made the decision to ask

**Page 61**

1  Nancy -- to terminate Nancy. I shouldn't say
2  ask. Strike it. To terminate Nancy.
3  Q. And do you recall anything else that
4  Nancy Default said at that meeting?
5  A. No. I don't. She just kept referring
6  to the fact that she had charted -- it was a
7  documentation issue. It was a charting issue.
8  That she had given the drugs.
9  But at this meeting, there was also
10  more evidence brought in that there was a lot of
11  drug taken out that wasn't even ordered.
12  For instance, I remember: There was
13  probably five or six morphine tubes that were
14  taken out. The order was only for one milligram.
15  And there was no documentation of where the waste
16  on that was.
17  So, we brought to Nancy's attention
18  that it's hospital policy, and it's policy across
19  the nation, that when a nurse has wasted a
20  narcotic, they have to have a second signature.
21  Not only did she not document it, but
22  she also did not have a second signature.
23  So, it was a narcotic that was
24  totally -- we couldn't account for it. So, we

**Page 70**

1   Q.   -- those discrepancies?
2   A.   Correct.
3   Q.   You did not, following the
4   investigation, or during the investigation,
5   advise Mary Brown that the proper result in this
6   case was to terminate Nancy Dufault?
7   A.   No. Never.
8   Q.   You didn't suggest that some other
9   level of discipline was appropriate?
10  A.   We didn't do levels of
11  appropriateness.
12       Again, the information was brought to
13  Mary. She made the decision. She did not ask my
14  advice.
15  Q.   And you didn't offer it without being
16  asked?
17  A.   I did not offer my advice.
18  Q.   Do you have an understanding of why
19  Nancy Dufault was terminated?
20  A.   Of course I do. Yes.
21  Q.   Okay. And what's the basis of your
22  understanding?
23  A.   My understanding would be --
24  Q.   I'm not asking what your understanding

**Page 71**

1   is. I'm asking how you came to an understanding.
2   A.   I don't understand.
3   Q.   Did somebody tell you, or is this
4   based on your observation of the process?
5   A.   Did someone tell me why she was being
6   terminated? Is that what you're asking?
7   Q.   Yes.
8   A.   Yes. Mary Brown told me she was being
9   terminated.
10  Q.   And when did she tell you that?
11  A.   She would have told me on the day
12  after our last meeting with Nancy. That was
13  exactly when she told me.
14  Q.   So, August 30th?
15  A.   I don't have anything in front of me.
16  Q.   Sure. If I suggest to you that there
17  were two meetings with Nancy, August 27th and
18  29th --
19  A.   Right. After the second one.
20       THE ARBITRATOR: Don't step on his
21  questions because --
22       THE WITNESS: I know. I'm sorry.
23       (Off-record discussion.)
24  Q.   (By Mr. Hickernell) So, is it your

**Page 72**

1   testimony then that Mary didn't tell you why
2   Nancy had been terminated until after she had
3   been terminated?
4   A.   Mary did not tell me that Nancy was
5   being terminated until after the second meeting.
6   That was the question you asked me. And that's
7   what I answered.
8       Mary did not tell me she was
9   terminating Nancy until after the second meeting.
10      Are you asking now if she told me why
11  she was terminating her?
12  Q.   My question is as to why. Yes.
13  A.   At that point, did she tell me why?
14  Q.   Yes.
15  A.   Yes. She told me -- and again, we had
16  the notes from the second meeting at that point,
17  where there were significant discrepancies, time
18  and time again, between drugs taken out of the
19  machine, and Nancy not documenting the drugs
20  being given to a patient.
21      So, as is policy at any hospital I've
22  worked at, a nurse takes a drug out, and doesn't
23  chart it, it's not been given. So, we did not
24  know where the narcotics were.

**Page 73**

1       So there, we made the -- Mary made the
2   decision, based on policy, that Nancy would be
3   terminated.
4   Q.   And what specific policy are you
5   referring to, when you say, "based on policy"?
6   A.   What I just referred to in my head was
7   nursing policy. I did not refer to Mercy policy
8   at all. So, I should say standard nursing
9   practice.
10  Q.   When did you first learn that Nancy
11  Dufault either would be or had been terminated?
12  A.   After the second meeting.
13  Q.   The day after the second meeting?
14  A.   The day -- no. After the second
15  meeting. So, after we left that meeting, Mary --
16  I went to Mary's office, and she told me.
17  Q.   And were you present throughout the
18  second meeting?
19  A.   Yes, I was.
20  Q.   And is it your testimony that Nancy
21  was not informed that she was being terminated at
22  the second meeting?
23  A.   At the second meeting -- and again, I
24  don't have my notes -- Mary said to Nancy, at the

**Page 74**

1  very end, when Nancy had no answers to where all
2  the drugs had gone, that Mary said to Nancy that,
3  "There's a lot of discrepancies. We can't
4  account for them. You have to answer for them.
5  So, at this point, we're going to terminate you."
6      The Union rep was in the room, as was
7  human resources. Mary then offered Nancy to talk
8  to anybody in the room privately, if she wanted.
9      She chose not to. And we all left.
10 And I believe she stayed behind with the Union
11 rep.
12     Q.  So, is it fair to say then that you
13 learned that Nancy was being terminated during
14 the second meeting?
15     A.  It would have been at the very end,
16 when she said it to Nancy. Correct.
17     Q.  Right. I'm going to show you Joint
18 Exhibit 2, please.
19     A.  Mm-hmm. Mm-hmm.
20     Q.  Have you seen that before?
21     A.  Yes.
22     Q.  And what is it?
23     A.  It's a -- it's what we use to
24 discipline, written warnings, up to and including

**Page 75**

1  termination.
2      Q.  And do you have a memory as to whether
3  Mary Brown gave that to Nancy at the second
4  meeting?
5      A.  No. I honestly do not.
6      Q.  Do you remember the first time you saw
7  that document?
8      A.  No. I honestly do not. I would say
9  it was very soon after. It was a long time ago.
10 It was very soon after this whole -- this last
11 meeting, which was the 29th of August.
12     So, it would have been soon thereafter
13 the 29th of August that I would have signed this.
14     Q.  And does your signature appear on
15 there?
16     A.  Mm-hmm.
17     Q.  And is there a date next to your
18 signature?
19     A.  There's a date on -- not right next to
20 my signature. No. Is that what you're asking?
21     Q.  Did you write a date yourself at the
22 same time you wrote a signature?
23     A.  No, I did not.
24     Q.  So, you don't have any way of telling,

**Page 76**

1  from that document, whether you signed it on the
2  29th, as well?
3      A.  I can tell you I signed it before Bev
4  Ventura did. And Bev Ventura signed it 8/29/02.
5      Q.  Based on that recollection, do you
6  conclude that you signed it on the 29th?
7      A.  Based on that, I would say I signed it
8  on the 29th.
9      Q.  And did you review it --
10     A.  Yes.
11     Q.  -- prior to signing it?
12     A.  It was only one sentence long.
13 Correct.
14     Q.  And the one sentence long on the
15 second side of the page --
16     A.  Mm-hmm.
17     Q.  -- does that sentence summarize your
18 understanding of the reasons that Nancy was
19 terminated?
20     A.  Correct.
21     Q.  Okay.
22         THE ARBITRATOR: For convenience's
23 sake, could I ask you to read that sentence into
24 the record.

**Page 77**

1          THE WITNESS: Sure. "Failure to
2  adhere to the standards of narcotic/controlled
3  substance administration -- suspected drug
4  diversion."
5      Q.  (By Mr. Hickernell) And did your
6  signature indicate that you agreed with the
7  contents of the document?
8      A.  My signature, as I understand it, on
9  these things, is that I'm a -- that Nancy refused
10 to sign, and that I am a witness that -- to two
11 things.
12     I was a witness to the August 29th
13 meeting, where she was given the information as
14 to why she was being terminated; as well as being
15 the manager of the ICU, and signing it.
16     Q.  So, your signature doesn't indicate
17 one way or another whether you agree with the
18 contents of the document; is that what you're
19 saying?
20     A.  No. I would say it does agree with
21 the contents. I'm sorry if I said that wrong.
22     Q.  So, if you agreed that that was the
23 reason for which she was being terminated, and
24 that termination was appropriate for that, could

Page 78

1  you explain to us what your understanding of
2  suspected drug diversion was.
3     A.   To me, suspected drug diversion, in
4  any situation, is when we have narcotics taken
5  out of -- right now, it's Omnicell -- and yet,
6  they are not charted in the medical record as
7  being given.
8         And by medical record, I mean our
9  standard med sheet, which is our MAR here.
10    Q.   And is it your testimony that
11 suspected drug diversion does not mean that Nancy
12 was suspected of having removed the drugs for her
13 own use, or for the use of someone other than the
14 patient?
15        MR. CAHILLANE: Objection.
16        THE ARBITRATOR: Sustained. It's a
17 compound question. Ask it again.
18 *  Q.   (By Mr. Hickernell) All right. Do I
19 understand, from your last answer, that suspected
20 drug diversion does not mean, to you, that Nancy
21 was suspected of having taken the drugs for her
22 own use?
23        MR. CAHILLANE: Objection.
24        THE ARBITRATOR: Basis?

Page 79

1         MR. CAHILLANE: I just think he's
2  mischaracterizing her prior testimony.
3         MR. HICKERNELL: Well, I'm asking her
4  though.
5         THE ARBITRATOR: This is cross. You
6  have a certain amount of latitude.
7         Did you understand the question?
8         THE WITNESS: Could you repeat it,
9· please.
10        *(Question read.)
11        THE WITNESS: I don't get the
12 question. Okay. Let me think. If you're asking
13 me, right now, if I think that drug diversion
14 means that Nancy was taking the drug --
15    Q.   (By Mr. Hickernell) I'm asking what
16 your understanding was, not right now, but at
17 that time.
18    A.   At that time, drug diversion means it
19 was diverted away from the patient.
20        Nancy had the drug. The patient
21 didn't get the drug. So, somehow, it was
22 diverted away from the patient. That's how I
23 understand it.
24    Q.   Okay. And does your definition of

Page 80

1  drug diversion include an instance in which
2  Nancy, or somebody else, had removed the drug
3  from the Omnicell, and given it to the patient,
4  as ordered, but failed to record it in the MAR?
5     A.   I would have no way of knowing that.
6     Q.   I didn't ask you if it happened. I
7  asked you if that would be included in your
8  definition of drug diversion.
9     A.   I don't understand the question.
10    Q.   Okay.
11        THE ARBITRATOR: Try again.
12        MR. HICKERNELL: I'll try again.
13    Q.   (By Mr. Hickernell) You have
14 testified so far, and please correct me if I
15 mischaracterize you, that Nancy Dufault was fired
16 for, among other things, suspected drug
17 diversion.
18    A.   Mm-hmm.
19    Q.   And that you agreed that that's what
20 she had been fired for?
21    A.   Correct.
22    Q.   And you agreed that that's what had
23 happened; is that right?
24    A.   Yes. Correct.

Page 81

1     Q.   Okay. And you've told us that when
2  the drugs disappear, basically, that that's
3  diversion?
4     A.   Correct.
5     Q.   Now, I'm trying to -- well, you don't
6  care what I'm trying to do. I'll just ask you
7  questions.
8         THE ARBITRATOR: Her definition of
9  suspected drug diversion is that it was diverted
10 away from the patient.
11        MR. HICKERNELL: Right. But she's
12 given a couple different answers.
13    Q.   (By Mr. Hickernell) So, are you
14 saying that drug diversion does not include
15 instances in which the patient received the drug,
16 but it was not recorded properly in the MAR?
17    A.   I would have no way of knowing, if it
18 wasn't recorded in the MAR, is what I'm saying.
19 If you're saying if that were to occur.
20        THE ARBITRATOR: No, no, no. That's
21 not the question.
22        THE WITNESS: I'm trying to answer it
23 though.
24        THE ARBITRATOR: Listen to it

21 (Pages 78 to 81)

MNA & MERCY HOSPITAL
June 10, 2003

Page 90

1  Mary Brown took the lead in speaking for the
2  Hospital?
3     A.  Yes. Correct.
4     Q.  And did you have a significant part in
5  the discussion?
6     A.  I would say I didn't say much.
7     Q.  And I don't see, in the first or the
8  second line, that Kathy Hutchins was present. Is
9  that --
10   A.  No, she wasn't.
11   Q.  Okay. So, she didn't say anything?
12   A.  Un-huh. Excuse me. No. She didn't.
13   Q.  Okay. And based on your review of the
14 second two pages of this document, and of your
15 recollection of the meeting, is it fair to say
16 that these two pages are not a verbatim
17 transcript of the second meeting?
18   A.  Only where I have quotes are they
19 verbatim. If they're quoted, then that's exactly
20 what they said, and I wrote it down as such.
21   Q.  Okay. And if you didn't write
22 anything down, then you don't know what was said?
23       MR. CAHILLANE: Objection.
24       THE WITNESS: Yeah. I guess I need

Page 91

1  that clarified.
2    Q.  (By Mr. Hickernell) Okay. Did you
3  write everything down that was said at the
4  meeting?
5    A.  No.
6    Q.  Okay. And in fact, had you written
7  everything down, not only would your fingers
8  likely have fallen off, but it would be a much
9  longer document than a page and a half?
10   A.  Right.
11   Q.  Okay. And looking at this -- well,
12 are you skilled in shorthand?
13   A.  No.
14   Q.  Okay. What did you do when you were
15 taking notes during the second meeting to
16 indicate that it was a direct quote?
17   A.  I'm sorry. I didn't really understand
18 the question.
19   Q.  When you were taking the notes during
20 the second meeting --
21   A.  Mm-hmm.
22   Q.  -- this reflects that -- actually,
23 almost everything you wrote down has quotation
24 marks on it.

Page 92

1    A.  Mm-hmm.
2    Q.  Do you have a specific recollection --
3  well, strike that. Let me find a quote.
4        Actually, let me go back to the first
5  two pages. I'm sorry.
6    A.  Mm-hmm.
7    Q.  Now, you testified that during the
8  meeting, Mary gave Nancy the evidence that had
9  been collected up to that point?
10   A.  She went over each incidence with her.
11   Q.  Okay. And with regard to the first
12 numbered incident --
13   A.  Mm-hmm.
14   Q.  -- here, do you recall what
15 documentation, or other evidence, Nancy was
16 given?
17   A.  No, I do not.
18   Q.  And do you recall what documentation
19 she was given for any of the instances?
20   A.  You mean handed to her?
21   Q.  Yes.
22   A.  No. I don't remember. I don't
23 remember -- I remember Mary going over the
24 situations, and Nancy replying to the situations.

Page 93

1        I don't remember her ever giving
2  anything. And I don't remember Nancy ever asking
3  for anything.
4        It was pretty much: "This is what
5  happened." And then she would reply what had
6  happened.
7    Q.  Okay.
8    A.  Nancy understood, when Mary said,
9  "This instance." She understood. She didn't ask
10 for any further explanation.
11   Q.  And what makes it possible for you to
12 state what Nancy's understanding was?
13   A.  I would say clearly, because I was
14 sitting in the room. And when Mary asked the
15 question, Nancy would respond very strongly that
16 that was the situation. "I did this," or, "I
17 didn't do this," or "I need to get better at it,"
18 or, "I'm not good at it."
19       She never said, "I don't remember."
20 She never said, "I can't recall." She never
21 said, "I don't know what you're talking about."
22 She never said, "Give me further --" so, from
23 where I was sitting, it looked like she clearly
24 understood what was going on. She responded

24 (Pages 90 to 93)

Page 94

1  appropriately.
2  Q.  So, as far as you could tell, at a
3  meeting on August 27th, 2002, Nancy, without the
4  benefit of any document, any review of charts --
5  A.  Mm-hmm.
6  Q.  -- remembered specifically the
7  incident on June 19th?
8      MR. CAHILLANE: Objection.
9      THE ARBITRATOR: Overruled. This is
10  cross.
11     THE WITNESS: I believe Nancy -- the
12  way Mary presented it, Nancy was speaking to her
13  practice, not necessarily the date of June 19th.
14     Mary presented June 19th as a
15  situation. Nancy presented her answer as how she
16  went about it.
17     MR. HICKERNELL: Okay.
18     THE WITNESS: I'm not saying she
19  specifically remembered, on June 19th, she did
20  this. No. Not at all.
21     MR. HICKERNELL: I think I'm almost
22  done. Can we just go off the record for a
23  moment.
24     (Recess taken.)

Page 95

1      THE ARBITRATOR: Okay. Back on.
2      MR. HICKERNELL: Just a few more
3  questions.
4      THE WITNESS: Sure.
5  Q.  (By Mr. Hickernell) Directing your
6  attention to the August 27th meeting, the first
7  meeting with the Grievant.
8  A.  The first meeting. Correct.
9  Q.  You said, if my notes are accurate,
10  that at the end of that meeting, no one asked for
11  anything; that is to say neither the union rep,
12  nor Nancy asked for anything. Is that correct?
13  A.  Correct.
14  Q.  Had Mary Brown or anybody else from
15  the Hospital told them, by the end of that
16  meeting, that termination was contemplated?
17  A.  Let me think. I remember Mary making
18  it very clear that disciplinary action, up to and
19  including termination -- I don't -- I don't -- I
20  cannot say she said that. But I do believe that
21  she said that disciplinary action would be
22  considered.
23  Q.  And do you remember her --
24  A.  Exact words? You would have to ask

Page 96

1  her.
2  Q.  I'd have to ask her if you remember
3  them?
4  A.  Oh, no, no, no. I thought you said
5  what she said.
6  Q.  Do you remember or not?
7  A.  Do I remember what Mary said?
8  Q.  Yes.
9  A.  No. That's what I meant by you'd have
10  to ask her. Ask her what she said.
11  Q.  Okay. So, you don't remember?
12  A.  I really -- I think I do, but I don't
13  want to go on record.
14  Q.  Well, if you think you do --
15  A.  I want to be 100 percent sure. I'm
16  under oath. So, I don't want to say something
17  that's not completely accurate and correct. I
18  mean, I want to be completely truthful. And I am
19  being completely truthful.
20     So, for me to say something that I'm
21  not absolutely, 100 percent sure of, I'm not
22  going to say that.
23     I can tell you that I think, rather
24  strongly, that Mary did.

Page 97

1  Q.  But you don't recall, as you sit here
2  today --
3  A.  Correct.
4  Q.  -- the exact words she used?
5  A.  Correct. Correct.
6  Q.  Okay. And directing your attention
7  back to Hospital 14, the first page, Case 1.
8  A.  Mm-hmm.
9  Q.  That June incident, is that the same
10  incident that you testified you had previously
11  met with Nancy about?
12  A.  Correct.
13  Q.  That is the same incident?
14  A.  Yes. I can tell, because within one
15  minute's time, she had taken out quite a bit of
16  Lorazepam.
17     MR. HICKERNELL: Okay. That's all the
18  questions I have. Thank you.
19     THE ARBITRATOR: Anything on redirect?
20     MR. CAHILLANE: Yes. A few questions.
21
22         * * * * *
23  REDIRECT EXAMINATION BY MR. CAHILLANE:
24



**Page 98**

1  Q. Ms. D'Espinosa, when Mary Brown asked
2  you to call Nancy Dufault and tell her she was
3  being placed on administrative leave, what did
4  Nancy Dufault say to you? Do you remember?
5  A. I called Nancy. She had worked the
6  night before, because I remember thinking I was
7  going to wake her up.
8  And I did. And I remember saying that
9  we were going to put her on administrative leave
10 because there was some issues with Omnicell and
11 medication administration records.
12 I remember her saying specifically,
13 "What?" And I remember saying that there were
14 discrepancies that we were looking at, and that
15 we would put her on administrative leave until we
16 had the investigation completed.
17 Q. Okay. Anything else?
18 A. No. That was all I said on the phone.
19 Q. Well, my question was specifically
20 what she said.
21 A. Oh. No.
22 Q. Okay. With respect to the two
23 meetings that were held on August 27th and
24 August 29th --

**Page 99**

1  A. Mm-hmm.
2  Q. -- there were different Union
3  representatives present at those meetings?
4  A. Yes. One was Mona. And the second
5  one was Dave Powers.
6  Q. And do you recall either of them
7  saying anything during either meeting?
8  A. Yes. The second meeting, David Powers
9  was the rep. And when we talked about the one
10 that I had said earlier referred to as I didn't
11 understand why she would ever do that, when Mary
12 was presenting it, and said that she looked back
13 at the patient, and Nancy was giving her
14 explanation, Dave Powers looked at her and said,
15 "Why would you do that?" out loud.
16 Q. Looked at who?
17 A. Looked at Nancy during the meeting,
18 and said, "Why would you do that?"
19 Q. And that was with respect to which of
20 these incidents?
21 A. It was with respect to Scenario
22 Number 1 on August 29th, when Mary asked her
23 about giving the 6 milligram boluses through an
24 IV drip of Ativan that was already infusing.

**Page 100**

1  MR. CAHILLANE: That's all I have.
2  THE ARBITRATOR: This is regarding
3  Scenario Number 1?
4  THE WITNESS: Correct. On
5  August 29th.
6  THE ARBITRATOR: I'm sorry. Anything
7  more?
8  MR. CAHILLANE: No. No other
9  questions.
10 THE ARBITRATOR: Anything on recross?
11
12 RECROSS EXAMINATION BY MR. HICKERNELL:
13
14 Q. When you took the notes for the second
15 meeting, were you attempting to make an accurate
16 record of what happened at the meeting?
17 A. Yes.
18 Q. And you didn't include the remark that
19 you just related by Dave Powers in your notes?
20 A. No. I didn't think it was relevant.
21 Q. Okay. And was there something that
22 spurred your recollection of that particular
23 comment?
24 A. At the time, I thought it was odd that

**Page 101**

1  her union rep would say to her, "Why would you do
2  that?" So, I remembered that, as bad as my
3  memory is. That shocked me.
4  And I was very shocked that her Union
5  rep would look at her, and ask her why she would
6  do something like that.
7  So, it stayed with me, yes. It stayed
8  with me a very long time.
9  Q. And since it stayed with you, can you
10 show us where, in the discussion of this Scenario
11 Number 1, Mr. Powers said that?
12 A. It was Scenario Number 1. Mary was
13 going over, if you look at Scenario Number 1,
14 paragraph number 1, Mary goes over the situation
15 with Nancy.
16 Nancy says, "Yes. I remember that
17 situation."
18 Mary goes on to say, "You went on to
19 tell us this was possible because what you had
20 done," I've already said it, "was giving
21 6 milligrams boluses through the IV drip of
22 Ativan."
23 It was in that time frame of that
24 paragraph that Dave looked at Nancy, and said,

MNA & MERCY HOSPITAL
June 10, 2003

### Page 126

1   it.
2   And she also showed me a couple of
3   examples where, again, she documented giving
4   narcotics prior to taking them out of the
5   Omnicell.
6   Q.   Now, prior to this meeting, the second
7   meeting, had you considered what action you would
8   or would not take with respect to Nancy Dufault?
9   A.   Yes. I had weighed the seriousness of
10  what -- and the discrepancies of the first
11  meeting, and had a lot of concern about that.
12  And I did speak to my vice president.
13  Q.   And who is that?
14  A.   That's Beverly Ventura.
15  Q.   And what happened when you talked to
16  her?
17  A.   She also -- you know, I reviewed the
18  meeting, the information, Nancy's responses. And
19  at that point, we were very suspicious that we
20  had some type of drug diversion going on.
21  Q.   Okay. Was any decision made as to
22  what you would do at the August 29th meeting?
23  A.   In my conversation with Beverly, we
24  discussed a couple of options.

### Page 127

1   One was that if, in fact, Nancy was in
2   trouble of some type -- and I'm talking about
3   substance abuse -- that we would recommend that
4   she go on a leave of absence, pending completion
5   of what they call here the SARP, the Substance
6   Abuse Rehabilitation Program through the Board of
7   Registration of Nursing.
8   THE ARBITRATOR:  SARP?
9   THE WITNESS:  SARP is the Substance
10  Abuse Rehabilitation Program. That was one
11  option that Beverly and I had discussed and
12  agreed to.
13  The other option was that if we could
14  not resolve the discrepancies at the second
15  meeting that was scheduled for the 29th, that we
16  would have no option but to terminate Nancy,
17  based on suspected drug diversion, and report
18  her.
19  Q.   (By Mr. Cahillane)  Okay. Now, going
20  into Hospital Exhibit Number 14, was she, again,
21  questioned concerning the incident on the patient
22  PR at that meeting?
23  MR. HICKERNELL:  Which meeting? I'm
24  sorry.

### Page 128

1   MR. CAHILLANE:  Scenario Number 1.
2   THE WITNESS:  The patient PR.
3   MR. HICKERNELL:  The second meeting?
4   MR. CAHILLANE:  The second meeting, on
5   the 29th.
6   THE WITNESS:  Yes. I told Nancy I was
7   very concerned about the explanation that she had
8   given me; and that after further investigation,
9   the IV had, in fact, been discontinued the day
10  before.
11  So that the explanation she had given
12  me on the 27th could not be possible, that she
13  had bolused through the IV.
14  Q.   (By Mr. Cahillane)  And what was her
15  response to that?
16  A.   She said that -- she had no answer.
17  That's what she recalled.
18  Q.   And then, was there another matter
19  that you brought up here, referred to as Scenario
20  Number 2?
21  A.   Yes. This is a case where, again,
22  there had been Ativan -- I'm sorry; this was
23  morphine -- morphine removed at 6:20 in the
24  morning. And she had documented that she gave it

### Page 129

1   at 2:00 a.m.
2   In that particular report, there was
3   no other -- that I had presented to her, there
4   was no other morphine removed on that patient.
5   Q.   Okay.
6   A.   And I presented her three other
7   similar scenarios, where she documented giving
8   morphine prior to removing it from the Omnicell.
9   Q.   And did she have a response to that?
10  A.   That those are the times that she
11  charted, and it must have been wrong in her
12  charting.
13  MR. HICKERNELL:  And if the record
14  could continue to reflect that the witness is
15  referring to Hospital Exhibit 14.
16  Q.   (By Mr. Cahillane)  And was there
17  still another scenario that you also presented
18  her with at that time?
19  A.   Yes. On that particular patient, on
20  May 14th, she took out morphine three times on
21  the patient.
22  At 11:41 p.m., she took out
23  2 milligrams. It was not charted. At 1:39 a.m.,
24  she took out 4 milligrams. It was not charted.