Page 130

1  And seven minutes later, at 1:46 a.m., she took
2  out 10 milligrams. And it was not charted.
3      And I asked how she could take out, in
4  seven minutes, 14 milligrams of morphine on the
5  same patient. She did not have an explanation.
6      And certainly, that was over the
7  amount that the doctor had ordered on that
8  patient.
9      THE ARBITRATOR: Let me interrupt for
10 one second. Do we have a patient initials for
11 Scenario 3?
12     MR. CAHILLANE: Yes. Actually, it is
13 the patient on the other exhibits whose initials
14 are CI.
15     THE ARBITRATOR: Okay.
16     MR. CAHILLANE: And I see that we just
17 missed on the redacting of the last name up
18 there.
19     THE ARBITRATOR: Okay. I wasn't sure
20 if that's the case.
21     MR. CAHILLANE: I think that's Patient
22 Number 5 on the prior exhibits.
23  Q.  (By Mr. Cahillane) So, at that time,
24 Ms. Brown, did you make a decision as to what to

Page 131

1  do?
2   A.  Yes. Since there was no plausible
3  explanation that I could see for any of this;
4  there was so many cases where medication was
5  taken out, documented it had been given
6  previously; the comments about bolusing through
7  the IV could not be accurate because the IV had
8  been discontinued; there were too many
9  discrepancies at that point, without any
10 explanation.
11     So, the decision was made to terminate
12 Nancy for failing to adhere to our administration
13 policy, and suspected drug diversion.
14  Q.  At either of these meetings, was there
15 any other explanation given by Nancy Dufault or
16 the union representative concerning these matters
17 that was not recorded in these notes?
18  A.  No.
19  Q.  Or that you have not testified to?
20  A.  No.
21  Q.  Did either Ms. Dufault or the union
22 representative ask for anything else at either
23 meeting?
24  A.  No.

Page 132

1   Q.  And I take it that you then procured a
2  disciplinary action form, which is, I believe,
3  Joint Exhibit Number 2?
4   A.  That's correct.
5   Q.  Okay. You might want to look at the
6  other side.
7   A.  Mm-hmm. That's correct.
8   Q.  One other thing, Ms. Brown: Does the
9  hospital have policies regarding medication
10 practice, in terms of giving it to patients?
11  A.  Yes, it does.
12  Q.  I'm just going to show you a copy of a
13 document, and ask you if that is the nursing
14 department policy with respect to medications?
15  A.  Yes, it is.
16     MR. CAHILLANE: And I would like to
17 introduce that.
18     THE ARBITRATOR: Let's identify it as
19 Hospital 15.
20     MR. HICKERNELL: Can I have a moment
21 to review it, please.
22     Can I have voir dire on this, please?
23     THE ARBITRATOR: Yes. Is Hospital 15
24 being offered into evidence at this time?

Page 133

1      MR. CAHILLANE: Oh, I'm sorry. I
2  thought I had. Yes. I am offering it as
3  evidence.
4      THE ARBITRATOR: Okay. Voir dire
5  questions.
6
7      VOIR DIRE BY MR. HICKERNELL:
8
9   Q.  Okay. Ms. Brown, is this the policy
10 that was in effect in 2002?
11  A.  Yes.
12  Q.  And has it been revised since?
13  A.  No.
14  Q.  So, it's still in effect?
15  A.  This is still in effect.
16  Q.  There's some references in the
17 document to appendixes and attachments?
18  A.  There's an Appendix C. It looks like
19 it's a chemotherapy order form. I didn't attach
20 that in. It's a written standard order form for
21 chemotherapy.
22  Q.  On the second page, the last bullet
23 point, there's a reference to Attachments 1 and
24 2. What are those?

**Page 150**

1  are not a verbatim transcript of the first
2  meeting?
3  A. No. There was no verbatim transcript
4  of the meeting.
5  Q. And in fact, a verbatim transcript
6  would be substantially longer than the two pages
7  here?
8  A. Mm-hmm.
9  Q. Did you consider, at any time, asking
10 Nancy Dufault to undergo a drug test?
11 A. No. We didn't ask her -- we didn't
12 ask her.
13 Q. And did you consider asking her?
14 A. No. That was not part of the initial
15 consideration. And it did not come up in further
16 conversations, because of the responses that we
17 received in those meetings, which was pretty much
18 stating that she either couldn't recall, or she
19 had bad documentation.
20     It did not seem to be something that
21 was appropriate to ask at that time, since she
22 was claiming all of this was just poor
23 documentation.
24 Q. So, fair to say that with regard to

**Page 151**

1  the issue of substance abuse and SARP, you were
2  asking for Nancy to state that she needed help?
3  A. We were asking for an explanation for
4  the scenarios that we presented to her around
5  numerous discrepancies between the medication she
6  removed from the machine, and what she
7  documented.
8     And I was not asking her to step
9  forward to tell me, you know, if she was using
10 the drugs. I simply was asking, in the meetings,
11 for an explanation of the discrepancies.
12 Q. Right. But you told me a few minutes
13 ago about your meeting with Ms. Ventura.
14 A. Mm-hmm.
15 Q. And as I understood it, you discussed
16 the possibility of SARP. And there was an
17 agreement that if she asked for help, you would
18 at least consider putting her on a leave of
19 absence while she underwent the SARP program. Is
20 that correct?
21 A. Correct.
22 Q. So then, is it fair to say that with
23 regard to the issue of substance abuse, you were
24 waiting for her to ask for help?

**Page 152**

1  A. I did give her, I thought, an
2  opportunity. At the end of the -- which I forgot
3  to tell you. You asked that.
4     At the end of the August 29th meeting,
5  which the HR person was there, myself, Jean, her
6  Union rep, and Nancy, before we concluded the
7  meeting, I did ask her if she would like to have
8  a private conversation with anyone that was
9  present in the room, including HR.
10     And I was trying to give her an
11 opportunity, that if she had an issue, and wanted
12 to bring that forward, that any one of us would
13 have been available to sit with her.
14     But at that point, she only remained
15 in the room with Dave Powers, who was the MNA
16 rep.
17 Q. Did you ever observe in Nancy, or have
18 anyone report to you, an observation of an
19 erratic behavior consistent with drug abuse?
20 A. No.
21 Q. Can I direct your attention to Joint
22 Exhibit 1, please.
23     THE ARBITRATOR: Joint Exhibit 1 is
24 the collective bargaining agreement?

**Page 153**

1     MR. HICKERNELL: Yes.
2  Q. (By Mr. Hickernell) And specifically
3  referring to Section 6.09 on page 17.
4  A. Mm-hmm.
5  Q. And in your current position, are you
6  generally aware of the terms of the collective
7  bargaining agreement?
8  A. Yes, I am.
9  Q. All right. And are you specifically
10 aware of the existence of Section 6.09?
11 A. Yes, I am.
12 Q. And was that section in existence in
13 2002?
14 A. Yes.
15 Q. And did you consider invoking that
16 section in dealing with Ms. Dufault?
17 A. There was not a question of fitness
18 for duty at that time. We were questioning drug
19 diversion.
20     She did not have anything that made me
21 think, clinically, that she was involved in --
22 that it was a fitness for duty issue.
23 Q. Okay. During the August 27th meeting,
24 when you were presenting the cases to Nancy, the

**Page 70**

1  A. I did come up with one that had
2  multiple -- I had removed multiple vials of
3  Ativan, and thinking, at the time, that it might
4  send a trigger off to pharmacy.
5      But as I wanted accountability for my
6  med, that I had signed off.
7  Q. And what did you do next?
8  A. The weekend went by. And I got a call
9  from Mary Brown on Monday morning at 8:30 in the
10 morning, setting up the meeting for 8/27 at
11 10:00 o'clock.
12 Q. And as best you recall, what did she
13 say when she called you?
14 A. This was my chance to dispute the
15 discrepancy, or give my explanation of the
16 transgressions that they had found between the
17 Omnicell and my SMS documentation.
18 Q. And what did you say, if anything?
19 A. I don't think I said anything special.
20 Nothing that I can recall.
21 Q. What happened next?
22 A. I went to the meeting the next
23 morning. Mona, the union rep, Jane D'Espinosa
24 was there, Mary Brown, and myself.

**Page 71**

1  Q. And as best you can recall, will you
2  tell us what happened at the meeting, identifying
3  specific speakers when possible.
4  A. Mary Brown sat to my left. On my
5  right, immediate right, was Mona, the Union rep.
6  And Jean was on her right.
7      At the meeting, Mary presented me with
8  Omnicell readouts, which was the first time I had
9  ever seen any of those sheets, and our MARs or
10 SRS readouts of documentation of the medications
11 that were administered to the patients.
12     THE ARBITRATOR: Had you seen MAR
13 readouts before?
14     THE WITNESS: Yes, I had. Those are
15 our work sheets that we use on the unit.
16     THE ARBITRATOR: But the readouts you
17 had seen before?
18     THE WITNESS: Right.
19     THE ARBITRATOR: But not the Omnicell
20 readout?
21     THE WITNESS: Right.
22 Q. (By Mr. Hickernell) And what
23 happened? Can you describe more specifically
24 what happened as she made that presentation to

**Page 72**

1  you?
2  A. The meeting lasted between 30 to 40
3  minutes. She would present -- show me the
4  Omnicell, show me the SMS, and then expect me to
5  recollect what had transpired on this or caused
6  me this discrepancy.
7  Q. And did the cases that she showed you
8  correspond to the cases set forth by the Hospital
9  in its presentation here?
10 A. Yes, they did.
11 Q. And other than the Omnicell and the
12 SMS printout, what documents were you shown?
13 A. None.
14 Q. Was there no case in which you were
15 shown any other documents?
16 A. No, there was not. Not at the first
17 meeting.
18 Q. And were you able, on the 27th, to
19 recall the specific instances that were presented
20 to you?
21 A. I tried to give responses to what
22 could have happened, or what could have caused
23 this discrepancy on them.
24     But not knowing who the patients were,

**Page 73**

1  or even being able to associate, even if they
2  gave me a name, what the patient was -- I mean,
3  most of the events were two months prior.
4  Q. So, were you able to recall the
5  specific instances?
6  A. Example: The Ativan that they
7  questioned me about, the 320 milligrams, I said I
8  must have mixed -- I had removed from the
9  Omnicell 320 milligrams at 6:34, thereabouts,
10 according to the Omnicell readout.
11     I said, "I must have mixed two drips
12 at 160 concentration, that I would have failed to
13 sign one drip out, depending on when the time was
14 calculated, what the drip was," which Jean
15 informed me was 25 ccs an hour.
16     So that, it would be, for my 12-hour
17 shift, I would need 300 milligrams. And I had
18 taken 320 out.
19 Q. And as you made those statements at
20 the meeting, did you have a specific recollection
21 of what had happened?
22 A. Not really. Not even of the Ativan.
23 I would just surmise that that is what I did with
24 the -- took out the 320, and mixed two drips, one

Page 74

1  being for when I would need it, whatever time on
2  my shift.
3       Because hopefully, this drip which was
4  already infusing, going at 25 an hour, whatever
5  time the previous nurse to me would have hung it,
6  depending on when I would have signed it out, or
7  would need it in the SRS, and then leave a
8  courtesy, or enough medication, so they don't
9  immediately, upon assumption of the patient care,
10 have to mix a bag.
11     Q.   And was anybody taking notes at that
12 meeting?
13     A.   Jean D'Espinosa.
14     Q.   Anybody else?
15     A.   Not that I can recall. Oh, and Mona
16 was, the Union --
17     Q.   I'm going to show you what's been
18 marked as Hospital Exhibit Number 14. And
19 specifically, the first two pages.
20          Drawing your attention to Case 1,
21 there's a quotation attributed to you there. Did
22 you say that?
23          THE ARBITRATOR: Read it into the
24 record, just so it's clearer.

Page 75

1      Q.   (By Mr. Hickernell) The quotation
2  attributed to Nancy says, "I gave the drug --
3  just didn't chart it," unquote.
4      A.   I cannot recall if I said those words
5  specifically. I know that I asked Jean if it was
6  not documented in the nurse's flow sheet that the
7  drip was going at 25 an hour.
8           And her response to me was that, "If
9  it's not charted, it's not documented," that,
10 "The nurse's notes is not a legal part of the
11 chart."
12     Q.   Drawing your attention to Case
13 Number 2, there's a quotation attributed to you.
14 Quote, "Equal to the dose ordered," unquote. Did
15 you make that statement?
16     A.   I could have.
17     Q.   And in the second part of Case 2,
18 there's a quote attributed to you. Quote, "Have
19 no answer for that," unquote. Did you make that
20 statement?
21     A.   They expected me to recall patients,
22 that in administering this medication to this
23 patient, I could not lie and say that I
24 remembered medicating Shelly's patient for her.

Page 76

1  So, I may have said, "I have no answer for this."
2      Q.   On the second page, in Case 3, there's
3  a quotation attributed to you. "I guess I didn't
4  chart it .... Bad documentation on my part,"
5  unquote. Did you say that?
6      A.   On this instance, I asked Jean if
7  there was nothing charted around the nurse's
8  notes around the time x-ray comes through. She
9  said there was not.
10          It is not my practice with an orientee
11 to document, unless something is transgressing,
12 or I need to intervene.
13          So, I can't imagine that I said, "Bad
14 documentation on my part," because I would have
15 expected Tawnia to be doing the documentation.
16     Q.   And you referred to your practice.
17 What was your practice with regard to documenting
18 while you were precepting another nurse?
19     A.   Unless I had to intervene to do
20 something, say a doctor was giving the nurse a
21 hard time, or the patient was overcomplicating
22 the orientee, as a preceptor, I did not step in.
23 I allowed them to be able to manage their time
24 and their skills.

Page 77

1      Q.   Drawing your attention to Case
2  Number 4, there's a quotation attributed to you.
3  "I bolused through the IV drip ... Used 999 to
4  bolus at 8:12 and 4:30 ... Then used the 18
5  milligrams to replace the IV," unquote. Did you
6  say that?
7      A.   What I said was something similar to
8  that. This was the only account, in the time
9  that they had placed me on administrative leave,
10 of my being able to recall anything that might be
11 alarming to the pharmacy, which is what Jean said
12 had -- something had triggered the pharmacy's
13 readouts.
14          And I said that I did recall this
15 instance and what I had done with the medication.
16 Mary Brown is the one who told me how much
17 medication I had removed from the Omnicell.
18          I did say that I bolused through the
19 drip, hanging drip. I do not recall saying that
20 the drip was running.
21          However, I did not go any further,
22 when I thought about what I had done, because of
23 my practice issues regarding adding medication to
24 an existing IV drip.

20 (Pages 74 to 77)

Page 86

1  came from specific medical records, correct?
2  A. The Omnicell readouts and the SMS that
3  she showed me. Yes.
4  Q. And during and after that meeting, you
5  did not ask for copies of those records or of any
6  further records from those patients, did you?
7  A. No, I did not.
8  Q. All right. And at the first meeting,
9  you had a union representative there with you?
10 A. Yes, I did.
11 Q. Did the union representative ask for
12 copies of those medical records?
13 A. I do not believe she did.
14 Q. And at the second meeting, you again
15 had a union representative there, present with
16 you, did you not?
17 A. I did.
18 Q. And neither you nor the Union
19 representative, at or after the second meeting,
20 asked for copies of the medical records that were
21 being shown to you?
22 A. We did not.
23 Q. And that's because you already knew
24 that what was going on here was that you had

Page 87

1  overmedicated the patients?
2  A. I've never heard of a nurse being
3  fired because they made a med error, in my 25
4  years at Mercy.
5  Q. Well, what if the overmedication was
6  because the nurse didn't agree with the doctor's
7  order, and thought the patient was agitated or
8  disturbed and needed more? Would that be grounds
9  for termination, do you believe?
10 MR. HICKERNELL: Objection.
11 Foundation. How is she in a position to
12 administer discipline?
13 MR. CAHILLANE: I'm asking her opinion
14 of whether or not it would be grounds for
15 termination if a nurse decided to administer more
16 medication to the patient than had been ordered
17 by the doctor.
18 THE ARBITRATOR: Is the Hospital now
19 saying that this Grievant was terminated for
20 suspected overmedication?
21 MR. CAHILLANE: No. What happened, I
22 thought that the Grievant freely admitted in her
23 direct testimony, was that the explanation for
24 the missing narcotics is that she gave too much

Page 88

1  to the patient.
2  THE ARBITRATOR: Listen to the
3  questions carefully.
4  Q. (By Mr. Cahillane) Well, would you
5  agree that if a nurse decided to give more
6  medication, particularly a narcotic, to a patient
7  than was prescribed by the doctor, that that
8  could be grounds for termination?
9  A. Again, I have never heard of this.
10 And I can't imagine a nurse doing that.
11 Q. Now, if we could just go to the case
12 of the patient PR, which is on Hospital Exhibit
13 Number 5.
14 MR. CAHILLANE: And am I correct,
15 Mark, Union Exhibit 5?
16 MR. HICKERNELL: I'll have to check.
17 I think PR may be in Union Exhibits 5 and 6.
18 Would you like the witness to be given both of
19 those?
20 MR. CAHILLANE: Well, she might want
21 them in front of her.
22 Q. (By Mr. Cahillane) On August 27th,
23 you were presented with some information by Mary
24 Brown concerning this patient and what had

Page 89

1  occurred between June 19th and June 21st,
2  correct?
3  A. Information being the Omnicell readout
4  and the SMS readout.
5  Q. And did you not testify that you
6  yourself, at the time, in August, questioned your
7  own practice with respect to the time when you
8  state that you bolused the medication into the
9  patient?
10 A. I questioned my practice of
11 administering or adding to the bag medication,
12 yes.
13 Q. And you said, in fact, that it was not
14 a common practice?
15 A. Absolutely.
16 Q. And in fact, it's not a proper
17 practice, is it?
18 A. No. As I had never done it before, I
19 would say no.
20 THE ARBITRATOR: Do we have a
21 definition of bolusing in the Hospital records,
22 so that we all know what bolusing is? What's the
23 definition?
24 Q. (By Mr. Cahillane) As you understand

23 (Pages 86 to 89)

**Page 154**

1 of the termination, correct?
2   A.  Correct.
3   Q.  And that used the term suspicion of
4 diversion of controlled substances, correct?
5   A.  Question of.
6   Q.  Question of. And at that point, or
7 shortly thereafter, you and/or the Union, on your
8 behalf, filed a grievance concerning your
9 termination, correct?
10   A.  I believe that's proper practice.
11   Q.  Well, that's what happened, correct?
12       MR. HICKERNELL: Just answer the
13 question.
14   Q.  (By Mr. Cahillane) You filed a
15 grievance?
16   A.  I told David to file a grievance.
17 Yes.
18   Q.  And in the grievance procedure, when
19 you were terminated, you first had a chance to
20 have your grievance heard internally, at the
21 Hospital, by, I believe it's the Hospital
22 president, or his designee, correct?
23   A.  Because this was a termination, I
24 understand it goes straight to Step 3? Is that

**Page 155**

1 what you're asking?
2   Q.  Yes.
3   A.  Correct.
4   Q.  Okay. But at that point, you have the
5 opportunity, do you not, together with the Union,
6 to present your case for why you should not have
7 been fired?
8       THE ARBITRATOR: At the Step 3
9 hearing?
10      MR. CAHILLANE: Yes.
11      THE WITNESS: I would not know what
12 the protocol is. But if you're telling me that's
13 it, yes. If that's the Union, yes. Correct.
14   Q.  (By Mr. Cahillane) Well, let me ask
15 you this: Did you understand that the grievance
16 proceedings provided you with an opportunity to
17 make your claim that the Hospital had violated
18 the contract by terminating you?
19   A.  Correct.
20   Q.  Did you go to the Step 3 hearing?
21   A.  Yes, I did.
22   Q.  And when you went to the Step 3
23 hearing, did you indicate, in any way, that,
24 "This is just a matter of my having made a

**Page 156**

1 medication error"?
2   A.  No, we did not.
3       THE ARBITRATOR: Now, medication
4 error? Is that what you meant?
5       MR. CAHILLANE: Yes.
6       THE ARBITRATOR: As opposed to
7 documentation error?
8       MR. CAHILLANE: Yes.
9       THE ARBITRATOR: Okay. Keep me on
10 board. Those are two different things.
11   Q.  (By Mr. Cahillane) Well, you
12 understood, at this point, by the time of the
13 Step 3 grievance, you understood that you had not
14 been fired just for a documentation error?
15   A.  That they were accusing me of
16 diversion of controlled substance, either using,
17 or in some way inaccountability for medication
18 that I had withdrawn from the Omnicell. Correct.
19   Q.  Okay. So, you understood that. But
20 you didn't indicate, at the Step 3 hearing, that,
21 "There's no just cause for my termination,
22 because this, in fact, was just a medication
23 error on my part," or errors?
24      THE ARBITRATOR: Wait, wait, wait.

**Page 157**

1 Now are you misspeaking yourself.
2       MR. CAHILLANE: No. That's exactly
3 what I mean.
4       THE ARBITRATOR: Okay. Medication
5 error. The question is -- state the question
6 again.
7   Q.  (By Mr. Cahillane) Well, do I
8 understand that here, in these proceedings,
9 Miss Dufault, it's your contention that whatever
10 discrepancies exist in the record as to the
11 amount of drugs withdrawn, versus the amount of
12 drugs given the patient are explainable by
13 inadvertent medication errors on your part?
14      THE ARBITRATOR: What is a medication
15 error, by your definition?
16      MR. CAHILLANE: Giving a patient too
17 much or too little of the drug that was
18 prescribed to them. Or not giving it at all. Or
19 giving a medication that had not been prescribed.
20      THE ARBITRATOR: That's a lot of
21 different kinds of medication errors.
22   Q.  (By Mr. Cahillane) Well, in this
23 case, let me amend my question to be: Is it your
24 contention, here and now, that whatever

## Page 162

1  is the responsibility of the nurse to document
2  all meds/IVs given prior to leaving the hospital,
3  and when the next shift's MAS are printed. RNs
4  on the night shift will check all physician's
5  orders written," I take it it is during, "the
6  past 24 hours, and the medication administration
7  schedule to assure accuracy."
8      Q.   (By Mr. Cahillane) Do you see that
9  paragraph, Miss Dufault?
10     A.   Yes, I do.
11     Q.   Now, the MAS is, is it not, a medical
12 administration sheet?
13         THE ARBITRATOR: Is that synonymous
14 with the SMS.
15         MR. CAHILLANE: I'm going to ask that
16 question next.
17         THE WITNESS: That's the med sheet
18 that we get, the MAS.
19     Q.   (By Mr. Cahillane) Right. And is the
20 MAS, the med sheet, is it like this document
21 here?
22     A.   Yes, it is.
23     Q.   One of the --
24     A.   Well, what we've been calling the SMS,

## Page 163

1  which is the equivalent with the MAR?
2      Q.   Yes.
3          MR. HICKERNELL: Can you tell us what
4  document you just showed her, for the record.
5          MR. CAHILLANE: Well, this one happens
6  to be -- I didn't write that exhibit on it. But
7  it regards patient B. I believe this one is --
8  well, it's the July 17th incident. This must be
9  patient BB. It's page 2.
10         But what I'm showing is a medical
11 administration sheet, that I believe there is one
12 contained in the records that we have in both
13 exhibits for every single patient.
14         THE ARBITRATOR: Except that there,
15 it's called the MAR, instead of the MAS.
16         MR. CAHILLANE: Correct. I just want
17 to ask her about that.
18         THE ARBITRATOR: Okay.
19     Q.   (By Mr. Cahillane) Those medical
20 administration sheets, Miss Dufault, are the
21 computer's record of the medicine that's been
22 administered to that patient, correct?
23     A.   Correct.
24     Q.   And they are part of the MAR, or the

## Page 164

1  SMS computer record, correct?
2      A.   The SMSs that you show us, we have a
3  work sheet that we work off, that that gets
4  discarded.
5      Q.   Well, this document, which is labeled
6  the, "Medical Administration Record," this is
7  what the policy here is referring to, the same
8  thing as what the policy here is referring to as
9  MAS, correct?
10         MR. HICKERNELL: And can the record
11 just reflect that Mr. Cahillane is holding up
12 Union Exhibit 21, page 2.
13     Q.   (By Mr. Cahillane) Let me ask you
14 this, Miss Dufault: Is it not the case that each
15 day, there is a medical administration sheet
16 printed off the computer?
17     A.   That goes into the permanent record?
18     Q.   Well, is one printed off?
19     A.   One that we write on and discard, that
20 the secretaries run off at the beginning of the
21 shift.
22     Q.   And that is printed off of the
23 computerized record, correct?
24     A.   Correct.

## Page 165

1      Q.   Okay. So, the information concerning
2  medication administration that is inputted by you
3  or other nurses into the computer is printed out
4  on a daily basis?
5      A.   Correct.
6      Q.   And it's there for the nurses' and the
7  doctors' use?
8      A.   If they needed it. I don't ever
9  recall a nurse going back into the permanent
10 record to see. But I guess, yes. Correct.
11     Q.   That's the permanent record. I'm
12 talking now about the medical administration
13 sheet that's printed each day.
14     A.   You throw that out at the end of each
15 shift.
16     Q.   Okay. But it's printed up for a
17 reason, isn't it?
18     A.   For you to work off for whatever shift
19 you're there. And then it's discarded.
20     Q.   Okay. So, every day, with respect to
21 the patient, you're printing, out of the
22 computerized record, the record that the computer
23 has of the medicine that's been administered to
24 that patient, correct?

Page 18

1  as far -- what did that consist of at Mercy
2  Hospital?
3     A.   Going way back, it was usually a --
4     Q.   Well, let me just say, the last year
5  that you were in active practice.
6     A.   At Mercy --
7           MS. BUTLER: Are we going back now
8  to 2000? Just to keep me oriented in time.
9           MR. CAHILLANE: Well, why don't I --
10 I don't want to go through 30 years.
11    A.   I could summarize if you'd like.
12    Q.   (By Mr. Cahillane) Are you familiar
13 with what would have been -- what was being done
14 at the hospital with respect to documentation of
15 controlled substances in 2002?
16    A.   I believe so, sir, yes.
17    Q.   Okay. And what record would the
18 physician have had to look at with respect to the
19 administration of a controlled substance in 2002?
20    A.   Basically, there were two sources
21 that I would usually turn to.
22         And if I can modify, briefly, my
23 previous testimony: My active practice
24 terminated July 2001. I hoped to return -- and

Page 19

1  actually provided care for a couple weeks in
2  August of 2001, after the first of two back
3  operations that year. The second occurred on
4  9/11/2001, that famous day. And I did
5  subsequently operate in 2002 on two physicians'
6  wives, in the process of hoping to return to
7  active practice. And I think it was in the
8  process of doing those procedures that it became
9  obviously apparent that I was not going to be
10 able to sustain the levels of practice to have an
11 active surgical practice that would produce
12 enough to cover the expenses and the income.
13        To continue back to the question
14 that you addressed, there were two sources that I
15 would generally turn to. The SMS system is a
16 computer system for recording administered
17 medications. And I believe the record is called
18 the MAR, or the medicine administration record.
19 That was a printed out every 24 hours and would
20 be put in the patient's record. So that if I
21 wanted to know what the patient received prior --
22 or somewhere up to the time of that being printed
23 out, I would go to that. And that would give me
24 a summation of what the patient received and

Page 20

1  when. Be it antibiotic, pain medication, blood
2  pressure supportive medication, every medication
3  would be there.
4          If I needed something within the
5  preceding several hours, I would then, basically,
6  access the MAR, where this was on computer and
7  had not yet been printed out. Many times, I
8  would either go to -- I would -- I would many
9  times talk with the nurse or go to that record.
10         But that record was what I expected
11 to tell me, as the responsible physician, what
12 happened from the day that patient came in to the
13 moment that I looked at her.
14    Q.   And would --
15         MS. BUTLER: And there was a second
16 record, you said.
17         THE WITNESS: I'm sorry?
18         MS. BUTLER: You said the doctor
19 looks at two sources.
20         THE WITNESS: Well, it's the same
21 record, but because it's printed out every
22 24 hours, in the chart there is an actual
23 printout. On the computer system -- from
24 the time that was printed out until the

Page 21

1  time the next printout occurs is on the
2  actual computer SMS system.
3          MS. BUTLER: Okay. So the second
4  source would be, if you didn't find out or
5  you weren't fully satisfied, you would go
6  to the computer itself.
7          THE WITNESS: Yes.
8          MS. BUTLER: That was what you meant
9  by second source.
10         THE WITNESS: Yes.
11         MS. BUTLER: Okay.
12         THE WITNESS: And that would cover
13 from the time the patient was admitted to
14 the very moment that I was looking at the
15 patient.
16    Q.   (By Mr. Cahillane) And would a --
17 would it be fair to say that a physician might
18 well be relying on that record, or records, in
19 making decisions as to patient care?
20    A.   Absolutely.
21    Q.   And would that be important with
22 respect to the administration of controlled
23 substances?
24    A.   Yes, it is.

**Page 30**

1  (Robert J. Kasper, M.D., stepped down from
2  the witness stand.)
3
4      MR. CAHILLANE: I should get my next
5  witness.
6      MS. BUTLER: Yes, please.
7      MR. HICKERNELL: In the meantime,
8  can we enter this as a union exhibit?
9      MS. BUTLER: Okay. What would it
10 be? Where are we up to now? I see a Union
11 21. That may be the last one.
12     MR. HICKERNELL: I think that's the
13 last one.
14
15     (Union Exhibit 22, Pharmacy
16 Department Medication Events and Adverse
17 Drug Reactions Policy, admitted)
18
19     MS. BUTLER: Let the record show
20 Union Exhibit 22 is admitted without
21 objection.
22     (Pause in proceedings)
23
24

**Page 31**

1  (Patricia Duclos-Miller, R.N., approached
2  the witness stand.)
3      MS. BUTLER: Please stand and rise
4  your right hand.
5      Do you swear, or affirm, the
6  testimony you're about to give in this
7  arbitration hearing will be the truth, the
8  whole truth, and nothing but the truth, so
9  help you God?
10     MS. DUCLOS-MILLER: I do.
11     MS. BUTLER: Thanks.
12
13 PATRICIA DUCLOS-MILLER, R.N., Witness,
14 having been duly sworn, testifies and states as
15 follows:
16
17 DIRECT EXAMINATION BY MR. CAHILLANE
18
19     Q.  Could you state your name, please?
20     A.  Patricia Duclos-Miller.
21     Q.  And what is your address?
22     A.  15 Maplewood Road in Farmington,
23 Connecticut.
24     Q.  And what is your present employment

**Page 32**

1  position?
2      A.  Director of quality improvement for
3  the Sisters of Providence Health System.
4      Q.  And could you just -- if you could,
5  briefly describe your education and what degrees
6  you hold.
7      A.  Graduate of St. Anselm College, with
8  a baccalaureate degree in nursing. Boston
9  University with a master's. And I'm certified in
10 nursing administration by the Academy.
11     Q.  And have you been a practicing
12 registered nurse?
13     A.  For over 30 years.
14     Q.  Okay. And what positions have you
15 held?
16     A.  I've been director of organizational
17 systems, director of specialty services, nurse
18 manager, staff nurse, former assistant professor
19 at various collegiate programs in the state of
20 Connecticut, and director of nursing.
21     Q.  And when were you first employed by
22 the Sisters of Providence Health System?
23     A.  December 2001.
24     Q.  And just so I'm sure that it's ever

**Page 33**

1  been on the record, but Mercy Hospital is part of
2  the Sisters --
3      A.  Correct.
4      Q.  -- of Providence Health System?
5      And what are your job duties at
6  Mercy Hospital, or Sisters of Providence Health
7  System?
8      A.  To provide resources, in
9  collaboration with quality improvement projects,
10 data management. I've lectured, worked with and
11 facilitated root cause analysis, intensive
12 investigations. I work with physicians on peer
13 review committees and facilitate all of the
14 quality improvement councils.
15     Q.  And have your duties included
16 holding in-service projects regarding proper
17 practice?
18     A.  Yes.
19     Q.  Including proper practice for
20 registered nurses and LPNs?
21     A.  Yes.
22     Q.  And are you, from your position
23 here, familiar with the standards at Mercy
24 Hospital with respect to the administration of

Page 34

1  and documentation of controlled substances?
2     A.   Yes.
3     Q.   With respect to the administration
4  of medication by a registered nurse, are you
5  familiar with something called the Five Rights?
6     A.   Yes.
7     Q.   And what are they?
8     A.   Right patient, right dose, right
9  medication, right route, right time.
10    Q.   And is this a standard which all
11 nurses -- all registered nurses have to follow?
12    A.   All nurses. All licensed nurses,
13 including licensed practical nurses.
14    Q.   Now, and I take it that those
15 standards apply for any narcotic or other
16 dangerous drug?
17    A.   That's correct. It's a fundamentals
18 of nursing, in one of your first nursing courses.
19    Q.   Now, with respect to the
20 administration of a controlled substance by a
21 registered nurse at Mercy Hospital, are you
22 familiar with where the registered nurse who
23 administers a controlled substance is supposed to
24 document that?

Page 35

1     A.   Yes.
2     Q.   And where is that?
3     A.   In the computer, in what's called
4  the MAR module of the computer.
5     Q.   And is that also referred to as the
6  SMS?
7     A.   Well, that's the -- the SMS is the
8  computer vendor that we currently utilize. The
9  MAR is a module within that computer.
10       MS. BUTLER:  But they're sometimes
11       used synonymously.
12       THE WITNESS:  Yes.
13    Q.   (By Mr. Cahillane) And is that
14 system at Mercy Hospital, is it relied upon by
15 physicians and nurses, in order to determine what
16 medications a patient has or has not received?
17    A.   That's correct.
18    Q.   Would it be inappropriate
19 practice -- well, is there also on the floor a
20 written medical record that nurses sometimes
21 make?
22    A.   Documentation in the progress notes?
23    Q.   Yes.
24    A.   Sometimes a nurse will document in

Page 36

1  the progress notes.
2     Q.   Would it be an appropriate practice
3  for a nurse administering a controlled substance
4  to document it in the nursing notes, but not in
5  the MAR?
6     A.   No, that is not the correct method.
7     Q.   Would it be appropriate for a nurse,
8  in documenting the administration of a controlled
9  substance, to not put the amount of the dosage
10 given to the patient?
11    A.   That is an improper method of
12 documentation.
13    Q.   Would it be a proper -- proper for
14 the nurse to not put the correct time at which
15 the controlled substance was administered?
16    A.   That is an improper way to document.
17    Q.   Would it be acceptable for the nurse
18 to sometimes document the administration of a
19 controlled substance in the nursing notes, but
20 not in the MAR?
21    A.   No, that is unacceptable. It is not
22 the policy or the standard.
23    Q.   Would it be an acceptable practice
24 for a nurse to -- in administering a controlled

Page 37

1  substance, to take out additional medication
2  ahead of time, in anticipation that there might
3  be in the future an increase in the dosage for
4  the patient?
5     A.   No. That is improper.
6     Q.   If a patient were receiving a
7  controlled substance by means of a drip, an IV
8  drip, and the physician ordered the drip
9  discontinued, would it be appropriate for the
10 nurse to later -- who later has an order for an
11 IV push for a dose of that drug, to use the
12 discontinued drip?
13    A.   No. That is an incorrect and
14 improper method.
15    Q.   And would it be fair to say that a
16 registered nurse would be obligated to follow the
17 physician's order with respect to that drip?
18    A.   That is correct. The physician's
19 order said "IV push."
20    Q.   Would it be appropriate for a nurse
21 to have a different standard of documentation
22 with respect to the administration of a
23 controlled substance for a patient who was a DNR?
24    A.   No. There should be no difference

10 (Pages 34 to 37)

Page 38

1  in standard.
2      Q.   Are you familiar with there being
3  such a practice or standard at Mercy Hospital?
4      A.   No.
5          MR. CAHILLANE: That's all.
6          MS. BUTLER: You have to answer for
7  the record. Your answer was?
8          THE WITNESS: No.
9          MS. BUTLER: Okay.
10         Your witness, Mr. Hickernell.
11         MR. HICKERNELL: Just have a
12 two-minute break?
13         MS. BUTLER: Two-minute break.
14         (Pause in proceedings)
15         MR. CAHILLANE: I do have one other
16 question that I forgot to ask, if I may.
17         MS. BUTLER: Okay. Back on the
18 record. An afterthought type question.
19     Q.   (By Mr. Cahillane) Ms. Duclos, if a
20 registered nurse has, for whatever reason,
21 withdrawn more narcotic than what is prescribed
22 and in fact only gives what is prescribed, what
23 is the standard of practice as to what she does
24 with the additional narcotic?

Page 39

1      A.   The additional narcotic --
2      Q.   Or controlled substance.
3      A.   -- controlled substance needs to be
4  wasted, and that needs to be countersigned by
5  another registered nurse.
6          MR. CAHILLANE: That's all.
7          MR. HICKERNELL: All set for cross?
8          MS. BUTLER: Okay. Yes, go ahead.
9
10         CROSS-EXAMINATION BY MR. HICKERNELL:
11
12     Q.   Good morning.
13         Where is your current place of work?
14     A.   Here. My office is here, but I work
15 for the Sisters of Providence Health System, of
16 which Mercy Medical Center is part of that
17 system.
18     Q.   And, as a director of quality
19 improvement for the system, are you responsible
20 for other hospitals as well?
21     A.   Providence, which is considered part
22 of Mercy Medical Center. I'm a resource to the
23 long-term care facilities, which are part of the
24 health system, and the home care agency,

Page 40

1  Community Home Care, Incorporated.
2      Q.   Are you here every day of the week,
3  or are you --
4      A.   Yes, I am. Unless I go out to
5  meetings off-site.
6      Q.   And how often do you do that?
7      A.   Probably twice a month, over to
8  Providence.
9      Q.   And you sort of went through,
10 briefly, your resume as a practicing registered
11 nurse. Where did you work as a staff nurse?
12     A.   Newton Wellesley Hospital, in
13 Massachusetts. New Britain General in New
14 Britain, Connecticut. Bristol Hospital in
15 Bristol, Connecticut. And John Dempsey Hospital
16 in Farmington, Connecticut.
17     Q.   And when you were a nurse manager,
18 where did you practice?
19     A.   Bristol Hospital.
20         MR. HICKERNELL: That's all the
21 questions I have. Thank you.
22         MR. CAHILLANE: Just with respect to
23 her background, I do have one question.
24         MS. BUTLER: Mm-hmm.

Page 41

1          REDIRECT EXAMINATION BY MR. CAHILLANE:
2
3      Q.   Do you hold any leadership positions
4  in nursing?
5      A.   Yes, I do. I'm currently the
6  president of the Connecticut Nurses Association.
7          MR. CAHILLANE: Okay.
8          MS. BUTLER: The equivalent of the
9  Massachusetts Nursing Association?
10         THE WITNESS: No. The Massachusetts
11 Nursing Association --
12         MS. BUTLER: Which is a union.
13         THE WITNESS: That's right. They --
14         MS. BUTLER: So that's why I was
15 wondering.
16         THE WITNESS: They separated from
17 the American Nurses Organization, which is
18 the national organization. Each of the
19 states belong to the national organization,
20 but Massachusetts and California no longer
21 belong to the American Nurses Association.
22         MS. BUTLER: Okay. I guess what I
23 was confused about was whether the
24 organization that you're president of is

Page 66

1 bottle except where your IV tubing goes in. So
2 she would have had to disconnect, keep this --
3 focus on keeping this totally sterile, which is
4 hard. Alcohol your top of the bottle anytime
5 you're going to reconnect or add something.
6 Excuse me. With the needle. Take alcohol to
7 clean it.
8     Put your needle in and deliver it.
9 Let the medicine go in, in this case the 18 cc's
10 of volume. She had 18 milligrams of the drug.
11 Let it all go in there. Disconnect.
12     Which I'll just insert -- say, at
13 this point, that we try to get out of using
14 needles here whenever possible. And, in this
15 case, by doing it this way, you would have to use
16 the needle. And it's just general nursing
17 practice nowadays, you try to avoid using
18 needles, at whatever cost, because of sticks. So
19 you cap off the needle so no one else sticks
20 themselves.
21     So you added the medication. Then
22 you would have to take this spike, which is the
23 end of the -- one -- the other end of your IV
24 tubing, and reinsert it into the bottle. And

Page 67

1 that just is a basic principle of nursing, that
2 you don't ever want to spike and respike, for
3 infection control purposes.
4     And then hang the bottle up and
5 leave it there. And it's unused, so I'm baffled
6 by why you added medication when you were --
7 according to Nancy's testimony, there was already
8 enough in there. But -- so she added the
9 medication, and it just stayed there, unused.
10   Q.   Well, let me ask you. I mean, in
11 terms of -- at least from -- from the record and
12 from the prescription that was given, is there
13 any apparent purpose for adding 18 milligrams to
14 that bottle?
15   A.   No apparent purpose because the
16 order was already DC'd, so it shouldn't have been
17 used in the first place. Plus, if she did
18 administer the controlled -- the Ativan in this
19 method, she documented in the computer already
20 that she gave it at 8:00 and at 12:00. So as far
21 as her accountability, her record of
22 administration, it was already there. So there
23 is no -- in my mind, any purpose why she would
24 take it out and then add it to something that's

Page 68

1 not even being used.
2   Q.   Okay. I think that's all with
3 respect to the IV.
4     With respect to documentation, when
5 the nurse has administered Ativan or morphine or
6 any controlled substance, she's supposed to
7 document it where?
8   A.   I'm sorry, can you repeat the
9 question.
10   Q.   When the nurse has administered any
11 controlled substance, she's supposed to document
12 it where?
13   A.   In the computer, in the medication
14 administration record.
15   Q.   Okay. And with respect to that
16 computerized record, is there any part of that
17 record that the nurses, and possibly physicians,
18 would be relying on during their shift, in order
19 to see what the patient has or should get?
20   A.   Yes. There's, actually, two pieces.
21 As Dr. Kasper pointed out, there is the
22 medication administration record, which gets
23 printed out during the night shift. And that is
24 everything that's received, for example,

Page 69

1 yesterday. It gets printed out last night, in
2 the middle of the night. The secretary or nurse
3 will file it in the chart. So physicians and
4 nurses can look at that medication administration
5 record to see everything the patient received
6 yesterday.
7     Now, as far as for today, there's
8 two ways that a nurse will look up what's
9 happening today. One, they can use that
10 medication administration schedule. And that's,
11 actually, kind of our -- the nurse coming on,
12 that's their bible of what meds the patient is
13 doing. And I shouldn't use the word "bible."
14 Their schedule of drugs: When the patient --
15 what the patient is on and when they're due. And
16 also on that med administration schedule is what
17 the patient most recently received, by the
18 previous shift.
19     MS. BUTLER:  So the med
20 administration schedule --
21     THE WITNESS:  Yes.
22     MS. BUTLER:  -- is synonymous with
23 what we've sometimes called the flowchart?
24 Or not.

18 (Pages 66 to 69)

Page 70

1  THE WITNESS: No. We have the
2  bedside flowchart, which in the ICU we use
3  to document all our active, current vital
4  signs, etc. Our assessment findings. So
5  that's a bedside chart. And I know that
6  confused you in the past. No, it's not
7  always kept at the bedside. It's kept on a
8  clipboard. So sometimes it's at the
9  nurses' station, but many times the nurse
10 carries that yellow flowsheet into the room
11 to document things. Okay.
12     MS. BUTLER: Now, there's --
13 medication administration schedule is what?
14 And what does that look like?
15 Q.  (By Mr. Cahillane) Well, did you
16 procure an example of one of these?
17 A.  Yes. I took one -- printed one out.
18 Q.  I'd ask if you can identify that
19 as --
20 A.  Yes. This is a medication --
21 Q.  -- as an example of --
22 A.  -- administration schedule.
23 Q.  And --
24     MS. BUTLER: Well, I'm --

Page 71

1      MR. CAHILLANE: Yes, I'd like to
2  enter that as a hospital exhibit.
3      MS. BUTLER: Hospital 17, perhaps?
4      MR. CAHILLANE: Yes, I believe that
5  would be it.
6      MS. BUTLER: Okay. We're
7  identifying this exhibit as Hospital No.
8  17. And this is something called the
9  medication administration schedule. Shall
10 we call it the MAS?
11     THE WITNESS: Yes.
12
13     (Hospital Exhibit 17, medication
14 administration schedule, marked for
15 identification)
16
17 Q.  (By Mr. Cahillane) And is that, in
18 fact, what it's referred to as, the MAS?
19 A.  Yes. Nurses usually call it their
20 med sheet.
21 Q.  And this med sheet is printed out
22 from the computer.
23 A.  That is printed out from the
24 computer -- usually by the secretary, if there's

Page 72

1  a secretary, or the nurse will have to print it
2  out -- within the first hour of their shift. So,
3  for example, I'm working days today at 7 a.m.
4  Between 7:00 and 8:00 myself or the secretary
5  will print out my med sheet, my medication
6  administration schedule, for me for my shift. So
7  I will know everything the patient is due. Like
8  on page 1 of that it shows all the drugs, the
9  dosages, when it was started. And, also, in this
10 example, where it says date, June 12th, it shows
11 the times that the patient is due for them. So,
12 in this case, these are routine orders, scheduled
13 drugs. And page 2 also has some more scheduled
14 drugs.
15     Page 3 has the PRN order. And, in
16 this case, many of the examples we are referring
17 to are PRN orders.
18 Q.  And I take it that the accuracy of
19 the information on this MAS is dependent upon the
20 accuracy of the information that has been put
21 into the MAR computer.
22 A.  One hundred -- totally. Right.
23     MS. BUTLER: Remind me again what
24 "PRN" stands for.

Page 73

1      THE WITNESS: "PRN" stands for
2  medications that are ordered by the doc
3  that are given by the nurse only when the
4  patient needs them, according to certain
5  parameters.
6      MS. BUTLER: "Per required" --
7      THE WITNESS: Or "per RN," I've
8  always assumed. I'm not really sure. A
9  lot of these are Italian terms. The nurse
10 makes the -- Italian, sorry. Latin.
11     MS. BUTLER: PRN -- well, just so it
12 can stick in my unmedical mind, per patient
13 request?
14     THE WITNESS: Sometimes it's
15 request. Sometimes it's a need that the
16 nurse determines. For example, a
17 medication like -- we'll use this page.
18 Page 3, the second one down, is the
19 lorazepam, the Ativan. Or if we look at
20 the third one down, Ativan. It's
21 .5 milligrams P.O., by mouth, every four
22 hours PRN. And it says down at the bottom
23 there, "for anxiety." So, in other words,
24 if someone is not anxious, we're going not

19 (Pages 70 to 73)

4

Tuesday, August 20, 2002
Nancy Dufault placed on administrative leave pending investigation of narcotic discrepancies.

Tuesday, August 27, 2002 10:00 a.m.
Meeting – Mary Brown, Director of Med/Surg Nursing, Jean D'Espinosa, RN, Nurse Manager, Nancy Dufault, RN, ICU, Mona Karkut, RN, OR, MNA Representative

Mary Brown explained the purpose of the meeting. Review discrepancies between omnicell controlled substance report and medical record documentation. Meeting to give Nancy Dufault an opportunity to explain findings.

Report used: Omnicell Transaction by User
User Name: Nancy Dufault. Date range of report 4/1/02 12 a.m. through 8/21/02 12 Noon.
Five (5) cases were presented to Nancy Dufault.

1. Omnicell Report
   6/19/02 6:28 p.m.  2 each Lorazepam 20 mg/10ml R            , P
   6/19/02 6:28 p.m.  10 each Lorazepam 20 mg/10ml R           , P
   6/19/02 6:28 p.m.  4 each Lorazepam 20 mg/10ml R            , P
   Total of 320 mg of Lorazepam withdrawn by Nancy Dufault,
   ICU Flowsheet 6/19/02 to 6/21/02 -- P        R            shows patient receiving 25 mg/hr – documented by Nancy Dufault.
   IV administration record 6/19/02, 6/20/02 – no documentation of IV ativan.
   Issues:  Lack of documentation in patient's medication record.
            Mixing of additional IV solutions in advance – question of controlled substance
            Loss of revenue due to pharmacy charges from medication record.
   Explanation by Nancy Dufault: "I gave the drug – just didn't chart it"

2. Omnicell Report
   7/15/02  11:51 p.m.  1 each Lorazepam 2mg  B       , B
   7/16/02  12:19 a.m.  1 each Morphine Sulfate 4 mg  B       , B
     withdrawn by Nancy Dufault
   7/15/02  10:01 p.m.  1 each Lorazepam 2 mg  B       , B
   7/16/02  12:52 a.m.  2 each Lorazepam 2 mg  B       , B
     withdrawn by Tawnia Iwasinski

Issue: Tawnia was on orientation working with Nancy Dufault (preceptor). Tawnia documented the medications she had removed from the omnicell. No documentation of medications withdrawn by Nancy.
Response: Nancy stated, medications were given; it was "equal to the dose ordered." Nancy thought the orientee would chart.

Omnicell Report
   7/17/02  7:42 p.m.  1 each Lorazepam 2 mg  B       , B
     withdrawn by Nancy Dufault.
   7/17/02  8:12 p.m.  2 each Lorazepam 2 mg  B       , B
   7/17/02  8:34 p.m.  1 each Morphine 4 mg  B       , B
     withdrawn by Michelle Lund (assigned to the patient)
IV administration record shows medications withdrawn by Michelle Lund are charted.
Medication withdrawn by Nancy Dufault is not charted in the record or on the flowsheet.
Issue: was the medication administered? If it was administered – physician order was for Lorazepam 2 – 4 mg q 2 hours prn - patient would have received 6 mg within 30 minutes.
Response: Nancy stated, "have no answer for that."

Nancy Dufault
Page 2

3. Omnicell Report
   7/17/02  3:46 a.m.  2 each Lorazepam 2 mg   B       , B
   7/17/02  4:03 a.m.  1 each Morphine 4 mg    B       , B
   withdrawn by Tawnia Iwasinski (orientee working with Nancy Dufault).
   7/17/02  4:26 a.m.  2 each Lorazepam 2mg    B       , B
   7/17/02  4:26 a.m.  1 each Morphine 4 mg    B       , B
   withdrawn by Nancy Dufault.

Issue: Medication administration record shows documentation of medications by Tawnia Iwasinski. No documentation of medications withdrawn by Nancy Dufault.
Response: Nancy states, "I guess I didn't chart it....bad documentation on my part."

4. Omnicell Report
   6/21/02  2:25 a.m.  3 each Lorazepam 2 mg   R       ., P
   6/21/02  2:26 a.m.  3 each Lorazepam 2 mg   R       ., P
   6/21/02  2:27 a.m.  3 each Lorazepam 2 mg   R       ., P
   Total of 18 mg Lorazepam withdrawn in 3 minutes by Nancy Dufault.

   IV administration record 6/20/02 and 6/21/02 shows:
       Lorazepam (no dose noted) administered 2000 (8 p.m.)
       Lorazepam (no dose noted) administered 0001 (12:01 a.m.)
       Lorazepam (no dose noted) administered 0430 (4:30 a.m.)

Issue: How could Lorazepam have been administered to the patient at 8 p.m. and 12 Midnight if it was not removed until 2:30 a.m.?
Response: Nancy – "I bolused through the IV drip...used '999' to bolus at 8, 12 and 4:30...then used the 18mg to replace the IV".

5. Omnicell Report
   5/21/02  8:09 p.m.   1 each Lorazepam 2 mg   G       , M
   5/22/02  11:42 p.m.  1 each Lorazepam 2 mg   G       ., M
   5/23/02  9:53 p.m.   1 each Lorazepam 2 mg   G       , M
   5/29/02  11:26 p.m.  1 each Lorazepam 2 mg   G       ., M
   5/30/02  11:25 p.m.  1 each Lorazepam 2 mg   G       ., M

Issue: Order was for 1 mg. Wasted Lorazepam not witnessed by second RN in all cases.
Response: Nancy, "I guess I need to get better about checking my 'waste'."

*Mary Brown, RN* (signed)
Mary Brown, RN
Director of Medical/Surgical Nursing

*Jean D'Espinosa, RN* (signed)
Jean D'Espinosa, RN
Nurse Manager ICU/CCU/IMC

Rose Garvey Room
Present: Mary Brown, Jean D'Espinosa, Nancy Dufault, Dave Powers and Anne Marie Smith.

Conversation began at 11:00 a.m. on August 29th.

Mary Brown: "We received several scenarios and found discrepancies between the Omnicell and the MAR". "We discussed these with you and identified different types. From that meeting some remain unclear."

**Scenario # 1:**

Mary Brown: "The one I presented that was most concerning was regarding P      R.
In this case you took Ativan out of the omnicell at 2:25 a.m., 2:26 a.m. and 2:27 a.m. Each time you took out three (3) amps of 2 mg each totaling 18 mg within 2 minutes. You charted these drugs at 8p.m., 12 a.m., and 4 a.m. Do you remember?"

Nancy Dufault: "Yes I remember."

Mary Brown: "You went on to tell us this was possible because what you had done was given 6 mg boluses through the IV drip of Ativan that was infusing at the documented times. You then went to Omnicell @ 2:25 a.m. to retrieve the Ativan so you could return the drug to the IV bag that was infusing. Is this right?"

Nancy Dufault: "Absolutely, that is what I said. I specifically remember that night and doing that."

Mary Brown: "Well the problem is this cannot be true. The Ativan drip had been discontinued that morning; there was no drip when you came on."

Nancy Dufault: After much thought – "I have no answer, I cannot recall that", "I really think that is what I did."


**Scenario #2:**
Mary Brown: "Another incident is regarding Morphine – where you removed it later and charted it earlier.
1. On May 4, 2002 – R      V
   "You removed 4 morphine @ 6:20 a.m. and the documentation shows you gave it at 2:00 a.m. There is no other morphine removed for that patient that can account for it."

2. On May 7th – R       V
   "You took out 4 mg of morphine at 1:14 a.m. per omnicell reports. You then charted the dose at 12:02 a.m."
   "Again, same patient – you took out morphine 4 mg:
   a. at 3:23 a.m. and documented it @ 2:00 a.m
   b. at 4:39 a.m. and documented it @ 4:00 a.m.

Mary Brown: "Numerous times this occurs where the documentation is earlier than the drug was removed from omnicell. You are also not documenting the <u>dose</u> you give."

Nancy Dufault: "Those times I charted it later; I just probably charted it wrong on SMS."

Nancy Dufault
Page 2

**Scenario #3:**
Mary Brown: The following are all on Isgro. You took out on May 14th the following:

1. 11:41 p.m. – 2 mg morphine – not charted at all.
2. 1:39 a.m. – 4 mg morphine – not charted at all.
3. 1:46 a.m. – 10 mg morphine – not charted at all.

"The question is why did you take out so much morphine and not chart them. Also, this patient did not even have this amount order."

Nancy Dufault: "Well, I cannot explain this – my documentation must be off – I'll get better."

Mary Brown: "Nancy, it is more than documentation, we have listed quite a variety of discrepancies which you do not have an answer for."

*Jean D'Espinosa RN*
Jean D'Espinosa, RN
Nurse Manager ICU/CCU/IMC


JD/am